## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| AMEGY BANK OF TEXAS, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | |
| | § | CIVIL ACTION NO. 3:20-cv-00375-N |
| CGI FRANCHISE SYSTEMS, INC.; | § | |
| ROGER MACDONELL; and | § | |
| SHARON MACDONELL, | § | |
| | § | |
| *Defendants.* | § | |

## SHARON MACDONELL'S APPENDIX IN SUPPORT OF
## RESPONSE TO DEFENDANTS ROGER MACDONELL AND CGIFSI'S
## <u>MOTION FOR SUMMARY JUDGMENT</u>

Defendant Sharon MacDonell files this Appendix in Support of her Response to Motion for Summary Judgment and Brief in Support of the Response, filed concurrently with this Appendix, and incorporates by reference the attached exhibits contained in this Appendix in her Response to Motion for Summary Judgment and Brief in Support for all purposes.

| Exhibit No. | Description |
|:---:|:---|
| **1** | Declaration of Sharon MacDonell  (S.APP_3) |
| A | CGIFSI Accounting Spreadsheet  (S.APP_6) |
| B | Wells Fargo Bank Statement  (S.APP_9) |
| C | Email string between Sharon MacDonell and Roger MacDonell (S.APP_12) |
| **2** | Declaration of Jerome Boursican  (S.APP_21) |

S.APP_1

| A | Judgment of the Court of Appeal of AIX EN PROVENCE of October 25, 2016  (S.APP_29) |
|---|---|
| B | English translation of Judgment of the Court of Appeal of AIX EN PROVENCE of October 25, 2016  (S.APP_46) |
| C | Judgment of the Court of Appeal of AIX EN PROVENCE of November 29, 2016  (S.APP_62) |
| D | English translation of Judgment of the Court of Appeal of AIX EN PROVENCE of November 29, 2016  (S.APP_89) |
| E | Order of the Superior Court of the County of San Mateo of 28 July 2016 (S.APP_116) |
| F | French decision  (S.APP_120) |
| G | English translation of French decision  (S.APP_123) |
| H | Order of Injunction of February 11, 2021  (S.APP_126) |
| I | English translation of Order of Injunction of February 11, 2021 (S.APP_129) |

Dated:  June 1, 2021

Respectfully submitted,


_____*/s/ Kelli M. Hinson*_____
**KELLI M. HINSON**
  Texas State Bar No. 00793956
  Email:  khinson@ccsb.com
**SVEN STRICKER**
  Texas State Bar No. 24110418
  Email:  sstricker@ccsb.com
**CARRINGTON, COLEMAN, SLOMAN**
  **& BLUMENTHAL, L.L.P.**
901 Main Street, Suite 5500
Dallas, Texas 75202-3767
214/855-3000 (phone)
214/580-2641 (fax)


*Attorneys for Defendant*
*Sharon MacDonell*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| AMEGY BANK OF TEXAS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| | § | CIVIL ACTION NO. 3:20-cv-00375-N |
| CGI FRANCHISE SYSTEMS, INC.; | § | |
| ROGER MACDONELL; and | § | |
| SHARON MACDONELL, | § | |
| | § | |
| Defendants. | § | |

## DECLARATION OF SHARON MACDONELL

1.     My name is Sharon MacDonell. I am over the age of twenty-one (21) years, am of sound mind, and am capable of making this declaration. The facts stated herein are within my personal knowledge and are true and correct.

2.     On October 3, 1992, I married Roger MacDonell in the State of California.

3.     In September 2006, Roger, I, and our four children moved to France.

4.     On or about September 24, 2010, Roger initiated divorce proceedings against me in France ("French Divorce Case").

5.     Upon information and belief, I have learned that during the pendency of the French Divorce Case, Roger failed and/or refused to take most of the distributions owed to him from CGIFSI in an effort to conceal the money owed to him and that that money, or a substantial part of it, remains in CGIFSI's account in Amegy Bank. Exhibit A to this Affidavit is a CGIFSI Accounting Spreadsheet of Distributions to Roger MacDonell and David Kiger, that was produced counsel for Worldwide Express in the Texas state court lawsuit between myself and

# EXHIBIT 1

Roger (Cause No. DC-18-02517). Upon information and belief, as of September 14, 2017, there remained a balance in the Amegy Account owed to Roger in the amount of $4,879,893.86. Roger did not disclose the fact that this amount was being held in the CGIFSI account at Amegy Bank and was owed to him either to me or the Court in the French Divorce Case.

6.    Roger has failed to disclose and/or accurately disclose financial information to the French Court and has failed to cooperate in the division of property proceedings in the French Court, which has resulted in this divorce case continuing on for over 10 years.

7.    Since the divorce, Roger has engaged in a pattern of behavior designed to hide money from me and the French Divorce Court. As just one example, Roger sold Shipping Solutions, LP in August of 2019 (which the French Divorce Court has ruled is community property). Attached as Exhibit B is a true and correct copy of a bank statement I received through a federal subpoena to Wells Fargo. The account statement reflects that on August 5, 2019 SHIPPING LOGISTICS, LLC wired Shipping Solutions, LP the sale proceeds of over $10 million. The next day, August 6, 2019, Roger wired the bulk of these proceeds to himself personally in Monaco at CFM Indosuez Wealth Bank. Our companies have no business in Monaco and there is no reason for him to move these monies offshore except to put them out of my reach. Roger agreed before the sale to hold 50% of the proceeds of the sale pending resolution of the community estate. But to date, he still refuses to tell me where he has put this money. Attached as Exhibit C is an email string in which I have repeatedly asked Roger to tell me where the sale proceeds are. He has refused to respond.

8.    I am extremely concerned that, if Roger is allowed to move the disputed funds out of the Amegy Account, I will never see that money again.

My name is *Sharon MacDonell* my date of birth is *10/27/1964*, and my address is *13153 Robles Dr. Auburn CA 95602* __[can be business address]__. I declare under penalty of perjury that the foregoing is true and correct.

Signed in [location] *CA* on the *1st* day of May, 2021.

**EXHIBIT A**

| | 8/31/2010 | 11/17/2010 | 5/2/2011 | 8/1/2011 | 11/1/2011 | 1/31/2012 | 4/30/2012 | 7/31/2012 | ######## | 1/31/2013 | 4/4/2013 | 5/1/2013 | 6/20/2013 | 8/1/2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Received | 513,246.58 | 489,675.88 | 27,862.34 | 29,012.20 | 29,231.58 | 29,425.50 | 63,207.43 | 65,174.79 | 75,629.41 | 76,079.79 | 127,116.00 | 74,103.52 | 1,153,126.60 | 12,025,056.49 |
| Kiger | 277,153.15 | 264,424.98 | 15,045.66 | 15,666.59 | 15,785.05 | 15,889.77 | 34,132.01 | 35,194.39 | 40,839.88 | 41,083.09 | 68,642.64 | 40,015.90 | 622,688.36 | 6,493,530.50 |
| MacDonnel | 236,093.43 | 225,250.90 | 12,816.68 | 13,345.61 | 13,446.53 | 13,535.73 | 29,075.42 | 29,980.40 | 34,789.53 | 34,996.70 | 58,473.36 | 34,087.62 | 530,438.24 | 5,531,525.99 |
| | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Paid | | | | | | | | | | | | | | |
| Kiger | 277,150.00 | 259,000.00 | 14,767.04 | 15,376.46 | 15,492.71 | 15,595.51 | 33,500.00 | 34,542.63 | 40,083.57 | 40,322.21 | 67,371.44 | 39,274.85 | 611,157.00 | 5,686,879.58 |
| MacDonnel | - | - | - | - | - | - | - | - | - | - | - | - | - | 3,500,000.00 |
| | | | | | | | | | | | | | | |
| Stock Purchase | | | | | | | | | | | | | | |
| Agreement | | | | | | | | | | | | | | (1,029,999.85) |
| | | | | | | | | | | | | | | 1,029,999.85 |
| Due To/From | | | | | | | | | | | | | | |
| Kiger | 3.15 | 5,424.98 | 278.62 | 290.13 | 292.34 | 294.26 | 632.01 | 651.76 | 756.31 | 760.88 | 1,271.20 | 741.05 | 11,531.36 | (223,348.93) |
| MacDonnel | 236,093.43 | 225,250.90 | 12,816.68 | 13,345.61 | 13,446.53 | 13,535.73 | 29,075.42 | 29,980.40 | 34,789.53 | 34,996.70 | 58,473.36 | 34,087.62 | 530,438.24 | 3,061,525.84 |

manual deposit with memo "deposit to open account"
Based on Rob Rose research we believe this to be refund from Texas for overpayment of TXFR prior to 2010

manual deposit with memo "David Kiger - on hold per Jim Bloodgood"
Email from this time frame leads us to believe this is also refund of overpaid TXFR from prior to 2010

Per the Stock Purchase agreement dated 7/31/13, Kiger was to pay MacDonnel. This was done through the distributions of the $12M proceeds.

= Interest paid by WWEX to BGI (not reported as income on CGI tax returns)
= Funds manually deposited into CGI account at Amegy bank.
= Funds received from WWEX quazi-quarterly, not reported as distributions on K-1s.  We don't know the nature of these receipts.
= Cash received from the restructure
= Reported as distributions on K-1s from WWEX Investment Holdings, LLC
= Funds received from Quad-C Management during 2017.  No K-1 available yet to determine if reported as distributions.



**EXHIBIT 3**



| 4/23/2014 | 8/1/2014 | 1/23/2015 | 3/15/2016 | 2/3/2017 | 3/23/2017 | 4/18/2017 | 9/14/2017 | 9/14/2017 | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 109,266.89 | 699,308.08 | 99,707.00 | 170,651.70 | 18,090,733.10 | 208,954.23 | 2,944.55 | 76,739.13 | 309,580.34 | 34,545,833.13 | |
| 59,004.12 | 377,626.36 | 72,516.90 | 124,114.98 | 18,042,151.32 | 151,972.41 | 2,141.57 | 76,739.13 | 309,580.34 | 27,195,939.12 | |
| 50,262.77 | 321,681.72 | 27,190.10 | 46,536.72 | 48,581.78 | 56,981.82 | 802.98 | | | 7,349,894.01 | |
| - | - | - | - | 0.00 | - | | | | | |
| | | | | | | | | | | |
| 59,004.12 | 508,606.77 | - | 92,151.92 | 18,090,733.10 | - | | | - | 25,901,008.91 | |
| - | - | - | - | - | - | | | - | 3,500,000.00 | |
| | | | | | | | | | | |
| | | | | | | | | | (1,029,999.85) | |
| | | | | | | | | | 1,029,999.85 | |
| | | | | | | | | | | |
| 0.00 | (130,980.41) | 72,516.90 | 31,963.06 | (48,581.78) | 151,972.41 | 2,141.57 | 76,739.13 | 309,580.34 | 264,930.36 | |
| 50,262.77 | 321,681.72 | 27,190.10 | 46,536.72 | 48,581.78 | 56,981.82 | 802.98 | - | - | 4,879,893.86 | |
| | | | | | | | | | 5,144,824.22 | |
| | | | | | | | | | (66,765.61) | 2/7/11 Wire to BNF WWEX |
| | | | | | | | | | (2,135.00) | 3/16/15 Wire to WWEX |
| | | | | | | | | | (2,950.00) | 6/1/15 Wire to BNF WWEX |
| | | | | | | | | | (658.00) | Bank Fees |
| | | | | | | | | | (80.00) | Licenses & Fees |
| | | | | | | | | | (50.40) | Office Supplies (checks) |
| | | | | | | | | | 5,072,185.21 | |
| | | | | | | | | | 5,072,185.21 | Bank Balance |

Per Steve Block - 100% of cash escrow received should go to Kiger

Manual deposit with memo "check #3283" We believe this to be a final payment of overpaid TXFR from before 2010. Split 54%/46%

Release of escrow from 2013 transaction - 54%/46% ownership

Per conversation with Steve Block - The $48,581.78 was sale of a fractional share owned by MacDonnel. The $18M was sale of 100% of the shares beneficially owned by CGI for Kiger. MacDonnel rolled over all of his into the acquiring company.

Cash activity not recorded

Allocation of Cash Activity Not Recorded

| | Total | Kiger | MacDonnel |
|---|---|---|---|
| Pre 2013 | 67,202.61 | 36,289.41 | 30,913.20 |
| Post 2013 | 5,436.40 | 3,953.89 | 1,482.51 |
| | 72,639.01 | 40,243.30 | 32,395.71 |

| Totals Due | | | |
|---|---|---|---|
| Kiger | 264,930.36 | (40,243.30) | 224,687.06 |
| MacDonnel | 4,879,893.86 | (32,395.71) | 4,847,498.15 |
| | 5,072,185.21 | | Bank Balance |

EXHIBIT 3

**EXHIBIT B**

# Platinum Business Checking

August 31, 2019 ▪ Page 1 of 6



SHIPPING SOLUTIONS, L.P.
2107 N 1ST ST STE 370
SAN JOSE CA 95131-2026

### Questions?

*Available by phone 24 hours a day, 7 days a week:*
Telecommunications Relay Services calls accepted
**1-800-CALL-WELLS** (1-800-225-5935)

*TTY:* 1-800-877-4833
*En español:* 1-877-337-7454

*Online:* wellsfargo.com/biz

*Write:* Wells Fargo Bank, N.A. (114)
P.O. Box 6995
Portland, OR 97228-6995

## Your Business and Wells Fargo

Since August 2003, the Wells Fargo/Gallup Small Business Index has surveyed small business owners on current and future perceptions of their business financial situation. View the latest results at wellsfargoworks.com.

## Account options

*A check mark in the box indicates you have these convenient services with your account(s). Go to wellsfargo.com/biz or call the number above if you have questions or if you would like to add new services.*

| | |
|---|---|
| Business Online Banking | ✓ |
| Online Statements | ✓ |
| Business Bill Pay | ☐ |
| Business Spending Report | ✓ |
| Overdraft Protection | ☐ |

## Activity summary

| | |
|---|---|
| Beginning balance on 8/1 | $0.00 |
| Deposits/Credits | 10,297,981.45 |
| Withdrawals/Debits | - 9,670,288.83 |
| **Ending balance on 8/31** | **$627,692.62** |
| Average ledger balance this period | $1,038,977.92 |

Account number:

**SHIPPING SOLUTIONS, L.P.**

*California account terms and conditions apply*

For Direct Deposit use
Routing Number (RTN):

For Wire Transfers use
Routing Number (RTN):

### Overdraft Protection

This account is not currently covered by Overdraft Protection. If you would like more information regarding Overdraft Protection and eligibility requirements please call the number listed on your statement or visit your Wells Fargo store.

August 31, 2019  ▪  Page 2 of 6



## Interest summary

| | |
|---|---|
| Interest paid this statement | $44.12 |
| Average collected balance | $1,038,977.92 |
| Annual percentage yield earned | 0.05% |
| Interest earned this statement period | $44.12 |
| Interest paid this year | $44.12 |

## Transaction history

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|---|---|---|---|---|---|
| 8/1 | | Online Transfer From Shipping Solutions, L.P. Business Checking xxxxxx Ref #Ib06Mb2M7C on 08/01/19 | 250.00 | | 250.00 |
| 8/5 | | WT Fed#09225 Jpmorgan Chase Ban /Org=Smb Shipping Logistics, LLC Srf# 1005700217Jo Trn#190805056728 Rfb# Als of 19/08/05 | 10,051,143.74 | | |
| 8/5 | | Online Transfer From Shipping Solutions, L.P. Business Checking xxxxxx Ref #Ib06Mmqxns on 08/02/19 | 217,608.67 | | |
| 8/5 | | Online Transfer From Shipping Solutions, L.P. Business Checking xxxxxx Ref #Ib06Mqtlns on 08/03/19 | 28,933.70 | | |
| 8/5 | | Online Transfer to Shipping Solutions, L.P. Business Checking xxxxxx Ref #Ib06Mxc9Qy on 08/05/19 | | 12,273.37 | 10,285,662.74 |
| 8/6 | | Wire Trans Svc Charge - Sequence: 190806100910 Srf# Trn#190806100910 Rfb# | | 45.00 | |
| 8/6 | | Wire Trans Svc Charge - Sequence: 190806104934 Srf# Trn#190806104934 Rfb# | | 30.00 | |
| 8/6 | | Wire Trans Svc Charge - Sequence: 190806123975 Srf# Trn#190806123975 Rfb# | | 30.00 | |
| 8/6 | | Wire Trans Svc Charge - Sequence: 190806136010 Srf# Trn#190806136010 Rfb# | | 30.00 | |
| 8/6 | | Wire Trans Svc Charge - Sequence: 190806136045 Srf# Trn#190806136045 Rfb# | | 30.00 | |
| 8/6 | | Wire Trans Svc Charge - Sequence: 190806139130 Srf# Trn#190806139130 Rfb# | | 30.00 | |
| 8/6 | | WT Fed#00460 Cfm Indosuez Wealt /Ftr/Bnf=Roger Macdonell Srf# Trn#190806100910 Rfb# | | 7,200,000.00 | |
| 8/6 | | WT Fed#00912 Bank of America, N /Fb/Bnf=Michael Joyce Srf# Trn#190806104934 Rfb# | | 428,559.88 | |
| 8/6 | | WT Fed#02631 Western Alliance Ba /Ftr/Bnf=Sweeney Mason Wilson and Bosomworth Srf# Trn#190806123975 Rfb# | | 36,372.96 | |
| 8/6 | | Withdrawal Made In A Branch/Store | | 15.00 | |
| 8/6 | | WT Fed#03784 Boston Private Ban /Fbr/Bnf=Farbstein and Blackman, Apc. Srf# Trn#190806136010 Rfb# | | 28,310.17 | |
| 8/6 | | WT Fed#03788 Texas Capital Bank /Ftr/Bnf=Hallett and Perrin, P.C. Srf# Trn#190806136045 Rfb# | | 20,209.83 | |
| 8/6 | | WT Fed#04998 First Republic Ban /Ftr/Bnf=Mclean Gleason, LLP Srf# Trn#190806139130 Rfb# | | 117,943.39 | |
| 8/6 | < | Business to Business ACH Debit - Intuit Verifybank 190806 Shipping Solutions, Lp | | 0.42 | |
| 8/6 | | The Calderwood G Sale 190806 Lp Shipping Solutions | | 27,450.00 | |
| 8/6 | 2004 | Check | | 4,453.38 | 2,421,152.71 |
| 8/7 | | Wire Trans Svc Charge - Sequence: 190807104008 Srf# Trn#190807104008 Rfb# | | 30.00 | |
| 8/7 | 2001 | Deposited OR Cashed Check | | 1,881.32 | |
| 8/7 | | WT Fed#01604 Bank of Prairie Vi /Ftr/Bnf=Aaron J. Rascine Srf# Trn#190807104008 Rfb# | | 12,250.00 | |
| 8/7 | 2003 | Deposited OR Cashed Check | | 76,771.79 | |
| 8/7 | 2007 | Deposited OR Cashed Check | | 742.11 | |
| 8/7 | 2008 | Deposited OR Cashed Check | | 1,733.02 | |

**EXHIBIT C**

Begin forwarded message:

**From:** Sharon MacDonell <shafnermac@mac.com>
**Date:** 2/22/2020
**To:** Roger MacDonell <rmacdonell@wwex.com>
**Cc:** roger macdonell <rjmonaco44@gmail.com>
**Subject: 7TH REQUEST -FORMAL DEMAND - SHIPPING SOLUTIONS, LP SALE PROCEEDS**

Roger,

This is a FORMAL DEMAND to know the whereabouts of the procseds of the sale of Shipping Solutions, LP, our community asset (as characterized by the French Courts on January 27, 2020)

Shipping Solutions, LP received a wire in the amount of  $ 9,380,750. in August 2019 and you have since cleared out the bank account.

I am demanding to know where you have placed these community funds. As you know, at least half of this cash belongs to me according to the recent court order in France and you are now required to tell me where you have put this money so that it can be accounted for in France.  You are well aware of the Breach of Fiduciary Duty laws in California.  Continuing to hide these monies from me is a clear breach of your duties.

I will give you 24 hours to respond to this demand and tell me where you have placed this cash.  If I do not hear back from you, your attorney, or Shipping Solutions, LP's attorney, I will take further action.

Sharon MacDonell

Begin forwarded message:
**From:** Sharon MacDonell <shafnermac@mac.com>
**Subject: Fwd: 6TH** REQUEST - ROGER ABSCONDS WITH $14 MILLION+ AS EXPECTED
**Date:** September 3, 2019 at 12:44:23 PM PDT
**To:** Roger MacDonell <rmacdonell@wwex.com>
**Cc:** RJ MACDONELL <rjmonaco44@gmail.com>

Roger,

This is my 6th Request from you to know exactly where you have placed the proceeds of the sale of our community asset, Shipping Solutions, LP and Global Shipping Solutions LLC on August 5, 2019.

WHY do you continue to ignore my requests?

You and your French counsel, Alain Luciani, have refused to respond to 3 Official Letters that were sent to him, despite his claim that you were reserving these funds for the division of assets in France.

THIS IS MY FORMAL DEMAND TO KNOW WHERE YOU HAVE PLACED THE FUNDS.

Sharon MacDonell

Begin forwarded message:
**From:** Sharon MacDonell <shafnermac@mac.com>
**Subject: 5TH REQUEST - ROGER ABSCONDS WITH $14 MILLION+ AS EXPECTED**
**Date:** August 12, 2019 at 3:20:13 PM PDT
**To:** Roger MacDonell <rmacdonell@wwex.com>

Roger,

WHERE HAVE YOU PLACED OUR MONEY?

WHY DO YOU CONTINUE TO IGNORE ME ?

**WHY HAVE YOU ABSCONDED WITH OVER $ 14 MILLION IN COMMUNITY MONIES??**

I DEMAND TO KNOW WHERE YOU HAVE PLACED THESE SALES PROCEEDS.

SHARON MACDONELL

Begin forwarded message:
**From:** Sharon MacDonell <shafnermac@me.com>
**Subject: Fwd: ROGER ABSCONDS WITH $14 MILLION+ AS EXPECTED**
**Date:** August 10, 2019 at 4:48:08 PM PDT
**To:** rmacdonell@wwex.com

Roger-

You ABSCONDED with Community monies again.

WHERE have you put these funds !!???

You have breached your fiduciary duty.

I DEMAND to know where you have placed my money !

Sharon MacDonell

Sent from my iPhone

Begin forwarded message:

**From:** Sharon MacDonell <shafnermac@mac.com>
**Date:** August 9, 2019 at 6:23:49 PM PDT
**To:** Roger MacDonell <rmacdonell@wwex.com>
**Subject: ROGER ABSCONDS WITH $14 MILLION+ AS EXPECTED**

ROGER,

**YOU HAVE ABSCONDED WITH OVER $ 14 MILLION OF COMMUNITY MONIES
FROM THE SALE OF OUR BUSINESSES ON AUGUST 5, 2019.**

YOU CONTINUE TO IGNORE MY REQUESTS TO KNOW WHERE YOU HAVE
PLACED THESE FUNDS AND WHERE YOU HAVE PLACED 50% OF THESE
FUNDS AND STOCK - AS PROMISED - TO PROTECT THEM FOR THE DIVISION
OF ASSETS IN FRANCE.

WHY ARE YOU REFUSING TO ACKNOWLEDGE MY EMAILS??

SHARON MACDONELL

Begin forwarded message:
**From:** Sharon MacDonell <shafnermac@mac.com>
**Subject: 3RD REQUEST FOR LOCATION OF COMMUNITY SALES PROCEEDS
OF SHIPPING SOLUTIONS LP AND GLOBAL SHIPPING SOLUTIONS on
AUGUST 5, 2019**
**Date:** August 8, 2019 at 6:00:50 PM PDT
**To:** Roger MacDonell <rmacdonell@wwex.com>

ROGER,

WHY ARE YOU REFUSING TO TELL ME WHERE YOU HAVE PLACED THE
COMMUNITY MONIES FROM THE SALE OF SHIPPING SOLUTIONS. LP AND
GLOBAL SHIPPING SOLUTIONS ???

**HAVE YOU ABSCONDED WITH THE FUNDS AS WE EXPECTED ?**

SHARON MACDONELL

Begin forwarded message:
**From:** Sharon MacDonell <shafnermac@me.com>
**Subject: Fwd: 2ND REQUEST FOR LOCATION OF COMMUNITY SALES
PROCEEDS OF SHIPPING SOLUTIONS LP AND GLOBAL SHIPPING**

SOLUTIONS on AUGUST 5, 2019
Date: August 7, 2019 at 7:53:04 PM PDT
To: gharper@winston.com
Cc: dkiger@wwex.com, rrose@wwex.com, tmadine@wwex.com

Sent from my iPhone

Begin forwarded message:

From: Sharon MacDonell <shafnermac@me.com>
Date: August 7, 2019 at 5:51:13 PM PDT
To: rmacdonell@wwex.com
Subject: 2ND REQUEST FOR LOCATION OF COMMUNITY SALES PROCEEDS
OF SHIPPING SOLUTIONS LP AND GLOBAL SHIPPING SOLUTIONS on
AUGUST 5, 2019

Roger,

Why have you not responded or given me the information below ?

I DEMAND to know WHERE you placed our COMMUNITY PROCEEDS.

Sharon MacDonell

Sent from my iPhone

Begin forwarded message:

From: Sharon MacDonell <shafnermac@mac.com>
Date: August 5, 2019 at 5:46:04 PM PDT
To: Roger MacDonell <rmacdonell@wwex.com>
Subject: Fwd: Final Demand and Notice

Roger,

According to the message today from Geoffrey Harper of Winston and Strawn (see
below). Worldwide Express/UniTOPCO and Ridgemont Partners have decided to
ignore my ongoing claim and demand to put the monies into the registry of the court
or interplead the funds until our assets are divided in the French courts.     Instead,
they went ahead and purchased our Community Property Assets, Shipping
Solutions. LP and Global Shipping Solutions from you, without my written consent or
approval.

Not only was this sale completed in a very sneaky "cat and mouse" styled fashion, (with the plug being pulled 3 times on the sale during the TRO's), it also does not qualify as an arms length transaction due to your close working your relationship with the gentleman at Worldwide Express/UniTOPCO and the fact that you have still not provided me with the financials (due to me by law) for both Shipping Solutions, LP and Global Shipping Solutions, despite repeated requests. Unfortunately, I have no idea if these businesses of ours were sold at fair market value since I had no chance to complete my due diligence.

Despite this bold and perilous move on Worldwide Express/UniTOPCO and Ridgemont's part, I am confident that, per your offers below (sent to us by your California and Texas attorney's ) that you have already set aside 50% of the sales proceeds in a blocked account until the court in France finalizes its division of our community estate for both parties protection. As your attorney's confirmed in their letters, in California Law, assets are split 50/50.

Having just reviewed the Asset Purchase Agreement, it is clearly lacking the details that I, as 50% owner in Shipping Solutions, LP and Global Shipping Solutions need. In this case, I need more information directly from you on the transaction today. Such as:

-Which bank and account name did Worldwide Express/UniTOPCO wire the SSLP/ GSS sales proceeds to ?
-Which bank have you put the 50% sales proceeds aside for the division of assets in France? Have you added my name to this bank account ? If not, when are you planning to do this ?
-Which bank have you put the other 50% of the sales proceeds in?   Since there are clearly personal expenditures that need to be paid back to the community. I obviously need to know where this money is as well.  -What name are the Class A stocks listed in ?
-When are we anticipating the next re-cap ?
-Who will be the next in line to purchase Worldwide Express/UniTOPCO?

Please forward me proof of all of the transactions today and the bank information as to where the sales proceeds from our community assets can be found. Also, please let me know specifically how you plan to keep the monies and stock guarded for me as promised until the French courts rule on our division of assets.

Thank you in advance for your cooperation

Sharon MacDoneil

**From:** Sharon MacDonell <shafnermac@mac.com>
**Sent:** Monday, August 5, 2019 10:58 AM
**To:** Harper, Geoffrey Scott <GHarper@winston.com>
**Cc:** rkolman@wwex.com; dkiger@wwex.com; rrose@wwex.com; tmadine@wwex.com
**Subject:** Final Demand and Notice

Gentlemen,

This is my **final demand** that you put the proceeds from the sale of Shipping Solutions, LP and Global Shipping Solutions into either the registry of the court or interplead these proceeds to the courts, today, August 5, 2019.

Shipping Solutions, LP and Global Shipping Solutions are presently the Community Property of Roger and Sharon MacDonell and **I have a claim** to at least 50% of the proceeds of these businesses. if not 100%. You have all been shown proof of this in open court and this has even been confirmed by David Kiger in his deposition. Mike Joyce clearly lied in his deposition when he said he did not have ownership in Global Shipping Solutions, yet now he has signed on the dotted line.

I still have no financial documents, despite repeated requests from both Roger MacDonell, Shipping Solutions, Global Shipping Solutions, Mike Joyce, and Worldwide Express. I have never been given the proper documents to complete my due diligence.

**This is not an arms length sale.**

I have never given my consent to this sale no matter how hard you try to twist my words Geoffrey Harper. I will only give my written

consent to this sale if the monies are sequestered to the courts.

If this demand is not met, I can guarantee you that I will take action
against all parties involved both corporately and personally for
conspiracy, collusion, and aiding and abetting Roger MacDonell.   All
of the parties involved are well aware of Roger MacDonell's
intentions and have been given proof of his behavior.

You are all formally on notice.

Sharon MacDonell

**From:** Harper, Geoffrey Scott <                                                >
**Sent:** Monday, August 05, 2019 5:18 AM
**To:** Phil Foster <                           >
**Subject:** WWE purchase of the SS and GSS franchises

I have been told that the sale is indeed going to close this morning.
As soon as I get a copy of the asset purchase agreement. I will
forward to you. But, to repeat, it is my understanding that everything
is going to be signed and money paid out this morning.

**Geoffrey Scott Harper**
**Partner**
Winston & Strawn LLP
2121 North Pearl Street, Suite 900
Dallas, TX 75201
D: +1 214-453-6476
F: +1 214-453-6400
Bio | VCard | Email | winston.com
<image002.jpg>

The contents of this message may be privileged and confidential. If this message has been received
in error, please delete it without reading it. Your receipt of this message is not intended to waive any
applicable privilege. Please do not disseminate this message without the permission of the author.
Any tax advice contained in this email was not intended to be used, and cannot be used by you (or
any other taxpayer) to avoid penalties under applicable tax laws and regulations.

This email has been scanned for email related threats and delivered safely by Mimecast.
For more information please visit http://www.mimecast.com

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| AMEGY BANK OF TEXAS, | § | |
| | § | |
| _Plaintiff,_ | § | |
| | § | |
| vs. | § | |
| | § | CIVIL ACTION NO. 3:20-cv-00375-N |
| CGI FRANCHISE SYSTEMS, INC.; | § | |
| ROGER MACDONELL; and | § | |
| SHARON MACDONELL, | § | |
| | § | |
| | § | |
| _Defendants._ | § | |

### DECLARATION OF JEROME BOURSICAN

1.  My name is Jérôme BOURSICAN. I am over the age of twenty-one (21) years, am of sound mind, and am capable of making this declaration. The facts stated herein are within my personal knowledge and are true and correct.

2.  I have been Sharon Hafner MacDonell's family law counsel since 2010.

3.  During the past 11 years of the MacDonell divorce proceedings, Mr. MacDonell has changed attorney's 7 times and postponed numerous hearings without justifiable cause. His continuous non-cooperation in the case has led this divorce to drag on unnecessarily for 11 years and has made it difficult to identify and preserve community assets.

4.  Mr MacDonell's opaque and stubborn behavior and attempts to hide money or transfer money out of Sharon's reach have been noted by various judges during the procedure. As just a few recent examples:

    • **The Judgment of the Court of Appeal of October 25, 2016**:

# EXHIBIT 2

"Roger MACDONELL's financial situation is therefore as opaque as any time the courts have had to rule in the context of the divorce proceedings" (Attached as Exhibit A is a true and correct copy of the Judgment of the Court of Appeal of AIX EN PROVENCE of October 25, 2016. An English translation is attached as Exhibit B).

• **The Judgment of the Court of Appeal of November 29, 2016**:

"The husband's financial situation is not at all clear, as already noted by the various courts that have considered the matter." (Attached as Exhibit C is a true and correct copy of the: Judgment of the Court of Appeal of AIX EN PROVENCE of November 29, 2016. An English translation is attached as Exhibit D).

• **The Judgement of the Superior Court of San Mateo, California**:

The opacity of Mr. MACDONELL, and his refusal to communicate the documents useful to the procedure was also noted by the California judge, in a decision dated July 28, 2016, which ordered him to communicate a certain number of documents and to pay $ 10,000 for "misconduct." (Attached as Exhibit E is a true and correct copy of the: Order of the Superior Court of the County of SAN MATEO of 28 July 2016).

5.     To date, Roger MacDonell has never given his true personal financial picture, nor the financial picture of the MacDonell community estate despite multiple requests, demands, and finally court injunctions.

6.     It has come to my attention that Mr. MacDonell is attempting to release $ 2.4 Million to himself from CGIFSI's bank account in Texas. This however, does not surprise



S.APP_22

me. His strategy and intent is evident. Mr. MacDonell is attempting to stockpile as much cash as he can on the sidelines and send it offshore, out of the courts' reach, and more importantly, out of the reach of Sharon MacDonell. This explains why he does not cooperate in the French courts, as he is buying time to implement his plan.

7.      Mrs. MacDonell was forced to initiate Federal Subpoenas to banks in order to obtain wire information to try to trace the money that should belong in the community estate. To date, based on our investigations, we believe Mr MacDonell has siphoned/secreted off with $35 million. He continues to refuse to tell us the whereabouts of these monies, despite repeated requests.

8.      Unfortunately, France has no jurisdiction over monies/assets outside of France. So, the French court can declare CGIFSI as community property, but it has no jurisdiction to freeze or otherwise secure the monies. (Attached as Exhibit F is a true and correct copy of the French decision on this point. Attached as Exhibit G is an English translation.)

9.      On January 27, 2020, the French court entered an order on the characterization of certain property, including CGIFSI, as community property. I have read Roger's MSJ and will tell you that Mr. MacDonell has twisted the French judge's words in order to attempt to further his case in Texas. For example, on page 8 of his brief, Roger states "the judgement expressly limits Sharon's community property interest to the *stock value* of CGIFSI, and explicitly rejects Sharon's suggestion that such interest would extend to CGIFSI's assets". This is completely incorrect and even Roger highlighted the correct sentence in English Translated version of the French judgment on page 20 - **States that** the value of CGIFSI is a common property. Nowhere in this decision

S.APP_23

inserted " stock value"  so as to confuse the Texas courts into believing that the "stock value" and the "cash value" are separate and not included as the "total value" of CGIFSI.  In fact, the "value" envelops ALL of CGIFSI.

10.    Allowing Roger to withdraw $2.4 million from CGIFSI would necessarily decrease the value of the company, since under California law the value of the company consists of all of its assets, including the cash held in its bank accounts.  If Mr. MacDonell is allowed to take these monies for his personal benefit and use, than by default, the company loses value because the money does not belong to CGIFSI anymore.

11.    Throughout the many years I have represented Sharon in this dispute, I have become familiar with the companies and other assets owned by Sharon and roger. CGIFSI is not an operating entity.  It is merely a shell, a holding account for distributions, and royalties for Roger MacDonell and his former partner, David Kiger.  There are no employees, no rent, no utilities, no payroll, etc... Therefore, there are no legitimate business needs to transfer the $2.4 million currently in the CGIFSI account.

12.    Below is the timeline since this decision in January 27, 2020. In short, Mr. MacDonell has refused to cooperate in disclosing his assets to the Notaire or in the division of the community estate.

13.    **January 27, 2020** the French Court confirmed the Community Property aspect of the MacDonell estate.   The file was then assigned to a Notaire (Forensic Accountant) for division.

14.     *March 10, 2020* - French Notaire asked both parties to bring all relevant financial documents to an initial meeting on April 3, 2020. (This meeting was subsequently postponed until June 4, 2020 due rise in Covid cases in France).

15.     *April 24, 2020* - I requested all relevant financial documents from Roger MacDonell's counsel so as to prepare for rescheduled meeting.

16.     Because Mrs. MacDonell was in the U.S. and could not travel to France to attend the hearing, I requested a Zoom call. Roger MacDonell refused a Zoom call for the next meeting.

17.     Two weeks later, Roger MacDonell fired his current attorney and remained without counsel.

18.     *June 4, 2020* - Roger did not show up for the first official meeting. I flew in from Paris to attend the meeting regardless of Roger's absence so that we could document his non-cooperation. A second meeting was scheduled and Roger MacDonell was subpoenaed to attend.

19.     *June 22, 2020* - Roger shows up to second meeting alone, without representation, without required documents and asked for another postponement, claiming that he will show up at the next meeting on July 8, 2020 with new legal representation.

20.     Roger hired new counsel.

21.     *July 3, 2020* - I sent a letter to Roger MacDonell's new attorney to ask for the documents which were already supposed to be provided in March 2020 for upcoming meeting.

22.     *July 8, 2020* - Notaire overrides Roger and arranges a Zoom call so that Mrs. MacDonell can participate. Roger arrived with his new attorney, and again, with no documents and attempted to buy more time. Notaire gave him a final date of September 3, 2020 to provide required documents.

23.     At the end of this meeting, both parties signed formal documents stating that each party would provide all of the documents for the next meeting on September 3, 2020. (See Attachments) One week prior (August 27, 2020), all documents were supposed to be provided to each person's counsel. Roger MacDonell officially signed off that the file is officially opened and that he will bring forth all documents requested.

24.     *August 27, 2020* - Mrs. MacDonell provided all of the documents requested of her by the Notaire.

25.     *September 3, 2020* - Meeting with Notaire between me, Roger and his new attorney. Roger's attorney came up with all kinds of distractions in order to evade producing documents. This was the 4th time that I flew in to meet with the Notaire and no documents were produced. I finally asked the Notaire to notify the judge of Roger's continuous obstruction of justice in our case. At the end of the meeting, Roger's attorney agreed to provide documents on October 10th.

produced. I finally asked the Notaire to notify the judge of Roger's continuous obstruction of justice in our case. At the end of the meeting, Roger's attorney agreed to provide documents on October 10th.

26. *October 10* - No documents arrived from Roger's attorney.

27. *November 4, 2020* - The judge sends her first injunction to Roger to produce all documents to divide the assets.

28. *December 7, 2020* - I contacted the Notaire to see if he received anything from Roger. Nothing was received. The Notaire told me he would contact the judge to inform her again of the obstruction of justice.

29. *February 11, 2021* - Judge issued a second injunction with daily monetary fines for not producing these necessary documents (Attached as Exhibit H is a true and correct copy of the: Order of Injunction of February 11, 2021. An English translation is attached as Exhibit I) We have exhausted all of our avenues with Roger MacDonell and his attorney. The Notaire will produce an Act of Liquidation based solely on the documents that Mrs. MacDonell has provided and a monetary decision will be issued. We anticipate that this will be completed within the next 6-9 months.

My name is Jérôme Boursican, my date of birth is April 28, 1964, and my address is 144, boulevard du Montparnasse – 75014 PARIS (FRANCE). I declare under penalty of perjury that the foregoing is true and correct.

Signed in Paris, on the 28th day of May, 2021.

# EXHIBIT A

# COUR D'APPEL D'AIX-EN-PROVENCE
## 6e Chambre B

### ARRÊT DEFERE
### DU 25 OCTOBRE 2016

### N° 2016/419

**Décision déférée à la Cour :**

**Rôle N° 16/01457**

Ordonnance du Cour d'Appel d'AIX EN PROVENCE en date du 11 Janvier 2016 enregistré(e) au répertoire général sous le n° 14/21683.

**Sharon Louise MACDONELL épouse HAFNER**

**APPELANTE**

**Madame Sharon Louise MACDONELL épouse HAFNER**

**née le** 27 Octobre 1964 à PALO ALTO (CALIFORNIE) USA

C/

de nationalité Américaine,

**Roger James MACDONELL**

**demeurant** Villa Rustica - 5 Avenue de l'Antiquité - 06160 CAP D'ANTIBES

**représentée par** Me Alexandra BOISRAME, avocat au barreau d'AIX-EN-PROVENCE

**assistée de** Me Jérôme BOURSICAN, avocat au barreau de PARIS,

**INTIME**

**Monsieur Roger James MACDONELL**

**né le** 10 Janvier 1962 à MOUNTAIN VIEW CALIFORNIE (USA)

de nationalité Française,

Grosse délivrée le :
à : Me BOISRAME
Me BOULAN

**demeurant** 1 Avenue du Commandant Garbe 06160 JUAN LES PINS

**représenté par** Me Françoise BOULAN de la SELARL BOULAN CHERFILS IMPERATORE, avocat au barreau d'AIX-EN-PROVENCE,

**assisté de** Me Alain LUCIANI, avocat au barreau de GRASSE

*-*-*-*-*

## COMPOSITION DE LA COUR

L'affaire a été débattue le **22 Septembre 2016** en Chambre du Conseil. Conformément à l'article 785 du Code de Procédure Civile, Chantal MUSSO, Président a fait un rapport oral de l'affaire à l'audience avant les plaidoiries.

La Cour était composée de :

Madame Chantal MUSSO, Présidente
Monsieur Joël MOCAER, Président
Madame Michèle CUTAJAR, Conseiller

qui en ont délibéré

**Greffier lors des débats** : Madame Marie-Sol ROBINET.

Les parties ont été avisées que le prononcé de la décision aura lieu par mise à disposition au greffe le 25 Octobre 2016.

## ARRÊT

Contradictoire,

Prononcé par mise à disposition au greffe le 25 Octobre 2016.

Signé par **Madame Chantal MUSSO, Présidente** et **Madame Marie-Sol ROBINET, Greffier** auquel la minute de la décision a été remise par le magistrat signataire.

Monsieur Roger James MAC DONELL et Madame Sharon HAFNER, tous deux de nationalité américaine, se sont mariés le 3 octobre 1992 devant un prêtre du Comté de San Mateo dans l'Etat de Californie aux Etas-Unis. Ils n'ont pas fait précéder leur union de la signature d'un contrat de mariage
.
De cette union sont issus quatre enfants, tous nés aux Etats-Unis :
- Lauren Michelle née le 4 août 1996 (majeure)
- Jackson Delaney né le 6 avril 1998 (majeur)
- Roger Junior  et  Taylor Diane nés le 30 juin 2000

Une procédure diligentée en Suisse par Madame HAFNER a donné lieu à  une décision de la Cour d'appel du canton de Berne en date du 2 décembre 2010 interdisant à Monsieur MACDONELL de disposer de quatre comptes bancaires détenus auprès de la SAANEN BANK AG, les fonds bloqués dans cet établissement représentant environ huit millions de dollars US.

Intialement saisie, la justice américaine s'est déclarée incompétente pour connaître de la procédure de divorce puisque la famille était installée en France depuis le mois de septembre 2006.

Saisi d'une requête en divorce, le juge aux affaires familiales de Grasse a prononcé  le 21 février 2011 une ordonnance de non conciliation, aux termes de laquelle il a notamment:
- attribué à l'épouse la jouissance du logement et du mobilier du ménage se trouvant au domicile conjugal, et ce à titre gratuit jusqu'à son retour aux Etats-Unis
- dit que l'époux devrait quitter les lieux dans le délai de quinze jours
- dit que Monsieur MACDONELL devrait payer les charges afférentes au logement familial
- ordonné la remise à l'époux de ses effets personnels et de ses vêtements
- dit n'y avoir lieu à statuer sur l'attribution de la jouissance des biens immobiliers appartenant aux deux époux et situés aux Etats-Unis, l'époux ayant toutefois l'obligation d'assumer seul le paiement des frais liés à la propriété et à l'occupation de ces biens dans la mesure où il est le seul à disposer de revenus
- condamné Monsieur MACDONELL à verser à son épouse une pension alimentaire de 20.000 euros par mois au titre du devoir de secours
- dit que Monsieur MACDONELL devrait également assumer, au titre du devoir de secours, le règlement provisoire des dettes communes suivantes : frais liés à la propriété et à l'occupation du domicile conjugal et des biens situés aux Etats-Unis, assurance maladie privée de l'ensemble de la famille, activités sportives et de loisir de la famille ainsi que les frais de personnel de maison (femme de ménage, chauffeur)
- dit que Monsieur MACDONELL devrait assurer le règlement provisoire des crédits communs suivants: prêt contracté auprès dela banque HSBC pour l'achat du domicile conjugal (échéance mensuelle de 11.060 euros) et crédits contractés pour l'acquisition de la maison située à Auburn et à Dallas aux Etats- Unis (charge mensuelle de 2.800 euros)
- condamné Monsieur MACDONELL à payer à son épouse la somme de 10.000 euros à titre de provision pour frais d'instance
- condamné Monsieur MACDONELL à verser à son épouse une avance sur part de communauté d'un montant de 1.000.000 euros
- dit n'y avoir lieu à désignation d'un notaire ou d'un professionnel qualifié
- débouté Madame HAFNER de sa demande de mise sous séquestre des sommes détenues sur les comptes bancaires ouverts aux noms des époux ou au nom de Monsieur MACDONELL et situés en Suisse, aux Etas-Unis et en France
- dit n'y avoir lieu à gestion desdits comptes par l'épouse
- dit que l'autorité parentale sur les quatre enfants mineurs serait exercée en commun par les deux parents
- fixé la résidence habituelle des enfants au domicile de la mère et accordé au père un droit de visite et d'hébergement élargi tant que les enfants sont en France et, à partir de leur installation aux Etats-Unis, l'intégralité des vacances scolaires de Toussaint, de février et de Pâques ainsi que la moitié des autres vacances scolaires
- dit que les frais de transport exposés pour l'exercice de ce droit de visite et d'hébergement seraient supportés exclusivement par le père
- autorisé d'ores et déjà, la mère à retourner vivre aux Etats-Unis avec les quatre enfants à l'issue de l'année scolaire en cours

- dit n'y avoir lieu à interdiction de sortie des enfants de l'espace Shengen
- fixé à la somme mensuelle indexée de 2.000 euros par enfant, soit une somme totale de 8.000 euros, le montant de la contribution paternelle à l'entretien et l'éducation des enfants communs
- dit que le père devrait continuer d'assumer seul les dépenses relatives aux enfants en ce qui concerne l'école, les cours particuliers, les activités sportives et ludiques, les séjours à l'étranger à Noël et l'été, et leur couverture d'assurance maladie.

Cette ordonnance a été déférée à la Cour d'appel de céans qui par arrêt en date du 23 octobre 2012 a réformé partiellement les dispositions de la décision, et :
- fixé la pension alimentaire due par Monsieur MAC DONELLà son épouse au titre du devoir de secours à la somme mensuelle indexée de 30.000 euros, à charge pour Madame HAFNER de payer les dépenses afférentes au domicile conjugal ainsi que les frais de santé, assurance comprise, de loisir et d'activités sportives, de personnel de maison et de chauffeur et toutes autres dépenses personnelles
- dit que Monsieur MAC DONELL assumerait les frais liés à la propriété et l'occupation des biens situés aux Etas-Unis, les crédits contractés pour l'acquisition desdits biens et le prêt contracté auprès de la banque HSBC pour l'acquisition du domicile conjugal sous réserve de faire les comptes entre les parties lors de la liquidation du régime matimonial
- accordé à l'épouse lajouissance gratuite du domicile conjugal
- débouté Madame HAFNER de sa demande d'attribution d'une provision à valoir sur ses droits dans la liquidation du régime matrimonial _
- fixé la part contributive paternelle à l'entretien et l'éducation des enfants communs à la somme de 2.000 euros par enfant et par mois et dit que cette somme couvrirait l'intégralité des dépenses des enfants
- débouté Monsieur MAC DONELL de sa demande tendant à voir limiter dans le temps lajouissance gratuite du domicile conjugal
- débouté Monsieur MAC DONELL de sa demande de déblocage des comptes bancaires ouverts dans les livres de la Saanen Bank AG
- mis à la charge de Monsieur MAC DONELL le règlement des factures émises par l'ISN pour la scolarité des enfants à compter de la date de l'arrêt
- dit que les dispositions de l'ordonnance de non conciliation auraient vocation à s'appliquer tant que les enfants seraient domiciliés en France
- rejeté la demande tendant à voir supprimer le temps de résidence des enfants chez le père le mercredi.

Le 8 novembre 2012 Madame HAFNER a assigné son mari en divorce sur le fondement des dispositions de l'article 242 du code civil.

Saisi sur incident, le juge de la mise en état a rendu le 2 décembre 2013 une ordonnance aux termes de laquelle il a notamment :
- dit et jugé que Madame HAFNER ne bénéficierait plus de lajouissance gratuite du domicile conjugal situé à Juan les Pins
- attribué lajouissance de ce bien immobilier à titre onéreux à Monsieur MAC DONELL à charge pour lui d'assumer l'ensemble des charges y afférentes avec un compte à faire entre les parties au moment de la liquidation du régime matrimonial
- constaté l'accord de Monsieur MAC DONELL pour une attribution de la jouissance du bien situé à Auburn aux Etats-Unis à Madame HAFNER et fait droit à cette demande à charge pour l'épouse de régler l'ensemble des charges y afférentes, sous réserve des droits de chacun lors de la liquidation du régime matrimonial
- maintenu la résidence habituelle des enfants communs mineurs au domicile de la mère aux Etats-Unis
- dit que le droit de visite et d'hébergement du père s'exercerait en dehors des vacances scolaires neuf jours par mois, du premier week-end de chaque mois, vendredi sortie des classes, au week-end suivant, lundi rentrée des classes et durant la totalité des vacances scolaires à l'exception de celles de Noël et d'été partagées par moitié
- dit que les frais de transport exposés pour l'exercice de ce droit seraient supportés exclusivement par le pere
- dit et jugé que Monsieur MAC DONELL devrait régler les frais d'inscription de l'enfant Lauren pour l'année 2013/2014

- supprimé à compter du 1er septembre 2013 la contribution paternelle pour l'entretien et l'éducation de l'enfant Lauren
- fixé à la somme mensuelle indexée de 1.000 euros par enfant, soit une somme totale de 3.000 euros, le montant de la part contributive paternelle pour l'entretien et l'éducation des trois autres enfants communs, étant précisé que cette somme couvrirait l'ensemble des dépenses des enfants.

La 6ème chambre C de la Cour d'appel d'Aix en Provence a, par arrêt en date du 26 mars 2015, infirmé la décision rendue par lejuge de la mise en état sur les seules mesure financières relatives aux enfants.
Le montant de la part contributive paternelle à l'entretien et l'éducation des enfants communs a été à nouveau fixé à la somme mensuelle indexée de 2.000 euros par enfant.
En outre la Cour a dit que Monsieur MAC DONELL prendrait en charge les frais de scolarité engagés pour l' année 2013/2014 pour les enfants Lauren et Jackson.

Par jugement contradictoire rendu le 16 juin 2014 le juge aux affaires familiales de Grasse a :
- prononcé le divorce aux torts partagés des époux
- dit et jugé que la loi applicable au régime matrimonial des époux MACDONELL/HAFNER est celle du régime primaire californien et que partant, les parties devraient régler leurs intérêts patrimoniaux en application des règles californiennes
- ordonné la liquidation et le partage des intérêts patrimoniaux existant entre les parties
- dit n'y avoir lieu à ce stade de la procédure à désignation d'un notaire pour procéder à la liquidation des droits respectifs des parties
- débouté Madame HAFNER de sa demande d'avance sur part de communauté
- confirmé les dernières mesures provisoires s'agissant des enfants
- condamné Monsieur MAC DONELL à payer à Madame HAFNER une prestation compensatoire en capital d'un montant de 2.000.000 euros
- rejeté la demande d'exécution provisoire
- débouté Monsieur MAC DONELL de sa demande de dommages et intérêts
- autorisé Madame HAFNER à conserver l'usage du nom du mari.

Madame HAFNER a relevé appel de cette décision par déclaration au greffe reçue le 17 novembre 2014.

Le 1er juillet 2015 les parties ont été convoquées à l'audience de la Cour fixée le 15 octobre 2015 à 8 h 20, la clôture de l'instruction devant intervenir le 8 octobre 2015.

Le 24 septembre 2015 Madame HAFNER a saisi le conseiller de la mise en état de conclusions
d'incident.

L'ordonnance de clôture a été révoquée le 15 octobre 2015 et l'affaire renvoyée à l'audience du
conseiller de la mise en état du 9 novembre 2015.

Dans ses conclusions d'incident notifiées le 6 novembre 2015 l'appelante a sollicité le rejet des débats des conclusions et pièces de la partie adverse déposées le 6 novembre 2015 en violation du principe du contradictoire. À défaut Madame HAFNER demandait de :
- débouter Monsieur MAC DONELL de l'ensemble de ses demandes, fins et conclusions
- lui attribuer lajouissance du bien commun sis 1 avenue commandant Garbes, 06160 Cap d'Antibes, ancien domicile conjugal, à titre gratuit, au titre du devoir de secours
- dire et juger que le père bénéficierait à compter de la décision à intervenir d'un droit de visite et d'hébergement les première, troisième et cinquième fins de semaine de chaque mois du vendredi soir sortie des classes au dimanche soir 18 heures pendant les périodes scolaires et la moitié de toutes les vacances scolaires de plus de cinq jours

- condamner Monsieur MAC DONELL à verser à la mère une contribution à l'entretien et l'éducation des enfants d'un montant de 2.000 euros par mois et par enfant, soit la somme globale de 8.000 euros par mois, et ce, à compter du mois de juillet 2014, date à laquelle Monsieur MAC DONELL a cessé de verser le devoir de secours à son épouse.

Dans ses conclusions en réponse sur incident notifiées le 6 novembre 2015, l'intimé demandait à titre principal de :
- dire et juger que la partie adverse ne démontre pas un élément nouveau au sens des articles 1118 et 1119 du code de procédure civile
- déclarer irrecevable l'incident de Madame HAFNER et la renvoyer au fond
- dire la procédure de Madame HAFNER dilatoire
- la condamner au paiement de la somme de 10.000 euros en application des dispositions de l'article 700 du code de procédure civile.
De façon subsidiaire il était demandé de :
- débouter Madame HAFNER de l'ensemble de ses demandes
- dire et juger que Monsieur MAC DONELL pourrait continuer àjouir à titre onéreux de l'appartement d'Antibes Juan les Pins
- mettre en place une résidence alternée des quatre enfants, quinze jours par mois, au domicile de chacun des parents
- confirmer que Monsieur MAC DONELL verserait une contribution aux enfants d'un montant de 4.000 euros, soit 1.000 euros par enfant
- dire et juger que les frais de scolarité seraient partagés entre les deux parents
- condamner la partie adverse aux dépens de l'incident et au paiement d'une somme de 5.000 euros en application de l'article 700 du code de procédure civile.

Par ordonnance en date du 11 janvier 2016, le conseiller de la mise en état a :
- dit que les juridictions françaises étaient compétentes pour connaître du litige, et qu'elles appliquent la loi française
- écarté les notes en délibérés qui ne répondaient pas à une demande du conseiller de la mise en état
- déclaré recevables les conclusions et pièces de l'intimé notifiées et déposées le 6 novembre 2015.
- débouté Madame Sharon HAFNER de sa demande d'attribution de la jouissance du bien commun sis 1 avenue Commandant Garbes au Cap d'Antibes
- maintenu la résidence des enfants mineurs au domicile maternel
- dit qu"à compter de la présente ordonnance Monsieur Roger MAC DONELL exercerait un droit de visite et d'hébergement sur ses enfants mineurs par principe à l'amiable et, à défaut d'accord entre les parties, les première, troisième et cinquième fins de semaine du vendredi à la sortie de l'école au dimanche 18 heures, le droit de visite et d'hébergement étant étendu aux jours fériés qui précèdent ou suivent la fin de semaine, les deuxième et quatrième milieux de semaine du mardi à la sortie des classes au mercredi 18 heures ainsi que la première moitié des vacances scolaires de plus de cinq jours les années paires et la seconde moitié les années impaires,
- fixé à compter de la présente ordonnance à la somme de 1.000 euros (mille euros) par mois et par enfant la part contributive de Monsieur Roger MAC DONELL à l'entretien et l'éducation des quatre enfants communs, soit une somme mensuelle totale de 4.000 euros (quatre mille euros), somme payable et indexée dans les conditions reprises dans le jugement rendu le 16 juin 204 par le juge aux affaires familiales du Tribunal de Grande Instance de Grasse,
- dit que Monsieur Roger MAC DONELL assumerait la totalité des frais de scolarité des quatre enfants,
- condamné Madame Sharon HAFNER à payer à Monsieur Roger MAC DONELL une somme de 1.500 euros (mille cinq cents euros) en application des dispositions de l'article 700 du code de procédure civile,
- condamné Madame Sharon HAFNER aux entiers dépens de l'instance d'incident recouvrés conformément aux dispositions de l'article 699 du code de procédure civile.

Sharon HAFNER a déféré cette ordonnance à la cour, par requête déposée le 26 janvier 2016.

Par dernières conclusions notifiées à la partie adverse le 23 mars 2016, Sharon HAFNER demande à la cour de :
- REFORMER l'ordonnance déférée en ce qu'elle a :
▸ Débouté Madame HAFNER de sa demande d'attribution de la jouissance du bien commun sis 1 avenue Commandant Garbes au Cap d'Antibes,
▸ Fixé à compter de la présente ordonnance à la somme de 1.000 euros par mois et par enfant la part contributive de Monsieur Roger MACDONELL a l'entretien et l'éducation des quatre enfants communs, soit une somme mensuelle de 4. 000 euros
Statuant à nouveau :
- ATTRIBUER à Madame MACDONELL la jouissance du bien commun sis 1 avenue Commandant Garbes - 06160 Cap d'Antibes, ancien domicile conjugal, à titre gratuit, au titre du devoir de secours,
- CONDAMNER Monsieur MACDONELL à verser à la mère une contribution à l'entretien et l'éducation des enfants d'un montant de 2.000 euros par mois et par enfant, pour les quatre enfants, soit la somme globale de 8.000 euros par mois, et ce, à compter du mois de juillet 2014, date à laquelle Monsieur MACDONELL a cessé de verser le devoir de secours à son épouse,
- CONDAMNER Monsieur MACDONELL à verser à son épouse la somme de 5.000 euros sur le fondement de l'article 700 du Code de procédure civile, ainsi qu'aux entiers dépens de première instance et d'appel, ces derniers distraits au profit de Maître Alexandra BOISRAME Avocat qui y a pourvu.

Elle développe les moyens suivants.

**Sur les éléments nouveaux** : elle a été contrainte de revenir en France avec les enfants dans un contexte dans lequel son mari a dissimulé une part considérable de ses revenus et où il refuse de s'acquitter du devoir de secours, alors qu'elle a elle-même tout mis en oeuvre pour récupérer les sommes dues.

**Sur l'attribution du domicile conjugal** : Madame MACDONELL a sollicité de son époux de pouvoir occuper avec les enfants l'ancien domicile conjugal, comme cela était le cas avant leur départ pour les Etats-Unis. Monsieur MACDONELL, de manière parfaitement injustifiée, s'y est opposé, et continue à s'y opposer, alors même qu'il n'occupe pas ce bien, car il vit à Monaco.

Madame MACDONELL n'a pas d'autre solution de logement, pour elle-même et les quatre enfants du couple. Elle est dans une situation financière catastrophique, dans la mesure où elle dépend financièrement de son mari. Elle n'a aucune épargne personnelle, et c'est son époux qui a seul accès à l'ensemble des fonds de la communauté.

La procédure d'exécution forcée qu'elle a mis en œuvre en Californie a abouti, au bout de long mois d'une procédure particulièrement onéreuse, à ce qu'elle puisse saisir pour l'avenir la moitié des revenus de son époux issus de SHIPPING SOLUTIONS, soit la somme de 8.125 dollars par mois (sur 30.000 euros de devoir de secours).

Elle sollicite donc le retour à la solution antérieure à son départ pour les Etats Unis, à laquelle son époux ne s'était pas opposé, solution conforme incontestablement à l'intérêt des enfants.

Sur la résidence du mari à Monaco, elle en veut pour preuve le fait qu'il a été poursuivi pénalement devant le tribunal de la principauté pour abandon de famille. Le dossier pénal établi par le Parquet de MONACO contient d'ailleurs une copie de la carte de résident à MONACO de Monsieur MACDONELL, qu'il a renouvelée récemment et qui est valable jusqu'au 20 mai 2018.
Par ailleurs, le domicile conjugal est mis en permanence à la location sur le site internet Airbnb

**Sur la contribution à l'entretien et l'éducation des enfants** : la dernière décision à avoir statué sur la contribution paternelle à l'entretien et l'éducation des enfants est le jugement de divorce du 16 juin 2014, dont appel.

Depuis que cette décision est intervenue, et contrairement à ce qu'a retenu le Conseiller de la Mise en Etat, la situation des parties a en réalité évolué, justifiant que s'il soit statué à nouveau sur le montant de cette contribution.

Ainsi :
      - elle ne perçoit plus le devoir de secours dû par Monsieur MACDONELL depuis le mois de juillet 2014, soit depuis 19 mois,
      - elle a, dans ce cadre, été contrainte de revenir s'installer en France, avec les quatre enfants du couple,
      - la Cour de Céans, a, dans un arrêt en date du 26 mars 2015, rétabli le montant de la contribution paternelle à la somme de 2.000 euros par mois et par enfant pour les quatre enfants, pour la période courant entre le mois de décembre 2013 et le mois de juin 2014 (période dont elle était saisie),
      - surtout, Madame MACDONELL a découvert , dans une pièce communiquée par Monsieur MACDONELL lui-même mais à la veille de l'audience d'incident ayant donné lieu à la décision déférée, que le père, qui déclarait percevoir des revenus de l'ordre de 200.000 euros par an, a en réalité des revenus de plus de 2 millions d'euros (2 millions de dollars de revenus annuels de CGI Franchise Systems Inc., soit 1.848.750 euros + 200.000 euros de revenus de SHIPPING SOLUTIONS).

Compte tenu des situations respectives des parents, il y a lieu de rétablir la contribution à l'entretien et l'éducation des enfants, telle que fixée par le magistrat conciliateur, c'est-à-dire à la somme de 2.000 euros par mois et par enfant, soit 8.000 euros par mois pour les quatre enfants.
Et ce, particulièrement dans un contexte dans lequel :
      - les enfants ont entre 15 et 19 ans et des besoins qui ne cessent d'augmenter,
      - le père, tel que retenu par le Conseiller de la Mise en Etat, n'exerce pas régulièrement son droit de visite et d'hébergement, et laisse donc les enfants à la charge de la mère la plupart du temps,
      - les enfants bénéficiaient, du temps de la vie commune, d'un train de vie élevé, ce qui
est toujours le cas du père : il n'y a aucune raison, alors que le père en a les moyens, de ne pas permettre que ce soit toujours le cas.

Dans ses écritures du 23 mars 2016, Roger MAC DONELL demande à la cour de :

Sur l'attribution de la jouissance du bien commun sis. 1 Av du Commandant GARBES à
ANTIBES :
      - le RECEVOIR en ses conclusions sur déféré et le déclarer bien fondé
      - CONFIRMER l'ordonnance querellée ;
      - DIRE ET JUGER que Madame HAFNER ne démontre pas un "élément nouveau" au sens des articles 1118 et 1119 du Code de Procédure Civile
      - DEBOUTER Madame HAFNER de son incident ;
      - DIRE la procédure de Madame HAFNER dilatoire
      - LA CONDAMNER au paiement de la somme de 10.000 € en application des dispositions de l'article 700 du Code de Procédure Civile ainsi qu'aux dépens.

Subsidiairement, si la Cour devait attribuer la jouissance du bien commun à Madame HAFNER:
      - DIRE ET JUGER que cette attribution se fera à titre onéreux
      - DIRE ET JUGER que Madame HAFNER devra assumer l'ensemble des frais, taxes,
impôts, crédits liés à ce bien commun

Sur la résidence des enfants et le droit de visite :
      - PRENDRE ACTE de ce que Monsieur MAC DONELL sollicite la mise en place d'une garde alternée des quatre enfants, 15 jours consécutifs par mois à son domicile d'ANTIBES JUAN LES PINS ;

- DIRE ET JUGER de la mise en place d'une garde alternée 15 jours par mois pour chacun des parents ;

Subsidiairement, CONFIRMER les dispositions de l'ordonnance querellée

Sur la contribution paternelle à l'entretien et l'éducation des enfants
- CONFIRMER que Monsieur MAC DONELL versera une contribution aux enfants d'un montant de 4.000 € soit 1.000 € par enfant ;
- DIRE ET JUGER que les frais de scolarité seront partagés entre les deux parents;

- CONDAMNER Madame HAFNER à régler à Monsieur MAC DONELL la somme de 5.000 € en application des dispositions de l'article 700 du Code de Procédure Civile.

Il développe les moyens suivants.

**Sur la demande d'attribution du bien commun** : Sharon HAFNER ne démontre pas un élément nouveau. Le fait qu'il ne paye plus la pension alimentaire depuis le prononcé du divorce n'est pas un élément nouveau.
Elle se trouverait dans une situation financière catastrophique ? Pourtant :
- depuis le début de cette procédure (2010) Madame HAFNER n'a pas éprouvvé un seul
instant le besoin de travailler, ni même essayé de retrouvé un travail. Son amant Monsieur Philippe LAURENT de 22 ans son cadet non plus; ce dernier vit à ses crochets depuis 7 années, entretenu avec l'argent que verse Monsieur MACDONELL à son épouse...
- Depuis le début de cette procédure (2011) Madame HAFNER a perçu plus de 3.111.000 euros : Cela représente près de 60.000 € / mois !! net de tous impôts et charges puisqu'elle n'a jamais versé aux débats ses avis d'imposition en France ou bien aux Etats Unis.
Aurait elle dépensé cette somme en quatre année ? C'est inconcevable, alors que c'est Monsieur MAC DONELL qui règle les crédits des maisons, tous les frais de scolarité des enfants chaque année (près de 100.000 € par an).
- Madame HAFNER réalise des économies substantielles puisqu'elle s'abstient de régler les sommes lui incombant considérant que tout lui est dû et que tout ce qu'elle perçoit est considéré comme du "net " :
▪ Lorsqu'elle occupait l'appartement conjugal d'ANTIBES, Madame HAFNER n'a réglé aucune charge de copropriété et a préféré partir s'installer aux ETATS-UNIS de sorte que le Syndic a du engager une action judiciaire pour recouvrer une somme qui s'élevait à plus de 30.000 €. C'est Monsieur MAC DONELL qui a dû régler cette somme, stoppant ainsi la procédure (Ordonnance du 15 janvier 2016).
▪ En percevant une pension alimentaire de 20.000 € puis de 30.000 € Madame HAFNER n'a jamais justifié régler ses impôts en France ou bien aux ETATS UNIS : elle considère que c'est du net pour elle. Elle n'a jamais versé aux débats la preuve qu'elle avait déclaré ces sommes à l'administration fiscale.

Il s'insurge contre les accusations d'organisation de son insolvabilité, faux et altération frauduleuse de la vérité qui d'ailleurs pénalement se sont soldées par des non lieu.

Il soutient que si elle a quitté le domicile des Etats Unis c'est uniquement parce que le bailleur souhaitait vendre la propriété, et non pas parce qu'elle ne pouvait plus régler le loyer. Elle a déménagé récemment dans une somptueuse demeure du CAP D'ANTIBES de 6 pièces, 250 m2 habitables sur un terrain de 1.200 m2 avec piscine chauffée dans l'écrin très préservé du quartier de la Garoupe.

Il précise qu'il lui verse 5000€/mois suite à un commandement de payer du 30 novembre 2015, et que Sharon HAFNER a été autorisée par un juge californien à pratiquer une saisie sur la moitié des revenus du mari, à savoir la somme de 8125$ soit un peu plus de 7 700€.

Il affirme demeurer dans le domicile conjugal . En tant que citoyen américain Monsieur MAC DONELL n'a aucun intérêt fiscal à résider en PRINCIPAUTE DE MONACO. Par ailleurs, Madame HAFNER elle-même est persuadée qu'il habite dans cet appartement; la meilleure preuve : c'est à cette adresse de JUAN LES PINS qu'elle lui fait délivrer le commandement de payer du 9 octobre 2015 relatif au non paiement de la pension de 30.000 € / mois .

Enfin, il y exerce son droit de visite et d'hébergement ; il a démontré qu'il y recevait ses quatre enfants dans le cadre de son droit de visite et d'hébergement, et ce malgré les innombrables difficultés crées par Madame HAFNER qui l'ont conduit à déposer quatre mains courantes au

Commissariat d 'ANTIBES les 4 janvier, 10 -24 février et 9 mars 2016.

**Sur la résidence alternée des enfants** : Monsieur MAC ,DONELL recevait déjà ses enfants 10 jours par mois ; mettre en place une garde alternée 15 jours consécutifs par mois soit deux semaines par mois ne poserait aucun problème. Qui plus est, l'appartement occupé par Monsieur MAC DONELL est situé à ANTIBES, non loin de l'école ISP TENNIS ACADEMY de BIOToù sont scolarisés les enfants.

**Sur la contribution à l'entretien et l'éducation des enfants** : il règle les frais de scolarité des 4 enfants au L'ISP TENNIS ACADEMY de Biot, soit la somme de 85 000€

L'affaire a été appelée à l'audience du 24 mars 2016. Par arrêt en date du 7 juin 2016, la Cour d'appel de céans a ordonné la réouverture des débats à l'audience du 22 septembre 2016, vu l'indisponibilité d'un des magistrats de la composition en cours de délibéré.

### Motifs de la décision

#### Sur la survenance d'un fait nouveau

Postérieurement à l'appel interjeté à l'encontre du jugement de divorce, Sharon HAFNER a saisi le conseiller de la mise en état d'un incident de procédure du fait de la survenance d'un fait nouveau, en l'espèce la situation catastrophique dans laquelle elle se trouvait depuis que Robert MAC DONELL avait cessé en juillet 2014 de verser le devoir de secours ce qui avait conduit à son retour en France, pour voir modifier les mesures provisoires relatives au devoir de secours et les mesures accessoires relatives à la contribution à l'entretien et l'éducation des enfants.

Il sera rappelé qu'aux termes combinés des articles 771, 907 et 1119 du Code de Procédure Civile, en cas d'appel, les modifications des mesures provisoires, en cas de survenance d'un fait nouveau, ne peuvent être demandées qu'au conseiller de la mise en état. En outre, l'article 1083 du même code prévoit que lorsque le jugement prononçant le divorce est frappé d'appel, la modification des mesures accessoires exécutoires par provision par application de l 'article 1074-1, en cas de survenance d'un fait nouveau, ne peut être demandée qu'au conseiller de la mise en état.

Le conseiller de la mise en état a refusé de considérer le retour de Sharon HAFNER en France comme un fait nouveau, au motif qu'il ne s'agissait pas d'un fait objectif, mais de la conséquence de ses choix personnels. Il a en revanche retenu comme un élément nouveau l'installation des enfants en France.

Il n'est pas contesté qu'à l'issue du prononcé du divorce, et nonobstant l'appel interjeté par Sharon HAFNER, Robert MACDONELL a cessé immédiatement de payer la pension alimentaire due à son épouse.

11

Certes Robert MAC DONELL a fait des propositions de règlement à Sharon HAFFNER :
d'une part de lui payer la prestation compensatoire de 2 millions d'euros, puis ensuite
l'arriéré de pension alimentaire, offres que Sharon HAFFNER a déclinées car les fonds
devaient être prélevés sur les comptes bloqués à la SAANEN BANK, et qu'elle voulait
qu'ils le soient à partir d'autres comptes (tel que celui ouvert à la MAERKI
BAUMANN&CO, sur lequel Robert MAC DONELL détenait 2 239 965€ - cf :
correspondance de Maître BOURSICAN du 8 septembre 2014). Sharon HAFFNER
considère en effet que la moitié des fonds gelés à la SAANEN BANK lui appartient, et
que la part de Robert MAC DONELL doit servir à régler les intérêts patrimoniaux à
l'issue du divorce. Ce point de vue a été admis par le juge de la cour suprême de
Californie – Comté de San Matéo, puisque ce dernier a autorisé le paiement direct de la
pension alimentaire sur les revenus que Robert MAC DONELL tire de son activité dans
la société SHIPPING SOLUTIONS (cf : procès du 30 juin 2015). Toutefois, ce paiement
direct a permis d'obtenir un prélèvement mensuel de 8125$US, soit l'équivalent de
7182€, ce qui ne correspond même pas au tiers de la pension, et ne couvre pas les arriérés.
Par ailleurs, cette procédure en paiement direct a entraîné des frais importants pour
Sharon HAFFNER (soit la somme de 46 044.84$US) car Robert MAC DONELL a
contesté devant la cour californienne le caractère exécutoire de l'arrêt du 23 octobre 2012
ayant fixé le devoir de secours, ce qui a rendu plus complexe la procédure.

Après cette procédure qui n'a que très partiellement donné satisfaction à Sharon
HAFNER, cette dernière a décidé de réintégrer le domicile conjugal. Elle a écrit à Robert
MAC DONELL en ce sens dès le 10 août 2015, ce qu'il a refusé au motif qu'elle
percevait une pension alimentaire de 33 000€/mois et que ni elle ni son amant ne
travaillaient, ce qui leur donnait du temps et de l'argent pour trouver un logement
convenable.

Robert MAC DONELL soutient que le départ de Sharon HAFNER de la maison de
Menlo Park n'était en rien justifié par des difficultés financières, car le propriétaire
voulait en fait vendre cette maison.

Il en veut pour preuve deux mails que lui a adressés James KATZMAN. Dans le premier
en date du 31 mars 2015, ce dernier lui indique que la famille déménageant début avril,
la maison sera prête à la vente fin avril début mai, ce qui lui faisait espérer une vente fin
juin. Dans le second daté du 30 juillet 2015, le prix de vente donné à Robert MAC
DONELL est fixé pour la somme de 4.75M$

Sharon HAFNER quant à elle produit deux courriels : l'un envoyé à James KATZMAN
le 8 avril 2015, où elle lui fait part de sa tristesse à devoir quitter la maison, et le fait
qu'elle espérait que son mari revienne à la raison, mais qu'il n'en a rien été. Un second,
daté du 22 mars 2016, émane de l'avocate de James KATZMAN, qui certifie que ce
dernier voulait vendre sa maison en décembre 2015.

Il résulte donc à l'évidence de ces différentes correspondances, que c'est bien parce
qu'elle ne parvenait plus à payer le loyer de 11 000$US que générait la location de Menlo
Park, à cause de l'entêtement de son mari à ne pas lui verser la pension alimentaire, que
Sharon HAFNER est partie, et non parce que James KATZMAN avait déjà à l'époque
mis en vente la maison. Si tel avait été le cas, il n'aurait pas répondu le 31 mars 2015 à
Robert MAC DONELL : « je n'ai pas fixé de prix, mais je peux m'y intéresser si vous
voulez un chiffre ».

Les difficultés financières de Sharon HAFNER sont d'ailleurs démontrées par le fait
qu'elle ait cherché à vendre un bijou en décembre 2014, ou que ses parents lui ont prêté
10 000$ en juin 2015, et par toutes les procédures qu'elle a mises en place pour essayer
de récupérer les arriérés de pension ( commandements de payer des 5 août et 9 octobre
2015, procédure californienne, plainte pour abandon de famille, citation devant le
tribunal correctionnel de Monaco)

A la suite de ce déménagement de Menlo Park, Sharon HAFNER s'est installée avec ses enfants chez ses parents, mais ces derniers, âgés de 92 et 90 ans, ne pouvaient garder auprès d'eux la famille trop longtemps. Elle a donc décidé de revenir en France et y occuper le domicile conjugal, ce qui lui permettait de faire de substantielles économies de logement, et représentait une réponse adaptée à la situation financière périlleuse dans laquelle l'avait plongée la volonté affichée de Robert MAC DONELL de ne plus lui payer la pension, se contentant de lui verser la contribution à l'entretien et l'éducation des enfants.

Le retour de Sharon HAFNER en France avec les enfants ne peut donc s'analyser comme un fait dépendant de sa seule volonté, et c'est à tort que le conseiller de la mise en état ne l'a pas retenu comme un fait nouveau.

**Sur l'attribution de la jouissance du domicile conjugal**

Il convient de rappeler que dans son arrêt du 23 octobre 2012, la Cour d'appel de céans avait attribué à Sharon HAFNER la jouissance du domicile conjugal à titre gratuit en considération des revenus de Robert MACDONELL et de l'absence d'activité professionnelle de Sharon HAFNER. Cette attribution s'est faite sans limitation de durée, la cour ayant pris note de ce que l'épouse avait manifesté le désir de retourner aux USA mais n'avait pas encore mis son projet à exécution. Le devoir de secours était par ailleurs comblé par l'octroi d'une pension alimentaire mensuelle de 30 000€.

Sharon HAFNER demande donc qu'il soit revenu au devoir de secours tel que défini par cet arrêt.

La cour avait relevé à l'époque les éléments suivants :

- En 2008, le mari avait déclaré en France un revenu global de 490 456€ soit un revenu mensuel de 40 871€, incluant les revenus perçus aux USA, en Suisse et en France. En 2009, le revenu avait chuté à 102 586€ soit en moyenne un revenu mensuel de 8548€, et en 2010 à 32 812€ soit une moyenne mensuelle de 2734€, totalement incompatible avec le train de vie de la famille qui n'avait subi aucune dégradation entre 2008 et 2010.

La cour avait effectivement relevé que le mari prenait en charge tous les crédits immobiliers grevant les biens du couple soit au total la somme de 15 194€/mois, qu'il versait une pension alimentaire de 20 000€ sans difficulté, que les époux possédaient de nombreux comptes bancaires et que sur le seul compte ouvert à la Société Générale, apparaissaient des dépenses mensuelle de près de 15 000€, que la famille effectuait de nombreux voyages et séjournaient dans des hôtels de luxe, que les enfants pratiquaient de nombreux sports ...

Par ailleurs, l'épouse avait administré la preuve que son mari tirait des revenus de la société SHIPPING SOLUTIONS, et que l'on pouvait les évaluer à la somme mensuelle de 24 000€ (en 2012)

- L'épouse n'exerçait aucune activité professionnelle depuis 1999. Elle chiffrait ses dépenses mensuelles à 23 454€, hors frais de nourriture et de vêture.

A l'heure actuelle, la situation se présente comme suit :

- Sharon HAFNER ne travaille toujours pas, pour une raison qui n'est pas exposée. Elle vit avec un compagnon qui ne perçoit aux dires de Robert MAC DONELL aucun revenu.

Elle loue la maison que le couple possède à Auburn ce qui représente l'encaissement d'un loyer annuel de 19 231$US

Comme Robert MAC DONELL lui a refusé la réintégration du domicile conjugal, elle a dû engager des frais de logement : elle a d'abord loué à Antibes à compter du 9 septembre 2015, une villa de 6 pièces et 280m2, pour la somme de 4000€. Puis à compter du 1er février 2016, elle a loué une autre villa au Cap d'Antibes pour la somme de 3500€ jusqu'au mois d'avril, puis 4000€ en mai.

- Robert MAC DONELL chiffre ses revenus mensuels à la somme de 28 000$US, soit la somme de 25 722€ au taux actuel. Ce chiffre est fortement contesté par la partie adverse qui soutient que Robert MAC DONELL perçoit des revenus annuels issus de la CGI Systems INC pour 2M $US (soit 1 831 435€), et en veut pour preuve le versement de cette somme le 28 février 2014 sur le compte ouvert à la DREYFUS SONS &CO, établissement bancaire situé à Bâle en Suisse, puis le virement de la somme de 1 401 891$US à la banque MAERKI BAUMANN AND CO de Zurich un an plus tard.

Robert MAC DONELL conteste une telle analyse et affirme que cette somme provient de la vente de ses actions dans cette société, ce que confirme son expert-comptable. Toutefois, si tel était bien le cas, il est difficile de comprendre pourquoi la somme proviendrait de la CGI Systems INC, car comme le fait pertinemment remarquer Sharon HAFNER, il n'est pas possible que cette société ait racheté ses propres actions. Comme Robert MAC DONELL ne produit aucun autre document qu'un mail de son expert-comptable pour prouver cette vente, il sera retenu la thèse avancée par Sharon HAFNER, d'une rémunération par cette société, laquelle avait en 2007, rapporté à Robert MAC DONELL des revenus salariés à hauteur de 2 317 358$US

La situation financière de Robert MAC DONELL est donc aussi opaque que toutes les fois où les juridictions qui ont eu à statuer dans le cadre de la procédure de divorce.

Même la domiciliation de Robert MAC DONELL est obscure. Le domicile conjugal lui a été attribué, et il prétend y vivre, Mais il loue un bien à Monaco, où il se domicilie dans divers documents ou mails qu'il envoie, et où son avocat le domiciliait également dans la procédure californienne.

Au vu de ces éléments, il convient de constater que la situation est identique à celle analysée par la cour en 2012, et d'attribuer la jouissance du domicile conjugal à Sharon HAFNER à titre gratuit, ce qui permettra également aux enfants de retrouver leur cadre de vie habituel, après les déménagements successifs qu'ils ont eu à subir.

**Sur la résidence des enfants**

Le conseiller de la mise en état a considéré à juste titre que l'intérêt des enfants mineurs était de rester avec la mère. En effet, depuis la rupture parentale, les enfants vivent avec elle, en France puis aux USA, et il ne convient pas de rajouter aux différents bouleversements qu'ils ont connus depuis la séparation du couple, la mise en place d'une résidence en alternance, qui ne ferait qu'empirer les relations exécrables qu'entretiennent les parties.

**Sur la contribution à l'entretien et l'éducation des enfants**

Sur ce point, Robert MAC DONELL est quelque peu contradictoire, car il demande dans le dispositif de ses conclusions la « confirmation » de la décision du conseiller de la mise en état sur cette question, tout en faisant valoir que le droit californien serait applicable en l'espèce, alors que le conseiller de la mise en état a jugé le contraire.

Il sera rappelé qu'en matière d'obligations alimentaires, s'applique pour les ressortissants étrangers, l'article 3 du protocole de la Haye du 23 novembre 2007, lequel désigne comme loi applicable, celle de la résidence habituelle du créancier. La mère résidant habituellement en France, la loi californienne n'a pas vocation à s'appliquer en la matière.

Le jugement de divorce a fixé la part contributive du père à la somme de 3000€, soit 1000€/mois pour les enfants, Jackson, Taylor et Robert Jr, en l'absence d'éléments nouveaux survenus depuis l'ordonnance d'incident du juge de la mise en état du 2 décembre 2013, qui avait supprimé la contribution due pour Lauren, dans la mesure où cette dernière était interne à la Gorin Tennis Academy et que son père prenait en charge l'intégralité des frais de scolarité soit la somme annuelle de 47 000€.

Or Sharon HAFNER a interjeté appel de cette ordonnance, et par un arrêt du 26 mars 2015, la Cour d'appel de céans a infirmé cette décision sur ce point, fixant la contribution à l'entretien et l'éducation des quatre enfants à la somme de 8000€ (soit 2000€/mois et par enfant) et condamnant le père à prendre en charge les frais de scolarité de Lauren et Jackson.

Depuis leur arrivée en France en septembre 2015, les enfants sont scolarisés à l'ISP TENNIS ACADEMY de Biot, à l'initiative de leur mère qui a décliné l'offre de Robert MAC DONELL de les voir inscrire au Centre International de Valbonne, qu'il tient pour le meilleur établissement bilingue de la région. Les frais annuels de scolarité à l'ISP TENNIS ACADEMY s'élèvent à 85 000€ pour les quatre enfants.

La situation se présente donc sur le plan des besoins des enfants comme elle se présentait lorsque la cour a statué en octobre 2012.

La situation financière des parties a été exposée plus haut.

En considération de ces éléments, la part contributive du père sera fixée à la somme de 2000€/mois et par enfant, soit au total 8000€, et Robert MAC DONELL devra régler les frais de scolarité à l'ISN. En revanche, cette contribution sera due à compter du mois de septembre 2015, date du retour des enfants en France, et non du mois de juillet 2014, date à partir de laquelle le mari n'a plus réglé la pension alimentaire à son épouse. En effet, la cessation du paiement de la pension n'est pas en soi un fait nouveau, puisque Sharon HAFNER avait un titre pour faire exécuter l'obligation. Ce sont les obstacles rencontrés par Sharon HAFNER pour rendre effective l'exécution, et les difficultés financières concomitantes qui ont abouti à son départ des Etats Unis et sa réinstallation en France qui seuls peuvent constituer ici le fait nouveau fondant la compétence du conseiller de la mise en état.

**Les dépens**

Tant ceux de première instance que d'appel, seront mis à la charge de Robert MAC DONELL, débiteur du devoir de secours et de la contribution à l'entretien et l'éducation des enfants

Tenu aux dépens, Robert MAC DONELL est irrecevable en sa demande au titre des frais irrépétibles.

L'équité commande d'allouer à Sharon HAFNER la somme de 5000€ sur le fondement de l'article 700 du Code de Procédure Civile

**Par ces motifs**

La cour, statuant sur déféré

Dit y avoir lieu à déféré sur le devoir de secours et la contribution à l'entretien et l'éducation des enfants

En conséquence

Attribue à Sharon HAFNER la jouissance du domicile conjugal à titre gratuit pendant toute la durée de la procédure

Fixe à la somme de 2000€ par mois et par enfant, la part contributive que Robert MAC DONELL sera tenu de verser à Sharon HAFNER pour l'entretien et l'éducation des quatre enfants, soit au total la somme de 8000€, et ce à compter du mois de septembre 2015

Vu l'article 465-1 du Code de Procédure civile

Dit que cette mensualité sera révisée de plein droit le 1er janvier de chaque année en fonction de l'évolution de l'indice des prix à la consommation des ménages urbains dont le chef de famille est un ouvrier ou un employé (Série France entière hors tabac) ou en fonction de l'indice qui lui aura été éventuellement substitué

Précise que le taux de variation s'appréciera par comparaison entre le dernier indice connu à au 1er septembre 2015 et le dernier indice qui sera publié au 1er janvier de chaque année, le nouveau montant pouvant être calculé par application de la formule :

**Montant de la mensualité   x   Nouvel indice
Dernier indice connu  au 1er septembre 2015**

Rappelle au débiteur de la mensualité qu'il lui appartient d'appliquer l'indexation et qu'il pourra avoir connaissance de l'indice sur le site www.service-public.fr/calcul-pension

Rappelle qu'en cas de défaillance dans le règlement de la contribution, la créancière peut obtenir le règlement forcé, en utilisant à son choix une ou plusieurs voies d'exécution suivantes :
- paiement direct entre les mains du tiers débiteur
- procédure de recouvrement public des pensions alimentaires
- recouvrement par l'organisme débiteur des prestations familiales subrogé dans les droits de la créancière

S.APP_44

Rappelle au débiteur de la mensualité que s'il demeure plus de deux mois sans s'acquitter intégralement du montant de la contribution résultant de ses obligations familiales, il est passible des sanctions prévues par l'article 227-3 du Code Pénal, et qu'il a l'obligation de notifier son changement de domicile à la créancière dans un délai d'un mois à compter de ce changement, sauf à encourir les pénalités édictées par l'article 227-4 du même code

Dit que Robert MACDONELL devra en sus régler les frais de scolarité pour les quatre enfants à l'ISN

Dit n'y avoir lieu à déféré sur la résidence des enfants et le droit de visite et d'hébergement instauré par le conseiller de la mise en état au profit du père

Rejette la demande de Robert MACDONELL au titre des frais irrépétibles

Condamne Robert MACDONELL à payer à Sharon HAFNER la somme de 5000€ par application de l'article 700 du Code de Procédure Civile

Dit que Robert MACDONELL sera tenu aux entiers dépens, de première instance et d'appel, distraits au profit de l'avocat constitué aux intérêts de Sharon HAFNER

**Le Greffier,**                                    **Le Président,**

**EXHIBIT B**

COURT OF APPEAL OF AIX-EN-PROVENCE
6th Room B

DEFERE STOP
OF OCTOBER 25, 2016
N ° 2016/419

Role N ° 16/01457

Sharon Louise MACDONELL
wife HAFNER

VS/

Roger James MACDONELL

Grosse issued on:
to: Me BOISRAME Me BOULAN
Decision referred to the Court:

Order of the Court of Appeal of AIX EN PROVENCE dated January 11, 2016 registered in the
general directory under number 14/21683.

CALLING
Madame Sharon Louise MACDONELL wife HAFNER born October 27, 1964 in PALO ALTO
(CALIFORNIA) USA
of American nationality,

residing Villa Rustica - 5 Avenue de l 'Antiquité - 06160 CAP D'ANTIBES

represented by Me Alexandra BOISRAME, lawyer at the AIX-EN-PROVENCE bar
assisted by Me Jérôme BOURSICAN, lawyer at the PARIS bar,

RESPONDENT
Mr Roger James MACDONELL
born January 10, 1962 in MOUNTAIN VIEW CALIFORNIE (USA)
French nationality,
residing 1 Avenue du Commandant Garbe 06160 JUAN LES PINS

represented by Me Françoise BOULAN from SELARL BOULAN CHERFI L S I MPERATORE,
lawyer at the AIX-EN-PROVENCE b a r r eau,
assisted by Me Alain LUCIANI, lawyer at the GRASSE bar

COMPOSITION OF THE COURT

The case was debated on September 22, 2016 in the Council Chamber. In accordance with article 785 of the Code of Civil Procedure, Chantal MUSSO, President made an oral report of the case at the hearing before the pleadings.
The Court was composed of:

Mrs Chantal MUSSO, President Mr Joël MOCAER, President Mrs Michèle CUTAJAR, Advisor

who deliberated
Clerk during the debates: Mrs Marie-Sol ROBINET.

The parties have been informed that the delivery of the decision will take place by making it available to the registry on October 25, 2016.


STOP

Contradictory,
Pronounced by provision at the registry on October 25, 2016.

Signed by Mrs. Chantal MUSSO, President and Mrs. Marie-Sol ROBINET, Clerk to whom the minute of the decision has been handed over by the signing magistrate.
Mr. Roger James MAC DONELL and Mrs. Sharon HAFNER, both of American nationality, were married on October 3, 1992 in front of a priest of the County of San Mateo in the State of California in the United States. They did not precede their union by signing a marriage contract

From this union came four children, all born in the United States:
  • Lauren Michelle born August 4, 1996 (major)
  • Jackson Delaney born April 6, 1998 (major)
  • Roger Junior and Taylor Diane born June 30, 2000

A procedure initiated in Switzerland by Mrs HAFNER gave rise to a decision of the Court of Appeal of the canton of Bern on December 2, 2010 prohibiting Mr MACDONELL from having four bank accounts held with SAANEN BANK AG, the funds stranded in this facility representing approximately eight million US dollars.

Initially seized, the American justice declared itself incompetent to hear the divorce proceedings since the family had been installed in France since September 2006.

Seized of a petition for divorce, the family court judge of Grasse pronounced on February 21, 2011 a non-conciliation order, under the terms of which he notably:
  • granted to the wife the enjoyment of the housing and household furniture in the marital home, free of charge until her return to the United States
  • says that the husband should leave the premises within the fifteen-day period
  • said that Mr. MACDONELL should pay the charges relating to family housing
  • ordered the return to the husband of his personal effects and his clothes
  • says there is no need to rule on the attribution of the enjoyment of real estate belonging to the two spouses and located in the United States, the spouse having however the obligation to assume

alone the payment of the expenses related to the property and the occupation of these assets insofar as he is the only one with income

• condemned Mr. MACDONELL to pay his wife a maintenance allowance of 20,000 euros per month for the duty of help

• said that Mr. MACDONELL should also assume, under the duty of help, the provisional settlement of the following common debts: costs related to the ownership and occupation of the marital home and property located in the United States, private health insurance of the whole family, sports and leisure activities for the family as well as the costs of house staff (housekeeper, driver)

• said that Mr. MACDONELL should ensure the provisional settlement of the following common credits: loan contracted with the HSBC bank for the purchase of the marital home (monthly maturity of 11,060 euros) and credits contracted for the acquisition of the house located in Auburn and Dallas in the United States (monthly charge of 2,800 euros)

• ordered Mr MACDONELL to pay his wife the sum of 10,000 euros as a provision for court costs

• ordered Mr MACDONELL to pay his wife an advance on the community share in the amount of 1,000,000 euros

• says there is no need to appoint a notary or a qualified professional

• dismissed Mrs HAFNER of her request for sequestration of the sums held in the bank accounts opened in the names of the spouses or in the name of Mr MACDONELL and located in Switzerland, the United States and in France

• says there is no need to manage said accounts by the wife

• said that parental authority over the four minor children would be exercised jointly by both parents

• fixed the habitual residence of the children at the mother's home and granted the father access and extended accommodation rights as long as the children are in France and, from their installation in the United States, all of the school holidays All Saints' Day, February and Easter as well as half of the other school holidays

• said that the transport costs incurred for the exercise of this right of visit and accommodation would be borne exclusively by the father

• already authorized the mother to return to live in the United States with the four children at the end of the current school year

• says that there is no ban on the exit of children from the Shengen area

• set at the indexed monthly sum of 2,000 euros per child, i.e. a total sum of 8,000 euros, the amount of the paternal contribution to the maintenance and education of common children

• says that the father should continue to assume alone the expenses relating to the children with regard to the school, the private lessons, the sports and play activities, the stays abroad at Christmas and the summer, and their cover health insurance.

This order was referred to this Court of Appeal, which by judgment dated October 23, 2012 partially reformed the provisions of the decision, and:

• set the alimony owed by Mr MAC DONELL to his wife under the duty of help at the indexed monthly sum of 30,000 euros, with the charge for Mrs HAFNER to pay the expenses relating to the marital home as well as the health costs, insurance included, leisure and sports activities, house staff and driver and all other personal expenses

• said that Mr. MAC DONELL would assume the costs related to the ownership and occupation of property located in the United States, the loans contracted for the acquisition of said property and the loan contracted with the HSBC bank for the acquisition of the marital home subject to making the accounts between the parties during the liquidation of the matimonial regime

• granted the wife free enjoyment of the marital home

• Ms. HAFNER rejected her request for the allocation of a provision against her rights in the liquidation of the matrimonial regime _

• fixed the paternal contribution to the maintenance and education of common children at the sum of 2,000 euros per child per month and said that this sum would cover all the children's expenses

• Mr MAC DONELL dismissed for his request to have the free enjoyment of the marital home limited in time.

• Mr MAC DONELL dismissed for his request to release the bank accounts opened in the books of Saanen Bank AG

• made Mr. MAC DONELL responsible for paying the invoices issued by the ISN for the education of the children from the date of the stoppage

• said that the provisions of the non-conciliation order would apply as long as the children were domiciled in France

• rejected the request for the removal of the children's residence time with the father on Wednesdays.

On November 8, 2012 Mrs HAFNER sued her husband for divorce on the basis of the provisions of article 242 of the civil code.

Seized on an incident, the pre-trial judge issued an order on December 2, 2013, under the terms of which he notably:

• found and ruled that Mrs HAFNER would no longer benefit from the free enjoyment of the marital home located in Juan les Pins

• attributed the enjoyment of this property for consideration to Mr. MAC DONELL, responsible for him to assume all the related charges with an account to be made between the parties at the time of liquidation of the matrimonial regime

• noted the agreement of Mr. MAC DONELL for an attribution of the enjoyment of the property located in Auburn in the United States to Mrs. HAFNER and grants this request with charge for the wife to settle all the related charges, under reservation of the rights of each person during the liquidation of the matrimonial regime

• maintained the habitual residence of common minor children at the mother's domicile in the United States

• said that the father's visitation and accommodation rights would be exercised outside school holidays nine days a month, from the first weekend of each month, Friday out of school, to the following weekend, Monday back to school and during the whole of the school holidays with the exception of those of Christmas and summer shared by half

• said that the transport costs incurred for the exercise of this right would be borne exclusively by the father

• found and ruled that Mr. MAC DONELL should pay the registration fees for the child Lauren for the year 2013/2014

• deleted as of September 1, 2013 the paternelle contribution for the maintenance and education of the child Lauren

• set at the indexed monthly sum of 1,000 euros per child, i.e. a total sum of 3,000 euros, the amount of the paternal contribution for the maintenance and education of the other three common children, it being specified that this sum would cover the all children's expenses.

The 6th chamber C of the Aix en Provence Court of Appeal, by judgment dated March 26, 2015, overturned the decision rendered by the pre-trial judge on only financial measures relating to children.
The amount of the paternal contribution to the maintenance and education of common children has again been set at the indexed monthly sum of 2,000 euros per child. In addition, the Court said that Mr. MAC DONELL would cover the school fees incurred for the year 2013/2014 for the children Lauren and Jackson.

By contradictory judgment rendered on June 16, 2014, the family court judge in Grasse:

• pronounced the divorce to the shared wrongs of the spouses

• said and ruled that the law applicable to the matrimonial regime of the MACDONELL /
HAFNER spouses is that of the Californian primary regime and that therefore, the parties should
settle their patrimonial interests in application of the Californian rules

• ordered the liquidation and the sharing of the property interests existing between the
parts

• says there is no need at this stage of the procedure to appoint a notary for
proceed with the liquidation of the respective rights of the parties

• dismissed Mrs HAFNER for her request for an advance on the share of the community

• confirmed the last provisional measures concerning children

• ordered Mr MAC DONELL to pay Mrs HAFNER a compensatory capital allowance in the
amount of 2,000,000 euros

• rejected the request for provisional execution

• Mr MAC DONELL dismissed his claim for damages

• authorized Mrs HAFNER to keep the use of the husband's name.

Mrs HAFNER appealed against this decision by declaration to the registry received on November
17, 2014.

On July 1, 2015, the parties were summoned to the Court hearing scheduled for October 15, 2015 at
8:20 a.m., with the closing of the investigation scheduled for October 8, 2015.

September 24, 2015 Mrs HAFNER seized the advisor of the pre-trial of conclusions
incident.

The closing order was revoked on October 15, 2015 and the matter remitted to the hearing of
pre-trial advisor of November 9, 2015.

In its findings of incident notified on November 6, 2015, the appellant requested the rejection of the
debates of the opposing party's findings and documents filed on November 6, 2015 in violation of
the adversarial principle. Failing that, Mrs HAFNER asked to:

• dismiss Mr. MAC DONELL of all his requests, purposes and conclusions

• grant him the enjoyment of the common good located at 1 avenue commandant Garbes, 06160
Cap d´Antibes, former marital home, free of charge, under the duty of help

• say and judge that the father would benefit from the decision to intervene from a right of
visitation and accommodation the first, third and fifth weekends of each month from Friday evening
out of school to Sunday evening 6 p.m. school periods and half of all school vacations of more than
five days

• order Mr MAC DONELL to pay the mother a contribution to the maintenance and education of
the children in the amount of 2,000 euros per month and per child, i.e. the total sum of 8,000 euros
per month, from of the month of July 2014, date on which Mr. MAC DONELL stopped paying the
duty of help to his wife.

In its findings in response to the incident notified on November 6, 2015, the Respondent's principal
request was to:

• declare and judge that the opposing party does not demonstrate a new element within the
meaning of articles 1118 and 1119 of the code of civil procedure

• declare the incident of Mrs HAFNER inadmissible and refer it to the merits

• say the procedure of Mrs. HAFNER dilatory

• order her to pay the sum of 10,000 euros in accordance with the provisions of Article 700 of the
Code of Civil Procedure.
Subsidiarily, it was requested to:

• dismiss Mrs HAFNER of all of her requests

• declare and judge that Mr. MAC DONELL could continue to enjoy the Antibes Juan les Pins apartment for payment

• set up an alternate residence for four children, two weeks a month, at the home of each of the parents

• confirm that Mr MAC DONELL would pay a contribution to children in the amount of 4,000 euros, or 1,000 euros per child

• say and judge that the tuition fees would be shared between the two parents

• order the opposing party to pay the costs of the incident and to pay a sum of 5,000 euros in application of Article 700 of the Code of Civil Procedure.

By order dated January 11, 2016, the pre-trial advisor:

• said that the French courts were competent to hear the dispute, and that they apply French law

• discarded notes under advisement that did not respond to a request from the pre-trial adviser

• declared admissible the conclusions and documents of the respondent notified and filed on November 6, 2015.

• Ms. Sharon HAFNER rejected for her request for the allocation of the enjoyment of the common good located at 1 avenue Commandant Garbes in Cap d'Antibes

• maintained the residence of minor children at the maternal home

• said that from the present order Mr. Roger MAC DONELL would exercise a right of visit and accommodation over his minor children in principle amicably and, in the absence of agreement between the parties, the first, third and fifth weekends from Friday at the end of the school to Sunday 6 p.m., the right of visit and accommodation being extended to the public holidays preceding or following the weekend, the second and fourth midweek from Tuesday to the class leaves on Wednesday 6 p.m. as well as the first half of school holidays of more than five days in even years and the second half in odd years,

• fixed as of this ordinance at the sum of 1,000 euros (one thousand euros) per month and per child the contribution of Mr. Roger MAC DONELL to the maintenance and education of the four common children, i.e. a total monthly sum of 4,000 euros (four thousand euros), amount payable and indexed under the conditions set out in the judgment rendered on June 16, 204 by the family affairs judge of the Tribunal de Grande Instance of Grasse,

• said that Mr. Roger MAC DONELL would assume all of the school fees for the four children,

• ordered Mrs. Sharon HAFNER to pay Mr. Roger MAC DONELL a sum of 1,500 euros (one thousand five hundred euros) in application of the provisions of Article 700 of the Code of Civil Procedure,

• ordered Mrs. Sharon HAFNER to pay all the costs of the incident proceedings recovered in accordance with the provisions of Article 699 of the Code of Civil Procedure.

Sharon HAFNER referred this order to the court, by motion filed on January 26, 2016.

By last conclusions notified to the opposing party on March 23, 2016, Sharon HAFNER asks the court to:

• REFORM the order referred in that it:

• Mrs HAFNER dismissed of her request for attribution of the enjoyment of the common good located at 1 avenue Commandant Garbes in Cap d'Antibes,

• Fixed as of this ordinance at the sum of 1,000 euros per month and per child the contribution of Mr. Roger MACDONELL to the maintenance and education of the four common children, ie a monthly sum of 4,000 euros

Ruling again:

◦ ATTRIBUTE to Madame MACDONELL the enjoyment of the common good located 1 avenue

Commandant Garbes - 06160 Cap d'Antibes, former marital home, free of charge, under the duty of help,

◦ CONDEMN Mr. MACDONELL to pay the mother a contribution to the maintenance and education of the children in the amount of 2,000 euros per month and per child, for the four children, i.e. the total sum of 8,000 euros per month, and this, from the month of July 2014, date on which Mr. MACDONELL ceased to pay the duty of help to his wife,

◦ CONDEMN Mr. MACDONELL to pay his wife the sum of 5,000 euros on the basis of article 700 of the Code of Civil Procedure, as well as all costs of first instance and appeal, the latter distracted in favor of Maître Alexandra BOISRAME Lawyer who provided for them.

It develops the following means.

On the new elements: she was forced to return to France with the children in a context in which her husband has concealed a considerable part of his income and where he refuses to fulfill the duty of help, while she has her -even made every effort to recover the amounts due.

On the allocation of the marital home: Mrs. MACDONELL asked her husband to be able to occupy the former marital home with the children, as was the case before their departure for the United States. Mr. MACDONELL, in a perfectly unjustified manner, opposed it, and continues to oppose it, even though he does not occupy this property, because he lives in Monaco.

Madame MACDONELL has no other housing solution for herself and the couple's four children. She is in dire financial straits, as she is financially dependent on her husband. She has no personal savings, and it is her husband who has sole access to all of the community's funds.

The forced execution procedure that she implemented in California resulted, after a long month of a particularly onerous procedure, in which she could seize for the future half of her husband's income from SHIPPING SOLUTIONS, i.e. the sum of 8,125 dollars per month (out of 30,000 euros of emergency duty).

She therefore calls for a return to the solution prior to her departure for the United States, to which her husband was not opposed, a solution which is undoubtedly in the best interests of the children.

As to the husband's residence in Monaco, she claims that he was criminally prosecuted in the principality's court for abandonment of his family. The criminal file established by the MONACO Public Prosecutor's Office also contains a copy of Mr. MACDONELL's resident card in MONACO, which he recently renewed and which is valid until May 20, 2018.

In addition, the marital home is permanently rented on the Airbnb website.

On the contribution to the maintenance and education of children: the last decision to have ruled on the paternal contribution to the maintenance and education of children is the divorce judgment of June 16, 2014, of which an appeal.

Since this decision has been taken, and contrary to what the Advisor of the State has retained, the situation of the parties has in reality evolved, justifying that if it is ruled again on the amount of this contribution.

So :

◦ it no longer perceives the duty of help owed by Mr. MACDONELL since July 2014, i.e. for 19 months,

◦ in this context, she was forced to return to settle in France, with the couple's four children,

◦ the Court of Ceans, in a judgment dated March 26, 2015, restored the amount of the paternal contribution to the sum of 2,000 euros per month and per child for the four children, for the period running between the month of December 2013 and the month of June 2014 (period before it),

◦ above all, Mrs. MACDONELL discovered, in a document communicated by Mr. MACDONELL himself but on the eve of the hearing of the incident which gave rise to the decision referred, that the father, who declared to perceive income of the order of 200,000 euros per year, in reality has annual revenues of more than 2 million euros ($ 2 million in annual revenues from CGI Franchise Systems Inc., or 1,848,750 euros + 200,000 euros in revenues from SHIPPING SOLUTIONS).

Taking into account the respective situations of the parents, it is necessary to restore the contribution to the maintenance and the education of the children, as fixed by the conciliator magistrate, that is to say to the sum of 2,000 euros per month. and per child, ie 8,000 euros per month for the four children.
And this, particularly in a context in which:

• the children are between 15 and 19 years old and their needs are constantly increasing,

• the father, as retained by the Advisor of the State, does not regularly exercise his right of visit and accommodation, and therefore leaves the children in the charge of the mother most of the time,

• the children benefited, from the time they spent together, from a high standard of living, what
is always the case of the father: there is no reason, when the father can afford it, not to allow this to always be the case.
In his writings of March 23, 2016, Roger MAC DONELL asks the court to:

On the attribution of the enjoyment of the common good sis. 1 Av of Commander GARBES in ANTIBES:

• RECEIVE it in its conclusions on referral and declare it well founded

• CONFIRM the disputed order;

• TELL AND RULE that Mrs HAFNER does not demonstrate a "new element" within the meaning of articles 1118 and 1119 of the Code of Civil Procedure

• DISCUSS Mrs. HAFNER from her incident;

• DIRECT Madame HAFNER's dilatory procedure

• ORDER HER to pay the sum of € 10,000 in application of the provisions of Article 700 of the Code of Civil Procedure as well as to the costs.

In the alternative, if the Court were to attribute the enjoyment of the common good to Mrs HAFNER:

• TELL AND RULE that this allocation will be made against payment

• TELL AND RULE that Mrs HAFNER will have to assume all the costs,
taxes,
taxes, credits related to this common good
On children's residence and visiting rights:

• TAKE NOTE that Mr. MAC DONELL is requesting the establishment of alternate custody of the four children, 15 consecutive days per month at his home in ANTIBES JUAN LES PINS;

• TELL AND JUDGE the implementation of alternating custody 15 days a month for each of the parents;
Alternatively, CONFIRM the provisions of the disputed ordinance On the paternal contribution to the maintenance and education of children

• CONFIRM that Mr. MAC DONELL will pay a contribution to children in the amount of € 4,000, ie € 1,000 per child;

• TELL AND RULE that the tuition fees will be shared between the two parents;

• CONDEMN Mrs HAFNER to pay Mr MAC DONELL the sum of € 5,000 in application of the provisions of article 700 of the Code of Civil Procedure.

It develops the following means.

On the request for the attribution of the common good: Sharon HAFNER does not demonstrate a new element. The fact that he no longer pays child support since the divorce is not new. Is she in dire financial straits? However :

• since the start of this procedure (2010) Ms. HAFNER has not experienced just one
moment the need to work, nor even tried to find a job. Her lover Monsieur Philippe LAURENT, 22 years younger, either; this last has lived on his hook for 7 years, maintained with the money that Mr MACDONELL pays his wife ...

• Since the start of this procedure (2011) Mrs HAFNER has received more than
3,111,000 euros: This represents nearly 60,000 € / month !! net of all taxes and charges since it has never contributed to the debates its tax notices in France or in the United States.
Would she have spent this amount in four years? It is inconceivable, whereas it is Mr. MAC DONELL who regulates the loans of the houses, all the school fees of the children each year (nearly 100,000 € per year).
- Mrs HAFNER realizes substantial savings since she refrains from paying the sums incumbent on her considering that everything is due to her and that everything she receives is considered "net":

• When she occupied the marital apartment of ANTIBES, Mrs HAFNER did not pay any co-ownership charges and preferred to move to the UNITED STATES so that the Trustee had to take legal action to recover a sum which amounted to over € 30,000. It is Mr. MAC DONELL who had to pay this sum, thus stopping the procedure (Ordinance of January 15, 2016).

• By receiving maintenance payments of € 20,000 and then € 30,000 Mrs. HAFNER has never justified paying her taxes in France or in the UNITED STATES: she considers that it is net for her. She never tendered proof that she had declared these sums to the tax authorities.

He protests against the organization's accusations of insolvency, falsehood and fraudulent alteration of the truth which, moreover, have resulted in criminal dismissals.

He argues that the only reason she left the US home was that the landlord wanted to sell the property, not because she could no longer pay the rent. She recently moved to a sumptuous 6-room, 250 m2 house in CAP D'ANTIBES on a 1,200 m2 plot with a heated swimming pool in the well-preserved setting of the Garoupe district.

He specifies that he pays her 5,000 € / month following an order to pay of November 30, 2015, and that Sharon HAFNER was authorized by a Californian judge to carry out a seizure on half of the husband's income, namely the sum of $ 8,125 or just over € 7,700.

He claims to remain in the matrimonial home. As an American citizen, Mr. MAC DONELL has no fiscal interest in residing in PRINCIPALITY OF MONACO. Moreover, Mrs HAFNER herself is convinced that he lives in this apartment; the best proof: it is at this address of JUAN LES PINS that she issues him the order to pay of October 9, 2015 relating to the non-payment of the pension of
30,000 € / month.
Finally, he exercises his right of visit and accommodation; he demonstrated that he received his four children there as part of his visitation and accommodation rights, despite the countless difficulties created by Mrs HAFNER which led him to deposit four handrails at the
ANTIBES police station on January 4, February 10-24 and March 9, 2016.

On the alternate residence of the children: Mr. MAC, DONELL already received his children 10 days a month; setting up alternating custody for 15 consecutive days per month, ie two weeks per month, would not pose any problem. What is more, the apartment occupied by Mr. MAC DONELL

is located in ANTIBES, not far from the ISP TENNIS ACADEMY school in BIOT, where the children are educated.

On the contribution to the upkeep and education of the children: it pays the school fees for the 4 children at the ISP TENNIS ACADEMY in Biot, i.e. the sum of € 85,000

The case was called at the hearing on March 24, 2016. By judgment dated June 7, 2016, the Court of Appeal hereby ordered the reopening of the proceedings at the hearing on September 22, 2016, given the unavailability one of the magistrates of the composition during deliberation.


Reasons for the decision


On the occurrence of a new fact

After the appeal lodged against the divorce judgment, Sharon HAFNER appealed to the pre-trial advisor for a procedural incident due to the occurrence of a new fact, in this case the catastrophic situation. in which it was since Robert MAC DONELL had ceased in July 2014 to pay the duty of help which had led to his return to France, to see modification of the provisional measures relating to the duty of help and the ancillary measures relating to the contribution to the maintenance and education of children.

It will be recalled that under the combined terms of articles 771, 907 and 1119 of the Code of Civil Procedure, in the event of an appeal, modifications to the provisional measures, in the event of the occurrence of a new fact, can only be requested pre-trial adviser. In addition, article 1083 of the same code provides that when the judgment pronouncing the divorce is appealed against, the modification of the accessory measures enforceable by provision by application of article 1074-1, in the event of the occurrence of a fact. new, can only be requested from the pre-trial adviser.

The pre-trial counselor refused to consider Sharon HAFNER's return to France as new, on the grounds that it was not an objective fact, but the consequence of his personal choices. On the other hand, he retained as a new element the installation of the children in France.

It is not disputed that after the divorce was concluded, and notwithstanding the appeal brought by Sharon HAFNER, Robert MACDONELL immediately ceased to pay the alimony owed to his wife.

Certainly Robert MAC DONELL made settlement proposals to Sharon HAFFNER: on the one hand to pay him the compensatory allowance of 2 million euros, then the arrears of alimony, offers that Sharon HAFFNER declined because the funds had to be withdrawn from accounts blocked at SAANEN BANK, and that she wanted them to be from other accounts (such as the one opened at MAERKI BAUMANN & CO, in which Robert MAC DONELL held € 2,239,965 - cf: correspondence of Maître BOURSICAN of September 8, 2014). Sharon HAFFNER indeed considers that half of the funds frozen at SAANEN BANK belong to him, and that Robert MAC DONELL's share should be used to settle property interests following the divorce. This point of view was accepted by the judge of the Supreme Court of California - County of San Matéo, since the latter authorized the direct payment of the alimony on the income that Robert MAC DONELL derives from his activity in the company SHIPPING SOLUTIONS (cf: trial of June 30, 2015). However, this direct payment made it possible to obtain a monthly withdrawal of US $ 8125, or the equivalent of € 7182, which is not even a third of the pension, and does not cover arrears. In addition, this direct payment procedure entailed significant costs for Sharon HAFFNER (i.e. the sum of US $ 46,044.84) because Robert MAC DONELL challenged before the California court the enforceability of the judgment of October 23, 2012 setting the rescue duty, which made the procedure more complex.

After this procedure, which only partially satisfied Sharon HAFNER, the latter decided to return to the marital home. She wrote to Robert MAC DONELL to this effect on August 10, 2015, which he

refused on the grounds that she was receiving maintenance payments of € 33,000 / month and that neither she nor her lover were working, which made them donated time and money to find suitable accommodation.

Robert MAC DONELL argues that Sharon HAFNER's departure from the Menlo Park house was in no way justified by financial difficulties, as the owner actually wanted to sell this house.

He wants as proof two emails sent to him by James KATZMAN. In the first dated March 31, 2015, the latter tells him that the family moving in early April, the house will be ready for sale at the end of April at the beginning of May, which made him hope for a sale at the end of June. In the second dated July 30, 2015, the sale price given to Robert MAC DONELL is set for the sum of $ 4.75M Sharon HAFNER for her part produced two emails: one sent to James KATZMAN on April 8, 2015, in which she told him of her sadness at having to leave the house, and the fact that she hoped that her husband would come to his senses, but that it was not. A second, dated March 22, 2016, comes from James KATZMAN's lawyer, who certifies that the latter wanted to sell his house in December 2015.

It therefore follows clearly from these different correspondences, that it is good because she could no longer pay the rent of US $ 11,000 generated by the rental of Menlo Park, because of her husband's stubbornness. not to pay him alimony, which Sharon HAFNER left, and not because James KATZMAN had already put the house up for sale at the time. If that had been the case, he would not have replied on March 31, 2015 to Robert MAC DONELL: "I have not set a price, but I can look into it if you want a number".

Sharon HAFNER's financial difficulties are moreover demonstrated by the fact that she sought to sell a piece of jewelry in December 2014, or that her parents loaned her $ 10,000 in June 2015, and by all the procedures she has had. set up to try to recover the pension arrears (orders to pay of August 5 and October 9, 2015, Californian procedure, complaint for family abandonment, summons before the Monaco Criminal Court)


Following the move from Menlo Park, Sharon HAFNER moved in with her children with her parents, but the latter, aged 92 and 90, could not keep the family with them for too long. She therefore decided to return to France and occupy the marital home there, which allowed her to make substantial savings in housing, and represented an appropriate response to the perilous financial situation into which the declared will of Robert MAC DONELL had plunged her. not to pay him any more the pension, being satisfied to pay him the contribution to the maintenance and the education of the children.

Sharon HAFNER's return to France with the children cannot therefore be analyzed as a fact dependent on her own will, and it is wrong that the pre-trial advisor did not accept it as a new fact.


On the attribution of the enjoyment of the marital home

It should be recalled that in its judgment of 23 October 2012, the Court of Appeal here granted Sharon HAFNER the enjoyment of the marital home free of charge in consideration of the income of Robert MACDONELL and the lack of professional activity of Sharon HAFNER. This award was made without time limit, the court noting that the wife had expressed a desire to return to the United States but had not yet implemented her plan. The duty to help was also fulfilled by the granting of a monthly maintenance allowance of € 30,000.

Sharon HAFNER therefore asks that he returned to the duty of help as defined by this judgment. The court noted at the time the following:

• In 2008, the husband declared in France a total income of 490,456 €, ie a monthly income of 40,871 €, including income received in the USA, Switzerland and France. In 2009, income had fallen to € 102,586, i.e. an average monthly income of € 8,548, and in 2010 to € 32,812, i.e. a monthly average of € 2,734, totally incompatible with the lifestyle of the family, which had no suffered no degradation between 2008 and 2010.

The court had effectively noted that the husband took charge of all the mortgages encumbering the property of the couple is in total the sum of 15,194 € / month, that he paid a maintenance allowance of 20,000 € without difficulty, that the spouses possessed. numerous bank accounts and that the only account opened at Société Générale showed monthly expenses of nearly € 15,000, that the family made many trips and stayed in luxury hotels, that the children played many sports. ..
In addition, the wife had provided proof that her husband derived income from the company SHIPPING SOLUTIONS, and that it could be assessed at the monthly sum of € 24,000 (in 2012)

• The wife had not been working since 1999. Her monthly expenses were 23,454 €, excluding food and clothing.

At present, the situation is as follows:

• Sharon HAFNER is still not working, for a reason that is not explained. She lives with a companion who, according to Robert MAC DONELL, does not receive any income.
She rents the house the couple own in Auburn which represents an annual rent receipt of US $ 19,231
As Robert MAC DONELL refused her reinstatement of the marital home, she had to incur housing costs: she first rented in Antibes from September 9, 2015, a villa of 6 rooms and 280m2, for the sum of 4000 €. Then from February 1, 2016, she rented another villa in Cap d'Antibes for € 3,500 until April, then € 4,000 in May.

• Robert MAC DONELL figures his monthly income at US $ 28,000, or € 25,722 at the current rate. This figure is strongly contested by the opposing party who maintains that Robert MAC DONELL receives annual income from CGI Systems INC for US $ 2M (or € 1,831,435), and wants as proof the payment of this sum on February 28. 2014 on the account opened at DREYFUS SONS & CO, a banking establishment located in Basel, Switzerland, then the transfer of the sum of US $ 1,401,891 to the MAERKI BAUMANN AND CO bank in Zurich one year later.
Robert MAC DONELL disputes such an analysis and affirms that this sum comes from the sale of his shares in this company, which confirms his chartered accountant. However, if this were the case, it is difficult to understand why the sum would come from CGI Systems INC, because as Sharon HAFNER rightly points out, it is not possible that this company has bought back its own shares. As Robert MAC DONELL does not produce any document other than an email from his chartered accountant to prove this sale, the thesis put forward by Sharon HAFNER, of remuneration by this company, which in 2007 had reported to Robert MAC, will be retained. DONELL salary income of US $ 2,317,358

Roger MACDONELL's financial situation is therefore as opaque as any time the courts have had to rule in the context of the divorce proceedings

Even the domicile of Robert MAC DONELL is obscure. The marital home has been assigned to him, and he claims to live there, but he rents a property in Monaco, where he is domiciled in various documents or mails he sends, and where his lawyer also domiciled him in the California proceedings.

In view of these elements, it should be noted that the situation is identical to that analyzed by the court in 2012, and to attribute the enjoyment of the marital home to Sharon HAFNER free of charge, which will also allow the children to regain their framework. of usual life, after the successive moves they have had to undergo.

On the children's residence
The pre-trial counselor rightly considered that the best interests of the minor children were to stay with the mother. Indeed, since the parental breakdown, the children have lived with her, in France and then in the USA, and it is not appropriate to add to the various upheavals they have known

since the separation of the couple, the establishment of a residence in alternation, which would only worsen the execrable relations between the parties.


On the contribution to the maintenance and education of children

On this point, Robert MAC DONELL is somewhat contradictory, because he asks in the operative part of his conclusions the "confirmation" of the decision of the pre-trial advisor on this question, while arguing that California law would be applicable in the case, while the pre-trial counsel ruled otherwise.

It will be recalled that in matters of maintenance obligations, for foreign nationals, Article 3 of the Hague Protocol of 23 November 2007, which designates as applicable law, that of the habitual residence of the creditor. As the mother usually resides in France, California law is not intended to apply in this matter.

The divorce judgment set the father's contribution to the sum of € 3,000, i.e. € 1,000 / month for the children, Jackson, Taylor and Robert Jr, in the absence of new elements that have arisen since the incident order. of the pre-trial judge of December 2, 2013, who had removed the contribution due for Lauren, insofar as the latter was internal to the Gorin Tennis Academy and that her father covered all the tuition fees, i.e. annual sum of € 47,000.

However, Sharon HAFNER appealed against this order, and by a judgment of March 26, 2015, the Court of Appeal reversed this decision on this point, fixing the contribution to the maintenance and education of the four children at the sum of € 8,000 (i.e. € 2,000 / month and per child) and condemning the father to pay the tuition fees of Lauren and Jackson.

Since their arrival in France in September 2015, the children have been educated at the ISP TENNIS ACADEMY in Biot, at the initiative of their mother who declined Robert MAC DONELL's offer to see them enroll at the International Center of Valbonne, which he is considered to be the best bilingual establishment in the region. The annual tuition fees at ISP TENNIS ACADEMY are € 85,000 for the four children.

The situation therefore arises in terms of the needs of the children as it did when the court ruled in October 2012.

The financial situation of the parties has been explained above.

In consideration of these elements, the father's contribution will be set at the sum of € 2,000 / month and per child, or a total of € 8,000, and Robert MAC DONELL will have to pay the tuition fees to ISN. However, this contribution will be due from September 2015, the date of the return of the children to France, and not from July 2014, the date from which the husband no longer paid the alimony to his wife. Indeed, the cessation of the payment of the pension is not in itself a new fact, since Sharon HAFNER had a title to enforce the obligation. It is the obstacles encountered by Sharon HAFNER to make the execution effective, and the concomitant financial difficulties which led to his departure from the United States and his resettlement in France which alone can constitute here the new fact founding the competence of the advisor of the implementation. in state.


The costs

Both those of first instance and of appeal, will be charged to Robert MAC DONELL, debtor of the duty of help and the contribution to the maintenance and education of the children

Held for costs, Robert MAC DONELL is inadmissible in his claim for irrecoverable costs.

Equity orders to allocate to Sharon HAFNER the sum of € 5,000 on the basis of article 700 of the Code of Civil Procedure

For these reasons

The court, ruling on a referral
Holds to be referred to the duty of help and the contribution to the maintenance and education of children
Consequently
Allows Sharon HAFNER to enjoy the marital home free of charge for the duration of the procedure
Fixed at the sum of € 2,000 per month and per child, the contribution that Robert MAC DONELL will be required to pay to Sharon HAFNER for the maintenance and education of the four children, i.e. a total of € 8,000, and this from September 2015
Considering article 465-1 of the Code of Civil Procedure

States that this monthly payment will be revised automatically on January 1 of each year according to the evolution of the consumer price index of urban households whose head of household is a worker or an employee (Entire France series excluding tobacco ) or according to the index which may have been substituted for it

Specifies that the rate of change will be assessed by comparison between the last known index on September 1, 2015 and the last index that will be published on January 1 of each year, the new amount being able to be calculated by applying the formula:

Amount of the monthly payment x New index Last known index on September 1, 2015

Reminds the debtor of the monthly payment that it is up to him to apply the indexation and that he can find out about the index on the site www.service-public.fr/calcul- pension

Recalls that in the event of default in the payment of the contribution, the creditor can obtain the forced payment, using one or more of the following means of execution at its option:
• direct payment into the hands of the third party debtor
• procedure for the public recovery of maintenance payments
• recovery by the debtor organization of family benefits subrogated in the rights of the creditor

Reminds the debtor of the monthly payment that if he remains for more than two months without paying in full the amount of the contribution resulting from his family obligations, he is liable to the penalties provided for by article 227-3 of the Penal Code, and that " he has the obligation to notify the creditor of his change of domicile within one month of this change, unless he incurs the penalties enacted by article 227-4 of the same code

Said that Robert MACDONELL will also have to pay the school fees for the four children at ISN
Holds to be referred to the residence of the children and the visitation and accommodation rights established by the pre-trial advisor for the benefit of the father
Rejects Robert MACDONELL's claim for irrecoverable costs
Condemns Robert MACDONELL to pay Sharon HAFNER the sum of € 5,000 by application of article 700 of the Code of Civil Procedure
Holds that Robert MACDONELL will be liable for all costs, of first instance and of appeal, distracted in favor of the lawyer constituted in the interests of Sharon HAFNER

The Registrar, The President,

**EXHIBIT C**

1

## COUR D'APPEL D'AIX-EN-PROVENCE
### 6e Chambre B

### ARRÊT AU FOND
### DU 29 NOVEMBRE 2016

### N° 2016/489

**Décision déférée à la Cour :**

**Rôle N° 14/21683**

Jugement du Tribunal de Grande Instance de GRASSE en date du 16 Juin 2014 enregistré(e) au répertoire général sous le n° 10/05257.

**Sharon Louise HAFNER épouse MAC DONELL**

**APPELANTE**

**Madame Sharon Louise HAFNER épouse MAC DONELL**

**née le** 27 Octobre 1964 à PALO ALTO CALIFORNIE (USA)

C/

de nationalité Américaine,

**Roger James MAC DONELL**

**demeurant** Villa Rustica - 5 Avenue de l'Antiquité - 06160 CAP D'ANTIBES

**représentée par** Me Alexandra BOISRAME, avocat au barreau d'AIX-EN-PROVENCE

**assistée de** Me Jérôme BOURSICAN, avocat au barreau de PARIS,

**INTIME**

**Monsieur Roger James MAC DONELL**

**né le** 10 Janvier 1962 à MOUNTAIN VIEW (CALIFORNIE) USA

de nationalité Américaine,

Grosse délivrée le :
à :Me BOISRAME
SELARL BOULAN
CHERFILS IMPERATORE

**demeurant** Le Continental - Bloc C n° 75 Place des Moulins - 98000 MONACO

**représenté par** Me Pierre-Yves IMPERATORE de la SELARL BOULAN CHERFILS IMPERATORE, avocat au barreau d'AIX-EN-PROVENCE,

**assisté de** Me Alain LUCIANI, avocat au barreau de GRASSE

\*-\*-\*-\*-\*

2

**COMPOSITION DE LA COUR**

L'affaire a été débattue le **22 Septembre 2016** en Chambre du Conseil. Conformément à l'article 785 du Code de Procédure Civile, Chantal MUSSO, Président a fait un rapport oral de l'affaire à l'audience avant les plaidoiries.

La Cour était composée de :

Madame Chantal MUSSO, Présidente
Monsieur Joël MOCAER, Président
M. Benoît PERSYN, Conseiller

qui en ont délibéré

**Greffier lors des débats** : Madame Marie-Sol ROBINET.

Les parties ont été avisées que le prononcé de la décision aura lieu par mise à disposition au greffe le 29 Novembre 2016.


**ARRÊT**


Contradictoire,

Prononcé par mise à disposition au greffe le 29 Novembre 2016.


Signé par **Madame Chantal MUSSO, Présidente** et **Madame Marie-Sol ROBINET, Greffier** auquel la minute de la décision a été remise par le magistrat signataire.

Monsieur Roger James MAC DONELL et Madame Sharon HAFNER, tous deux de nationalité américaine, se sont mariés le 3 octobre 1992 devant un prêtre du Comté de San Mateo dans l'Etat de Californie aux Etas-Unis d'Amérique. Ils n'ont pas fait précéder leur union de la signature d'un contrat de mariage
.
De cette union sont issus quatre enfants, tous nés aux Etats-Unis
      - Lauren Michelle née le 4 août 1996 (majeure)
      - Jackson Delaney né le 6 avril 1998 (majeur)
      - Roger James et  Taylor Diane nés le 30 juin 2000

Une procédure diligentée en Suisse par Madame HAFNER a donné lieu à  une décision de la Cour d'appel du canton de Berne en date du 2 décembre 2010 interdisant à Monsieur MAC DONELL de disposer de quatre comptes bancaires détenus auprès de la SAANEN BANK AG, les fonds bloqués dans cet établissement représentant environ huit millions de dollars US.

Intialement saisie,  la justice américaine  s'est déclarée incompétente pour connaître de la procédure de divorce puisque la famille était installée en France depuis le mois de septembre 2006.

Lejuge aux affaires familiales de Grasse a été saisi d'une requête en divorce par, et a rendu  le 21 février 2011 une ordonnance de non conciliation aux termes de laquelle il a notamment :
      - attribué à l'épouse la jouissance du logement et du mobilier du ménage se trouvant au domicile conjugal, et ce à titre gratuit jusqu'à son retour aux Etas-Unis
      - dit que l'époux devrait quitter les lieux dans le délai de quinze jours
      - dit que Monsieur MAC DONELL devrait payer les charges afférentes au logement familial
      - ordonné la remise à l'époux de ses effets personnels et de ses vêtements
      - dit n'y avoir lieu à statuer sur l'attribution de la jouissance des biens immobiliers appartenant aux deux époux et situés aux Etats-Unis, l'époux ayant toutefois l'obligation d'assumer seul le paiement des frais liés à la propriété et à l'occupation de ces biens dans la mesure où il est le seul à disposer de revenus
      - condamné Monsieur MAC DONELL à verser à son épouse une pension alimentaire de 20.000 euros par mois au titre du devoir de secours
      - dit que Monsieur MAC DONELL devrait  également assurer, au titre du devoir de secours, le règlement provisoire des dettes communes suivantes : frais liés à la propriété et à l'occupation du domicile conjugal et des biens situés aux Etats-Unis, assurance maladie privée de l'ensemble de la famille, activités sportives et de loisir de la famille ainsi que les frais de personnel de maison (femme de ménage, chauffeur)
      - dit que Monsieur MAC DONELL devrait assurer le règlement provisoire des crédits communs suivants: prêt contracté auprès dela banque HSBC pour l'achat du domicile conjugal (échéance mensuelle de 11.060 euros) et crédits contractés pour l'acquisition de la maison située à Auburn et à Dallas aux Etats- Unis (charge mensuelle de 2.800 euros)
      - condamné Monsieur MAC DONELL à payer à son épouse la somme de 10.000 euros à titre de provision pour frais d'instance
      - condamné Monsieur MAC DONELL à verser à son épouse une avance sur part de communauté d'un montant de 1.000.000 euros
      - .dit n'y avoir lieu à désignation d'un notaire ou d''un professionnel qualifié
      - débouté Madame HAFNER de sa demande de mise sous séquestre des sommes détenues sur les comptes bancaires ouverts aux noms des époux ou au nom de Monsieur MAC DONELL et situés en Suisse, aux Etats-Unis et en France
      - dit n'y avoir lieu à gestion desdits comptes par l'épouse
      - dit que l'autorité parentale sur les quatre enfants mineurs sera exercée en commun par les deux parents
      - fixé la résidence habituelle des enfants au domicile de la mère et accordé au père un droit de visite et d'hébergement élargi tant que les enfants sont en France et, à partir de leur installation aux Etats-Unis, l'intégralité des vacances scolaires de Toussaint, de février et de Pâques ainsi que la moitié des autres vacances scolaires
      - dit que les frais de transport exposés pour l'exercice de ce droit de visite et d''hébergement seront supportés exclusivement par le père
      - autorisé d'ores et déjà, la mère à retourner vivre aux Etats-Unis avec les quatre

enfants à l'issue de l'année scolaire en cours
- dit n'y avoir lieu à interdiction de sortie des enfants de l'espace Shengen
- fixé à la somme mensuelle indexée de 2.000 euros par enfant, soit une somme totale de 8.000 euros, le montant de la contribution paternelle à l'entretien et l'éducation des enfants communs
- dit que le père devra continuer d'assumer seul les dépenses relatives aux enfants en ce qui concerne l'école, les cours particuliers, les activités sportives et ludiques, les séjours à l'étranger à Noël et l'été, et leur couverture d'assurance maladie.

Cette ordonnance a été déférée à la Cour d'appel de céans qui par arrêt en date du 23 octobre 2012 a réformé partiellement les dispositions de la décision, et :
- fixé la pension alimentaire due par Monsieur MAC DONELLà son épouse au titre du devoir de secours à la somme mensuelle indexée de 30.000 euros, à charge pour Madame HAFNER de payer les charges afférentes au domicile conjugal ainsi que les frais de santé, assurance comprise, de loisir et d'activités sportives, de personnel de maison et de chauffeur et toutes autres dépenses personnelles
- dit que Monsieur MAC DONELL assumerait les frais liés à la propriété et l'occupation des biens situés aux Etas-Unis, les crédits contractés pour l'acquisition desdits biens et le prêt contracté auprès de la banque HSBC pour l'acquisition du domicile conjugal sous réserve de faire les comptes entre les parties lors de la liquidation du régime matimonial
- accordé à l'épouse lajouissance gratuite du domicile conjugal
- débouté Madame HAFNER de sa demande d'attribution d'une provision à valoir sur ses droits dans la liquidation du régime matrimonial _
- fixé la part contributive paternelle à l'entretien et l'éducation des enfants communs à la somme de 2.000 euros par enfant et par mois et dit que cette somme couvrira l'intégralité des dépenses des enfants
- débouté Monsieur MAC DONELL de sa demande tendant à voir limiter dans le temps lajouissance gratuite du domicile conjugal
- débouté Monsieur MAC DONELL de sa demande de déblocage des comptes bancaires ouverts dans les livres de la Saanen Bank AG
- mis à la charge de Monsieur MAC DONELL le règlement des factures émises par l'ISN pour la scolarité des enfants à compter de la date de l'arrêt
- dit que les dispositions de l'ordonnance de non conciliation ont vocation à s'appliquer tant que les enfants seront domiciliés en France
- rejeté la demande tendant à voir supprimer le temps de résidence des enfants chez le père le mercredi.

Le 8 novembre 2012 Madame HAFNER a assigné son mari en divorce sur le fondement des
dispositions de l'article 242 du code civil.

Saisi sur incident, le juge de la mise en état a rendu le 2 décembre 2013 une ordonnance aux termes de laquelle il a notamment :
- dit et jugé que Madame HAFNER ne bénéficierait plus de la jouissance gratuite du domicile conjugal situé à Juan les Pins
- attribué lajouissance de ce bien immobilier à titre onéreux à Monsieur MAC DONELL à charge pour lui d'assumer l'ensemble des charges y afférentes avec un compte à faire entre les parties au moment de la liquidation du régime matrimonial
- constaté l'accord de Monsieur MAC DONELL pour une attribution de la jouissance du bien situé à Auburn aux Etats-Unis à Madame HAFNER et fait droit à cette demande à charge pour l'épouse de régler l'ensemble des charges y afférentes, sous réserve des droits de chacun lors de la liquidation du régime matrimonial
- maintenu la résidence habituelle des enfants communs mineurs au domicile de la mère aux Etats-Unis
- dit que le droit de visite et d'hébergement du père s'exercerait en dehors des vacances scolaires neuf jours par mois, du premier week-end de chaque mois, vendredi sortie des classes, au week-end suivant, lundi rentrée des classes et durant la totalité des vacances scolaires à l'exception de celles de Noël et d'été partagées par moitié
- dit que les frais de transport exposés pour l'exercice de ce droit seraient supportés exclusivement par le père

- dit et jugé que Monsieur MAC DONELL devrait régler les frais d'inscription de l'enfant Lauren pour l'année 2013/2014
- supprimé à compter du 1er septembre 2013 la contribution paternelle pour l'entretien et l'éducation de l'enfant Lauren
- fixé à la somme mensuelle indexée de 1.000 euros par enfant, soit une somme totale de 3.000 euros, le montant de la part contributive paternelle pour l'entretien et l'éducation des trois autres enfants communs, étant précisé que cette somme couvrirait l'ensemble des dépenses des enfants.

La 6ème chambre C de la Cour d'appel d'Aix en Provence a, par arrêt en date du 26 mars 2015, infirrmé la décision rendue par lejuge de la mise en état sur les seules mesure financières relatives aux enfants.
Le montant de la part contributive paternelle à l'entretien et l'éducation des enfants communs a été à nouveau fixé à la somme mensuelle indexée de 2.000 euros par enfant.
En outre la Cour a dit que Monsieur MAC DONELL prendrait en charge les frais de scolarité engagés pour 1' année 2013/2014 pour les enfants Lauren et Jackson.

Par jugement contradictoire rendu le 16 juin 2014 le juge aux affaires familiales de Grasse a notamment:
- prononcé le divorce aux torts partagés des époux
- dit et jugé que la loi applicable au régime matrimonial des époux MAC DONELL/HAFNER est celle du régime primaire californien et que partant, les parties devraient régler leurs intérêts patrimoniaux en application des règles californiennes
- ordonné la liquidation et le partage des intérêts patrimoniaux existant entre les parties
- dit n'y avoir lieu à ce stade de la procédure à désignation d'un notaire pour procéder à la liquidation des droits respectifs des parties
- débouté Madame HAFNER de sa demande d'avance sur part de communauté
- confirmé les dernières mesures provisoires s'agissant des enfants
- condamné Monsieur MAC DONELL à payer à Madame HAFNER une prestation compensatoire en capital d'un montant de 2.000.000 euros
- rejeté la demande d'exécution provisoire
- débouté Monsieur MAC DONELL de sa demande de dommages et intérêts
- autorisé Madame HAFNER à conserver l'usage du nom du mari.

Madame HAFNER a relevé appel de cette décision par déclaration au greffe reçue le 17 novembre 2014.

Le 1er juillet 2015 les parties ont été convoquées à l'audience de la Cour fixée le 15 octobre 2015 à 8 h 20, la clôture de l'instruction devant intervenir le 8 octobre 2015.

Le 24 septembre 2015 Madame HAFNER a saisi le conseiller de la mise en état de conclusions d'incident.

L'ordonnance de clôture a été révoquée le 15 octobre 2015 et l'affaire renvoyée à l'audience du conseiller de la mise en état du 9 novembre 2015.

Dans ses conclusions d'incident notifiées le 6 novembre 2015, l'appelante a sollicité le rejet des débats des conclusions et pièces de la partie adverse déposées le 6 novembre 2015 en violation du principe du contradictoire. À défaut Madame HAFNER demandait de :
- débouter Monsieur MAC DONELL de l'ensemble de ses demandes, fins et conclusions
- lui attribuer lajouissance du bien commun sis 1 avenue commandant Garbes, 06160 Cap d'Antibes, ancien domicile conjugal, à titre gratuit, au titre du devoir de secours

- dire et juger que le père bénéficierait à compter de la décision à intervenir d'un droit de visite et d'hébergement les première, troisième et cinquième fins de semaine de chaque mois du vendredi soir sortie des classes au dimanche soir 18 heures pendant les périodes scolaires et la moitié de toutes les vacances scolaires de plus de cinq jours

- condamner Monsieur MAC DONELL à verser à la mère une contribution à l'entretien et l'éducation des enfants d'un montant de 2.000 euros par mois et par enfant, soit la somme globale de 8.000 euros par mois, et ce, à compter du mois de juillet 2014, date à laquelle Monsieur MAC DONELL a cessé de verser le devoir de secours à son épouse.

Dans ses conclusions en réponse sur incident notifiées le 6 novembre 2015, l'intimé demandait à titre principal de :

- dire et juger que la partie adverse ne démontre pas un élément nouveau au sens des articles 1118 et 1119 du code de procédure civile

- déclarer irrecevable l'incident de Madame HAFNER et la renvoyer au fond

- dire la procédure de Madame HAFNER dilatoire

- la condamner au paiement de la somme de 10.000 euros en application des dispositions de l'article 700 du code de procédure civile.

De façon subsidiaire il était demandé de :

- débouter Madame HAFNER de l'ensemble de ses demandes

- dire et juger que Monsieur MAC DONELL pourrait continuer à jouir à titre onéreux de l'appartement d'Antibes Juan les Pins

- mettre en place une garde alternée des quatre enfants, quinze jours par mois, au domicile de chacun des parents

- confirmer que Monsieur MAC DONELL verserait une contribution aux enfants d'un montant de 4.000 euros, soit 1.000 euros par enfant

- dire et juger que les frais de scolarité seraient partagés entre les deux parents

- condamner la partie adverse aux dépens de l'incident et au paiement d'une somme de 5.000 euros en application de l'article 700 du code de procédure civile.

Par ordonnance en date du 11 janvier 2016, le conseiller de la mise en état a :

- dit que les juridictions françaises étaient compétentes pour connaître du litige, et qu'elles appliquent la loi française

- écarté les notes en délibérés qui ne répondaient pas à une demande du conseiller de la mise en état

- déclaré recevables les conclusions et pièces de l'intimé notifiées et déposées le 6 novembre 2015.

- débouté Madame Sharon HAFNER de sa demande d'attribution de la jouissance du bien commun sis 1 avenue Commandant Garbes au Cap d'Antibes

- maintenu la résidence des enfants mineurs au domicile maternel

- dit qu''à compter de la présente ordonnance Monsieur Roger MAC DONELL exercerait un droit de visite et d'hébergement sur ses enfants mineurs par principe à l'amiable et, à défaut d'accord entre les parties, les première, troisième et cinquième fins de semaine du vendredi à la sortie de l'école au dimanche 18 heures, le droit de visite et d'hébergement étant étendu aux jours fériés qui précèdent ou suivent la fin de semaine, les deuxième et quatrième milieux de semaine du mardi à la sortie des classes au mercredi 18 heures ainsi que la première moitié des vacances scolaires de plus de cinq jours les années paires et la seconde moitié les années impaires,

- fixé à compter de la présente ordonnance à la somme de 1.000 euros (mille euros) par mois et par enfant la part contributive de Monsieur Roger MAC DONELL à l'entretien et l'éducation des quatre enfants communs, soit une somme mensuelle totale de 4.000 euros (quatre mille euros), somme payable et indexée dans les conditions reprises dans le jugement rendu le 16 juin 204 par le juge aux affaires familiales du Tribunal de Grande Instance de Grasse,

- dit que Monsieur Roger MAC DONELL assumerait la totalité des frais de scolarité des quatre enfants,

- condamné Madame Sharon HAFNER à payer à Monsieur Roger MAC DONELL une somme de 1.500 euros (mille cinq cents euros) en application des dispositions de l'article 700 du code de procédure civile,

- condamné Madame Sharon HAFNER aux entiers dépens de l'instance d'incident recouvrés conformément aux dispositions de l'article 699 du code de procédure civile.

Sharon HAFNER a déféré cette ordonnance à la cour, par requête déposée le 26 janvier 2016.

Par dernières conclusions récapitulatives n° 4 notifiées le 21 septembre 2016, Sharon HAFNER demande à la cour de :
In limine litis :
         - rejeter des débats les pièces 272 et 354 communiquées dans l'intérêt de Roger MAC DONELL
         - débouter Roger MAC DONELL de ses demandes de voir certaines pièces produites par l'épouse écartées des débats
Au fond,
         - DEBOUTER Monsieur MAC DONELL de l'ensemble de ses demandes, fins et conclusions
         - CONDAMNER Monsieur MAC DONELL à verser à son épouse la somme de 6.000.000€ en capital au titre de la prestation compensatoire,
         - CONDAMNER Monsieur MAC DONELL à verser à son épouse la somme de 1.047.720€ à titre d'avance sur part de communauté ;
         - FIXER les effets du divorce au 4 août 2010, date à laquelle les époux ont cessé de collaborer et de cohabiter ;
         - FIXER la résidence des enfants mineurs du couple au domicile de la mère,
         - FIXER au bénéfice du père un droit de visite et d'hébergement qui s'exercera de la manière suivante, à défaut de meilleur accord entre les parties :
▸     Les première, troisième et cinquième fins de semaine de chaque mois, du vendredi après l'école au dimanche 18h,
▸     Les deuxième et quatrième milieux de semaine, du mardi à la sortie des classes au mercredi 18h,
▸     La moitié des vacances scolaires (première moitié les années paires et seconde les années impaires pour le père).

         - CONDAMNER Monsieur Roger MAC DONELL à verser à Madame Sharon MAC DONELL la somme de 2.000 € par mois et par enfant, soit la somme globale de 8.000 € au titre de sa contribution à l'entretien et l'éducation des enfants, et ce, rétroactivement à la date du jugement de divorce, et, si de besoin, l'y condamner
         - DIRE ET JUGER que ces pensions seront payables d'avance à la résidence de Madame MAC DONELL, le 1er de chaque mois,
         - DIRE ET JUGER que ces pensions seront révisées chaque année sur l'indice des prix à la consommation de l'ensemble des ménages urbains (série parisienne hors tabac) et variera chaque année au 1er 'janvier ;
         - CONDAMNER Monsieur Roger MAC DONELL à prendre en charge l'intégralité des frais de scolarité des enfants ;
         - CONDAMNER Monsieur MAC DONELL à verser à Madame MAC DONELL une somme de 10.000 € en application des dispositions de l'article 700 du Code de Procédure Civile ainsi qu'aux entiers dépens de l'instance.

En préliminaire, Sharon HAFNER insiste sur l'absence de transparence de Roger MAC DONELL tout au cours de la procédure de divorce et illustre ce comportement de divers exemples. Par ailleurs, au fil des écritures, Monsieur MAC DONELL adopte volontairement une position floue, notamment sur ce qui doit être qualifié de propre et de commun, étant précisé que ses écritures sont en contradiction les unes avec les autres, ce procédé ne permettant pas à Madame MAC DONELL de pouvoir conclure utilement en réponse, et à la Cour de comprendre qu'elle est véritablement la position de Monsieur MAC DONELL.C'est ainsi par exemple qu'il entretient une confusion entre ses propres et les biens communs. Ou qu'il prétend désormais après 6 ans de procédure que la loi californienne serait applicable aux conséquences financières du divorce.

Sur les demandes in limine litis :
         - la demande présentée par l'épouse de voir écarter les pièces 354 ter et 272 des débats : Roger MAC DONELL produit des pièces obtenues grâce à un faux réalisé par ses soins, et surtout des photos particulièrement intimes de son épouse, obtenues par fraude et parfaitement attentatoires à sa vie privée. C'est à tort que le premier juge l'a déboutée de la demande de voir écarter ces pièces aux débats

- sur la demande de Roger MAC DONELL de voir écarter des débats un certain nombre de pièces produites par l'épouse : il a été débouté sur ce point en première instance et la décision devra être confirmée. Le premier juge a relevé à juste titre que Roger MAC DONELL avait déjà demandé le rejet de ces pièces, et que la Cour d'appel de céans avait déjà tranché dans le cadre de son arrêt du 23 octobre 2012.

**Sur le prononcé du divorce** :

Le divorce a été prononcé par le premier juge aux torts partagés, le premier juge ayant retenu :
- Les faits d'adultère prouvés à l'encontre de l'époux,
- Les faits d'adultères à l'encontre de l'épouse,
- Le " harcèlement et la hargne" dont Sharon HAFNER faitpreuve à l'égard de son époux

Ce faisant :
- Le juge n'a pas pris en considération les faits de recel d'argent de la communauté (par la constitution d'un trust au nom des enfants)  commis par Monsieur MAC DONELL, pourtant parfaitement établis
- Le juge n'a pas retenu le désintérêt matériel et affectif de Monsieur MAC DONELL, pourtant établi par l'épouse et constitutif d'une faute : il est irrégulier dans l'exercice du droit de visite, ne s'occupe absolument pas de Lauren qui a, à l'initiative de sa mère, été diagnostiquée comme souffrant de troubles du spectre autistique et de troubles de déficit de l'attention, ces troubles nécessitant qu"elle soit particulièrement suivie, et notamment au cours de séances de psychothérapie, dont le coût est de l'ordre de 160 dollars (120 euros) par séance, à raison de deux séances par semaine.

Monsieur MAC DONELL ne verse plus la pension alimentaire au titre du devoir de secours depuis deux ans, laissant son épouse et ses quatre enfants dans une situation catastrophique (arriéré de 390.000 euros), alors qu'il indique dans ses écritures détenir un patrimoine propre de plus de 16 000 000€, et qu'il offre à Jackson une voiture neuve d'une valeur de 36 000$

Le juge a retenu le grief d'adultère à l'encontre de Madame MAC DONELL sur le fondement de pièces obtenues par fraude (les photos visées plus haut)

Le grief de « harcèlement et de hargne ›› de l'épouse à l'encontre de son mari n'a aucune réalité
Le juge du divorce a cru pouvoir retenir à son encontre  un grief résultant du "harcèlement et de la hargne dont Sharon HAFNER fait preuve à l'égard de son époux", établi selon celui-ci par:
- Les messages « innombrables ›› adressés par Madame MAC DONELL à son époux
- Les messages adressés à l'entourage de l'époux,
- L'émission de télévision intitulée « Divorce : quand tous les coups sont permis ››

Elle fait valoir que :
- Les deux époux se sont adressés de nombreux messages, qui s'inscrivent dans une réciprocité,
- Madame MAC DONELL est contrainte d'adresser de nombreux messages à son époux, celui-ci ayant pour habitude de ne pas répondre à son épouse, alors même qu'elle l'interroge sur des sujets importants et non conflictuels, et notamment sur les enfants.
- En ce qui concerne enfin l'émission de télévision à laquelle il est fait référence, Madame MAC DONELL, qui n'en a bien évidemment pas choisi le titre, a été enregistrée dans le cadre d'une émission générale sur le divorce, des années après la séparation, ce qui ne saurait constituer un grief.

Le grief d'adultère était parfaitement établi à l'encontre de Monsieur MAC DONELL, au regard des pièces versées au débat par son épouse et du fait, qu'en tout état de cause, celui-ci ne conteste pas avoir eu des relations extra- conjugales.

Il conviendra de rajouter deux autres griefs :
- le recel d'argent de la communauté
- le désintérêt pour la vie familiale et pour les enfants

Le divorce sera prononcé aux torts exclusifs du mari, et il conviendra à l'instar du premier juge, de rejeter sa demande de dommages et intérêts.

**Sur les conséquences du divorce** :

Sur l'usage du nom marital :

Madame MAC DONELL porte le nom de son époux depuis 24 ans : l'ensemble de ses documents d'identité, comptes bancaires, adresses mails, etc... sont à ce seul nom.Madame MAC DONELL n'est connue que sous son nom de femme mariée.

Les époux MAC DONELL ont quatre enfants qui portent ce nom, tous les quatre scolarisés.

Il est enfin rappelé qu'aux ETATS-UNIS, l'épouse a toujours le choix de conserver l'usage du nom de son époux après le divorce, sans que celui-ci ne puisse s'y opposer

Sur la date des effets du divorce :

Le jugement de divorce a jugé que le divorce produirait ses effets à la date de l'ordonnance de non-conciliation, soit le 21 février 2011. Cependant, les époux étaient en réalité à cette date séparés depuis plusieurs mois, et avaient cessé de cohabiter et de collaborer.En effet, les époux se sont séparés le 4 août 2010, date à laquelle Monsieur MAC DONELL a pris la décision de quitter le domicile conjugal et à laquelle Madame MAC DONELL a saisi les juridictions américaines d'une demande de divorce (demande du 5 août 2010).

Sur la prestation compensatoire :

En préliminaire, dans le cadre d'une confusion volontairement entretenue par Monsieur MAC DONELL entre la loi applicable au régime matrimonial des époux et la loi applicable aux conséquences financières du divorce, en particulier à la prestation compensatoire, Monsieur MAC DONELL prétend, pour la première fois dans ses dernières écritures déposées a la Cour, que la loi californienne serait applicable à la prestation compensatoire.

Il n'en est évidemment rien, et ainsi que rappelé par l'ordonnance du Conseiller de la Mise en Etat du 11 janvier 2016, c'est bien la loi française qui est applicable au divorce des époux MAC DONELL et à ses conséquences financières.

Les développements de Monsieur MAC DONELL sur la loi californienne sont donc hors débat, et ne sauraient fonder la décision de la Cour sur la prestation compensatoire de l'épouse.

La décision du premier juge qui lui a attribué une prestation compensatoire de 2 000 000€ est critiquable, dans la mesure où ce dernier :

    - N'a pas tiré les conséquences qui s''imposaient du refus de Monsieur MAC DONELL d'être transparent, et donc l'impossibilité dans laquelle celui-ci met la juridiction de connaître la réalité de sa situation ;

    - N'a pas tiré les conséquences qui s'imposaient des difficultés d'exécution qui ne manqueront pas de se poser, qui empêchaient de considérer, comme l'a fait le premierjuge, pour acquis que Madame MAC DONELL " a vocation à percevoir une part de plusieurs millions d'euros" dans la liquidation du régime matrimonial

Il est précisé que ce point est désormais contesté par Monsieur MAC DONELL, qui prétend désormais que l'essentiel du patrimoine du couple serait composé de biens lui appartenant en propre. Ce point devra nécessairement être pris en considération par la Cour.

    - A commis une erreur d'appréciation sur les éléments à prendre en considération, portant à cet égard un jugement de valeur sur le comportement de Madame MAC DONELL aussi inexact qu'inapproprié.

Il a retenu en effet, que Roger MAC DONELL a, en exécution des différentes décisions rendues dans le cadre de la présente procédure, déjà versé à son épouse la somme de 1.370.000 euros.

Or les sommes perçues l'ont été au titre du devoir de secours ou de contribution à l'entretien et l'éducation des enfants.

Madame MAC DONELL n'a pas travaillé depuis 1999, ayant cessé, d'un commun accord avec son époux, son activité professionnelle après la naissance du second enfant du couple, soit depuis 17 ans.

Il est évident qu'il n'est pas simple, dans le contexte actuel et après une période d'inactivité aussi longue, de retrouver un emploi et, contrairement à ce que laisse à penser le jugement de divorce, le seul fait d'être en bonne santé n'est pas suffisant pour retrouver un emploi.

Par ailleurs, Madame MAC DONELL est seule a s'occuper des quatre enfants du couple au quotidien, au regard du peu d'investissement du père dans le quotidien de ces derniers.

Roger MAC DONELL a repris une activité professionnelle depuis 2012, sans préciser la nature exacte de celle-ci et les revenus qu'elle génère. Il a reconnu qu'il percevait des revenus de la société SHIPPING SOLUTIONS représentant une somme de 25 000$ par mois sans en justifier.

En réalité, SHIPPING SOLUTIONS n'est pas la seule source de revenus de Monsieur MAC DONELL.

Monsieur MAC DONELL a conservé des parts dans la société CGI Franchise Systems Inc. (ce qu'il ne conteste pas) mais refuse de faire état des revenus qu'il perçoit à ce titre, malgré les sommations de communiquer qui lui ont été faites en ce sens.
Surtout, et ainsi que déjà indiqué, Monsieur MAC DONELL a reçu la somme de 2 millions de dollars provenant de cette société, au mois de février 2014 et dont tout laisse à penser qu'il s'agit de revenus de cette société.
En effet, Monsieur MAC DONELL prétend qu'il s'agirait de la vente de parts de la société mais refuse de communiquer les éléments qui permettraient d'en attester (attestation du comptable de la société, acte de cession, valorisation par le comptable de la société du nombre de parts qu'il détient et de leur valeur, etc...)
Les dépenses personnelles de Monsieur MAC DONELL directement réglées par la société SHIPPING SOLUTIONS constituent un complément de revenus de 200.000 dollars par an;
Les revenus annuels de Monsieur MAC DONELL issus de SHIPPING SOLUTIONS sont donc de : (25.000 X 12) + 200.000 = 300.000 + 200.000 = 500.000 $
Monsieur MAC DONELL perçoit des revenus de deux trusts: à hauteur de 2.000 dollars par mois (1.500 euros) d'un trust constitué par ses parents, et d'un montant ignoré par Madame MAC DONELL, du trust qu'il a constitué sans l'accord de son épouse.

Les autres revenus dont il fait état dans sa déclaration sur l'honneur, pour un total de 68.462 dollars US, c'est-à-dire environ 50.000 euros, soit un revenu mensuel de 4.166 euros.

Soit un total d'a minima 150.000 euros par mois de revenus, hors revenus de CGI et du trust constitué par Monsieur MAC DONELL.

Elle rappelle que son train de vie du temps de la vie commune était de 85 000€/ mois. Que la famille effectuait tous les ans des voyages à l'étranger, séjournant à chaque fois dans les plus beaux hôtels, hôtels de 4 à 5 étoiles au minimum, comme par exemple le Ritz ou le Four Seasons.
La famille est habituée aux vêtements de luxe, ainsi qu'à la joaillerie.La famille est également habituée aux restaurants, puisqu'elle s'y rendait quasiment toutes les semaines.

Elle affirme que le niveau de vie de Monsieur MAC DONELL, est en réalité, pour lui seul, de l'ordre de 50 000 € par mois, depuis l'ordonnance de non conciliation. Il a acquis un véhicule neuf Range Rover de 100 000$

Sur le patrimoine estimé ou prévisible des époux, tant en capital qu'en revenu, après la liquidation du régime matrimonial : selon Monsieur MAC DONELL, ne sont communs que les biens immobiliers du couple, une assurance vie HSBC adossée à l'emprunt sur l'ancien domicile conjugal et le bateau, la place au port Gallice et un scooter, soit un patrimoine commun, selon l'époux, représentant une valeur nette globale de 2.095.440 euros, c'est-à-dire une somme de 1.047.720 euros pour chaque époux. selon la déclaration sur l'honneur de Monsieur MAC DONELL, son patrimoine propre global est de 17.679.606 euros.
Quant à elle, elle n'a aucun patrimoine propre.

Les situations respectives des parties en matière de pension de retraite : elle a dû clôturer son compte épargne-retraite et ne dispose de plus rien. Monsieur MAC DONELL n'a pas justifié de sa situation en matière de pension de retraite.

Sur l'avance sur les droits de l'épouse dans la liquidation du régime matrimonial : le premier juge a rejeté cette demande au motif qu'elle avait déjà fait l'objet d'un rejet par la Cour d'appel de céans, confondant ainsi les dispositions de l'article 255 7° et de l'article 267 alinéa 3 du Code Civil . Elle sollicite la somme de 1 047 720€ qui représente la part non contestée de ses droits.
Cette avance se justifie par le comportement de Monsieur MAC DONELL, qui,va nécessairement tout mettre en œuvre pour faire durer la procédure de liquidation pendant des années (10 à 15 ans selon ses propres menaces), à l'issue de laquelle l'épouse aura toutes les difficultés de faire exécuter la décision obtenue.

<u>Sur les conséquences du divorce concernant les enfants</u> : elle demande le rétablissement de la part contributive du père à la somme de 2000€/mois et par enfant, et de condamner le père au paiement des frais de scolarité.

Dans ses dernières écritures notifiées le 14 septembre 2016, Roger MAC DONELL demande à la cour de :
Statuant in limine litis :
     - DIRE et JUGER Monsieur Roger MAC DONELL recevable et bien fondé en sa demande et REJETER des débats les pièces communiquées dans l'intérêt de Madame Sharon HAFNER, numérotées en première instance n°14, 19 à 21, 26 à 33, 36 à 39, 42, 43, 45, 93, 94, 96 à 98, 148 à 150, 157, 165, 183, 207 à 216, 223 à 225, 235, 237, 254 à 258, 264, 288 à 293, 370, 382 à 385, 407 à 408, car obtenues par fraude, en violation de l'article 259-1 du code civil ;

Statuant au fond :
     - Infirmer le jugement de première instance et PRONONCER le divorce des époux
MAC DONELL aux torts exclusifs de l'épouse, conformément aux dispositions des articles 242 et suivants du Code Civil ;
     -Infirmer le jugement de première instance et DIRE et JUGER que Madame Sharon HAFNER ne sera pas autorisée à porter le nom de son mari après le prononcé du divorce ;
     - DIRE ET JUGER que les relations des parties, le divorce et la liquidation de la communauté entre les époux sont soumises au droit californien ;
     - DIRE ET JUGER que les effets du divorce seront fixés à la date de l'ordonnance de non conciliation.
     - ORDONNER la liquidation et le partage des intérêts patrimoniaux des époux MAC DONELL au regard des règles de droit applicable dans le régime primaire californien ;
     - DIRE et JUGER que le comportement fautif de Sharon HAFNER a causé un préjudice à son époux ,
     - Infirmer le jugement de première instance et CONDAMNER Madame Sharon HAFNER à verser à son époux des dommages et intérêts d'un montant de 50.000 € en application de l'article 1382 du code civil ;
     - DIRE que l'autorité parentale sur :
▸     Lauren MAC DONELL, née le 4 août 1996 à Redwood City (Californie, Etats- Unis),
▸     Jackson MAC DONELL, né le 6 avril 1998 à Redwood City (Californie, Etats- Unis),
▸     Roger MAC DONELL, né le 30 juin 2000 à Redwood City (Califomie, Etats- Unis),
▸     Taylor MAC DONELL, née le 30 juin 2000 à Redwood City (Californie, Etats-Unis),
sera exercée en cormnun par les deux parents ;
     - FIXER la résidence des enfants chez la mère en France ;
     - FIXER le droit de visite et d'hébergement du père sur Jackson, Lauren, Roger Jr et Taylor selon les modalités suivantes :
▸     En dehors des vacances scolaires: 9 jours par mois, du premier week-end de chaque mois, vendredi sortie des classes, au week-end suivant, lundi rentrée des classes ;
▸     Pendant les vacances: la totalité des vacances scolaires, à l'exception des vacances de Noël et d'été qui seront partagées par moitié en alternance, les enfants étant chez le père la première moitié les années paires et la seconde moitié les années impaires ;
     - Confirmer le jugement de première instance en ce qu'il a fixé la contribution du père à l'entretien et à l'éducation de Jackson, Roger Jr. et Taylor à la somme de 1.000 € par enfant et par mois, soit la somme totale de 4.000 € ;
     - DIRE ET JUGER que Monsieur Mac DONELL aura la jouissance de l'appartement de ANTIBES JUAN LES PINS, à titre onéreux, à charge pour lui d'en assumer les charges.
     - DIRE ET JUGER que les frais de scolarité seront partagés par les deux parents ;
     - DEBOUTER Madame Sharon HAFNER de l'ensemble de ses demandes, fins et conclusions;
Subsidiairement, si le Tribunal devait considérer que Madame HAFNER est en droit d'obtenir une prestation compensatoire, fixer cette dernière à la somme de 523.000 € et infirmer le jugement de première instance en ce qu'il a fixé cette somme à 2.000.000 €.
     - CONDAMNER Madame HAFNER, au besoin sous une astreinte de 1.000 € par jour de retard à compter de la signification de l'arrêt à venir, à donner main levée immédiate des sommes bloquées sur le compte de la SAANEN BANK: si la Cour estime que Madame HAFNER est en droit de percevoir une prestation compensatoire, elle devra alors se la faire régler sur ce compte bancaire de sorte que le solde sera immédiatement libéré au profit de Monsieur MAC DONELL ;
     - CONDAMNER Madame Sharon HAFNER à verser à Monsieur Roger MAC DONELL une somme de 10.000 € au titre de l'article 700 du code de procédure civile;
     - CONDAMNER Madame Sharon HAFNER aux entiers dépens d'appel, ces derniers distraits au profit de la SELARL LEXAVOUE AIX EN PROVENCE représentée par Maître

12

Pierre-Yves IMPERATORE, avocat postulant, sur justification d"en avoir fait l'avance.

**Sur le rejet des pièces adverses** : Madame Sharon HAFNER verse aux débats des pièces obtenues par fraude. Les pièces adverses de première instance n°14, 19 à 21, 26 à 33, 36 à 39, 42, 43, 45, 93, 94, 96 à 98, 148 à 150, 157, 165, 183, 207 à 216, 223 à 225, 235, 237, 254 à 258, 264, 288 à 293, 370, 382 à 385, 407 à 408 ont été obtenues en violation des dispositions de l'article 259-1 du code civil.

En l'espèce, il s'agit de courriels que Madame Sharon HAFNER a subtilisés sur la messagerie de son époux,protégée par un code personnalisé. Il est incontestable que ces documents ont été subtilisés par fraude et doivent par conséquent être rejetés des débats.En effet, le constat de Maître Fabien de MATTEIS, huissier de justice, en date du 16 septembre 2010, démontre que Madame Sharon HAFNER a violé les codes secrets de son époux pour accéder aux informations contenues dans son ordinateur et partant, sa messagerie électronique.
Plus encore, depuis le 10 avril 2012, Madame Sharon HAFNER verse aux débats des courriels postérieurs à la séparation des époux, subtilisés sur les diverses boîtes électroniques de Monsieur Roger MAC DONELL.
Au regard de tous ces éléments, Monsieur Roger MAC DONELL a obtenu, sur le fondement de l'article 145 du code de procédure civile, une ordonnance tendant à la saisie du matériel informatique de Madame Sharon HAFNER. Le 27 juin 2012, dès l'arrivée de l'huissier à son domicile, Madame Sharon HAFNER a «téléphoné à son avocat» et confié son ordinateur à son amant, Monsieur Laurent PHILIPPE qui «a soudainement pris lafuite avec l'ordinateur sous le bras ». Madame Sharon HAFNER a également « doublement verrouillé » son téléphone portable
Elle a ainsi rendu impossible toutes les mesures d'investigation autorisées par le juge des requêtes qui auraient permis de démontrer la captation frauduleuse des correspondances électroniques de Monsieur Roger MAC DONELL. L'obstruction de Madame Sharon HAFNER démontre de plus fort la fraude alléguée.

**Sur le prononcé du divorce** :

Les griefs invoqués par Madame HAFNER :
     - l'adultère : Il n'est pas contesté que Monsieur Roger MAC DONELL a entretenu une relation avec Madame Saterah KEYKAVOUSSI alors que son épouse avait depuis longtemps manqué au devoir de fidélité en prenant un amant âgé de 20 ans avec lequel elle partage désormais sa vie. Le comportement fautif de Monsieur Roger MAC DONELL sera excusé par le comportement fautif de son épouse
     - le prétendu « recel d'argent de la communauté »:  les allégations, de recel, dissimulation de fonds. organisation d"insolvabilité ont été examinées tour à tour par les  juridictions monégasques et par les autorités pénales francaises : AUCUNE POURSUITE n'a été engagée contre Monsieur MAC DONELL
     - . Le prétendu « désintérét pour la viefamiliale et pour les enfants »: depuis qu'il a cessé ses activités professionnelles, Monsieur Roger MAC DONELL s'est consacré à sa famille et tout particulièrement à ses enfants. L'audition des enfants MAC DONELL n'a en rien corroboré les accusations de Madame Sharon HAFNER. Ceux-ci ont déclaré vouloir voir leur père dans le cadre d"un droit de visite et d'hébergement élargi, soit tous les mercredis et une fin de semaine sur deux. Ce souhait démontre leur volonté de passer du temps avec leur père, avec lequel ils partagent des moments de grande complicité
Actuellement Monsieur MAC DONELL exerce son droit de visite et d'hébergement tel qu'il a été fixé par le jugement de divorce soit 9 jours par mois ; les choses se passent d'ailleurs tellement bien qu'une garde alternée parait aujourd'hui parfaitement adaptée.
En ce qui concerne le prétendu désintérêt pour Lauren, elle  est installée aux ETATS UNIS où elle pratique le tennis de manière intensive comme interne ; Monsieur MAC DONELL a pris un appartement sur le campus et règle naturellement le loyer (1 .800 $ / mois).

Sur le comportement de Sharon HAFNER : Madame Sharon HAFNER entretient une relation adultère avec Monsieur Laurent PHILIPPE, de 23 ans son cadet avec lequel elle mène un train de vie fastueux (pièce 235, 256, 272) dans une villa luxueuse avec piscine qu"elle louait quand elle résidait en France (pièce 232), laissant à son «personnel» le soin de s'occuper de ses enfants et se préoccupant exclusivement de tirer un maximum de profit de la procédure de divorce qu"elle a initiée. Cette relation a débuté en 2009, un an avant la séparation du couple.

Monsieur Roger MAC DONELL a été contraint de verser aux débats des photographies non équivoques sur les liens qui unissent Madame Sharon HAFNER et Monsieur Laurent PHILIPPE.

Monsieur Roger MAC DONELL entend souligner que ces photographies ont été obtenues par procès-verbal d'huissier en application d'une ordonnance du tribunal de grande instance de Grasse en date du 25 juin 2012.

Madame Sharon HAFNER accule son époux non seulement par les nombreuses procédures qu'elle diligente mais également par le flot de messages quotidiens qu'elle lui adresse (pièces 2, 3, 15, 16, 260 à 262, 310, 437, 493). Ces messages, par leur nombre et les propos injurieux qu'ils véhiculent constituent un véritable harcèlement.

En outre, Madame Sharon HAFNER ne se contente pas d'insulter son époux : elle prend également à partie l'intégralité des interlocuteurs de son époux : comptables, avocats, anciens et nouveaux partenaires professionnels, amies...

Non contente des effets de ces sollicitations individuelles, Madame Sharon HAFNER a participé, à visage découvert, à un documentaire intitulé «Divorce : quand tous les coups sont permis ›› (pièce 386). Ce documentaire, diffusé de nouveau au mois d'août 2013 sur Canal+, relaie des propos mensongers et porte une atteinte caractérisée à la vie privée de Monsieur Roger MAC DONELL. Celui-ci a en effet appris l'existence de ce documentaire lors de sa diffusion télévisée, car de nombreuses connaissances l'ont contacté pour lui dire que son épouse exhibait sa procédure de divorce à la télévision

Madame HAFNER instrumentalise les enfants et ne respecte pas l 'autorité parentale en commun. Il illustre cette assertion de divers exemples.

**Sur les dommages et intérêts** : il reproche à son épouse la multiplication des procédures .
De plus, le comportement «sulfureux ›› de Madame Sharon HAFNER au cours des trois dernières années a conduit de nombreuses relations professionnelles de Monsieur Roger MAC DONELL à prendre des distances avec lui, de peur de susciter l'ire de son épouse, alors même qu'il tente de reprendre une activité professionnelle.

**Sur la loi applicable au régime matrimonial** : il convient d'approuver le premier juge qui a considéré qu'il s'agissait de celle du régime primaire californien. Le droit californien attribue à chaque époux la moitié du patrimoine constitué par les époux depuis leur mariage (pièce 478).
Au travers de sa déclaration sur l'honneur 2016 Monsieur MAC DONELL a clairement identifié les biens communs des biens propres (Pièce n°613).

**Sur le nom** : Sharon HAFNER  ne travaille pas et n'exerce aucune activité commerciale et/ou industrielle portant son nom de mariée.
Le simple fait de vouloir porter le même nom que ses enfants ne constitue pas de nos jours une raison suffisante pour justifier le maintien de l'usage du nom.

**Sur la prestation compensatoire** : le principe de la prestation compensatoire n'existe pas en droit californien.
Il va se livrer au calcul d'une pension permanente, à partir d'avis juridiques donnés par Maître VORSATZ, avocat californien spécialisé dans le droit de la famille., et confirmés par le professeur Ben DEPOORTER.
Ainsi, au regard du comportement de Madame Sharon HAFNER et en application des articles 4323 et 4320 du Code de la Famille californien, l'équité commande que Madame HAFNER soit purement et simplement privée de prestation compensatoire.
A TITRE SUBSIDIAIRE, si la Cour  devait fixer une prestation compensatoire, le montant de cette dernière sera alors fixé à la somme de 523.000 €., en ce en application des règles de droit californien applicable en l'espèce.

Il expose ensuite sa situation. Il  a cofondé une société dans le transport de marchandise dénommée Consortium Group. Inc (pièces 67, 68). Il a dirigé cette société jusqu'au mois d'août 2006, puis a vendu ses actions en 2007 (pièce 165). Il a perçu une somme de 28.246.l70$, soit 19.490.643 € et non 23.000.000 € comme l'affirme son épouse.
Comme il a été dit précédemment cette société appartenait en propre à Monsieur MAC DONEL; le prix de cession de cette société constitue donc un bien propre pour Monsieur MAC DONEL conformément au droit californien applicable en la matière.

Il considère que cette somme d'argent ne peut être prise en compte pour calculer la prestation compensatoire qui revient à Madame HAFNER.

Monsieur MAC DONELL est resté actionnaire de la société Shipping Solutions, franchise de la société Worldwide Express (pièce 31).
En raison des nombreuses procédures diligentées par son épouse et des frais considérables qui en découlent, Monsieur Roger MAC DONELL a repris en 2012 une activité professionnelle partielle A ce jour les revenus de Monsieur MAC DONELL sont de 25.000 $ soit environ 22.000 € / mois tirés de la société SHIPPING SOLUTIONS (pièce n°614).

Il insiste beaucoup sur le fait que Sharon HAFNER n'a pas versé ses déclarations de revenus, et il doute même qu'elle ait fait des déclarations fiscales sur les fortes sommes d'argent qu'elle a encaissées depuis l'introduction de la requête.

**Sur les mesures relatives aux enfants** : il fait ici référence au droit californien tant pour l'exercice de l'autorité parentale que pour la contribution à l'entretien et l'éducation des enfants .

Il indique qu'il a décidé d'abandonner sa demande de transfert de la résidence de Jackson à son domicile, compte tenu de la pression exercée par sa mère.

Aujourd'hui, il reçoit les enfants 10 jours par mois et leurs relations sont excellentes. Il a abandonné sa demande de résidence alternée, et sollicite que le même rythme de droit de visite et d'hébergement soit maintenu.

Pour la contribution à l'entretien et l'éducation des enfants, en application des dispositions de l'article 4061 du Code de la Famille californien, et en tenant compte des revenus mensuels de Monsieur MAC DONELL (28.000 $ / mois), c'est Madame HAFNER qui devait en réalité régler les frais de scolarité des enfants, disposant d°un revenu mensuel de 20.000 € puis de 30.000 € /mois. Par ailleurs, en application des règles applicables en droit califomien, le montant maximal de la pension alimentaire due par Roger MAC DONELL serait de 6.229 $ pour les quatre enfants soit 5.500 € environ (cf : pièce n°582 précitée).

**Sur l'avance sur communauté** : il s'y oppose . Les opérations de liquidations se feront à la lumière des dispositions applicables en droit califomien: or, il est démontré que ce dernier prévoit un partage égalitaire entre les deux époux pour les biens acquis durant la période de mariage mais précise que les biens acquis avant le mariage restent  des biens propres, y compris d'ailleurs le produit de la vente desdits biens. Ainsi, la somme de 19 Millions d'euros issue de la vente de la société appartenant en propre à Monsieur MAC DONELL ne peut faire l"objet d'un quelconque partage puisqu'il s`agit d'un bien propre.
Faire droit à la demande de Madame HAFNER, qui réclame une avance de 1 Million d`euros, serait préjuger que ces sommes là figurent dans la communauté : or, cela n'est pas le cas; qui plus est, Madame HAFNER a reçu près de 4 Millions d'euros ces trois dernières années et ne justifie, à aucun moment, par la transmission de ses déclarations de revenus américaines ou bien française son train de vie.

**Sur la saisie du compte de la SAANEN BANK** : Cela fait maintenant plusieurs années qu'une somme très importante est bloquée dans les comptes de la SAANEN BANK à l'initiative de Madame HAFNER. Madame HAFNER ne démontret à aucun moment que les sommes qui figurent sur ce compte seraient des sommes appartenant à la communauté.
Et même si elles appartenaient à la communauté, ce qui n'est pas démontré, Madame HAFNER n'aurait droit qu'à la moitié,  soit à ce jour à la somme de 3.7 M € environ.
De plus, Madame HAFNER, alors qu'elle a fondée sa demande de saisie de ce compte bancaire pour lui garantir le paiement des pensions alimentaires SE REFUSE à utiliser une partie de cet argent pour recevoir le paiement des arriérés, préférant multiplier les saisies et harceler son époux.

L'ordonnance de clôture a été prononcée le 22 septembre 2016.

**MOTIFS DE LA DÉCISION**

**Sur la recevabilité de l'appel**

La recevabilité de l'appel n'est pas contestée. Aucun élément n'est fourni à la Cour lui permettant de relever d'office la fin de non-recevoir tirée de l'inobservation du délai de recours. L'appel sera déclaré recevable.

**Sur la compétence et la loi applicable**

En présence d'un élément d'extranéité, les deux époux étant de nationalité américaine, il résulte de l'article 3 du Code Civil, 13 du Code de Procédure Civile, et des principes du droit international privé, que le juge français doit d'office, et sous réserve du respect du principe de la contradiction, mettre en application la règle de conflit de lois pour les droits indisponibles.

La compétence et la loi applicable seront examinées pour le principe du divorce et toutes les mesures accessoires en débat.

En ce qui concerne le divorce

En application de l'article 3a) du règlement CE 2201/2003 du Conseil du 27 novembre 2003, dit Bruxelles II bis, la présente juridiction est compétente pour connaître de l'action aux fins de divorce, compte tenu de la résidence sur le sol français de chacun des deux époux.

Il sera ici rappelé que Sharon HAFNER avait introduit le 5 août 2010 une demande en divorce devant la cour supérieure de Californie pour le comté de San Mateo, et que la juridiction californienne s'était déclarée incompétente, car l'intéressée ne justifiait pas résider depuis au moins six mois avant le dépôt de la requête sur le sol américain.

La requête en divorce ayant été déposée par Roger MAC DONELL le 24 septembre 2010, s'applique quant à la détermination de la loi applicable, l'article 309 du Code Civil qui dispose que le divorce est régi par la loi française, lorsque les époux ont l'un et l'autre leur domicile sur le territoire français.

En ce qui concerne la liquidation des intérêts patrimoniaux

Les époux MAC DONELL s'étant mariés le 3 octobre 1992, ils sont soumis à la règle de conflit édictée par la Convention de la Haye du 14 mars 1978.

Aux termes de l'article 4 de la Convention, si les époux n'ont pas avant le mariage, désigné la loi applicable à leur régime matrimonial, celui-ci est soumis à la loi interne de l'Etat sur le territoire duquel ils établissent leur première résidence habituelle après le mariage.

En l'espèce, les époux MAC DONELL sont soumis au régime primaire californien.

Toutefois, en ce qui concerne les biens qu'ils possèdent en France, les époux MAC DONELL ont aménagé leur régime matrimonial en se plaçant sous le régime de la communauté universelle de biens, suivant acte reçu le 19 novembre 2007 par Maître NAOUR, notaire à Antibes.

En matière d'autorité parentale

La compétence est fixée par l'article 8 du règlement CE du Conseil n° 2201/2003 du 27 novembre 2003 dit Bruxelles II bis relatif à la compétence, la reconnaissance et l'exécution des décisions en matière matrimoniale et en matière de responsabilité parentale. Aux termes de cet article, les juridictions d'un Etat membre sont compétentes en matière de responsabilité parentale à l'égard d'un enfant qui réside habituellement dans cet Etat membre au moment où la juridiction est saisie.

Au moment où Roger MAC DONELL a déposé sa requête en divorce, les quatre enfants du couple résidaient avec leur mère en France, comme l'avait décidé la juridiction californienne déjà citée.

Par application de l'article 15 de la Convention de la Haye du 19 octobre 1996, entrée en vigueur le 1ᵉʳ février 2011, le juge français résout le litige selon les règles édictées par la loi française.

### en matière de contribution à l'entretien et l'éducation des enfants et de prestation compensatoire

Ces matières sont soumises au règlement CE n° 4/2009 du 18 décembre 2008 relatif à la compétence, la loi applicable, la reconnaissance et l'exécution des décisions et la coopération en matière d'obligations alimentaires, entré en vigueur le 18 juin 2011.

Dans son article 3 ledit règlement édicte que sont compétentes pour statuer en matière d'obligations alimentaires dans les Etats membres, la juridiction du lieu où le défendeur a sa résidence habituelle ou celle du lieu où le créancier a sa résidence habituelle.

Sharon HAFNER étant domiciliée dans le ressort du Tribunal de Grande Instance de Grasse, le juge français est bien compétent pour connaître de ces mesures.

L'article 15 du règlement dispose par ailleurs, qu'en matière d'obligations alimentaires, la loi applicable est déterminée par le protocole de La Haye du 23 novembre 2007, lequel désigne dans son article 3, la loi de la résidence habituelle du créancier. La loi applicable est donc ici la loi française, quoi que Roger MAC DONELL soutienne qu'il conviendrait d'appliquer la loi californienne.

**Sur la procédure**

Roger MAC DONELL et Sharon HAFNER sollicitent que soient écartées des débats, un certain nombre de pièces.

Il sera rappelé qu'aux termes de l'article 259 du Code Civil, les faits invoqués en tant que causes du divorce ou comme défenses à une demande peuvent être établis par tout mode de preuve, y compris l'aveu. Mais, l'article 259-2 du même code impose une limite à la liberté dans l'administration de la preuve en édictant qu'un époux ne peut verser aux débats un élément de preuve qu'il aurait obtenu par fraude ou par violence.

Roger MAC DONELL soutient que Sharon HAFNER a versé aux débats un nombre important de pièces obtenues par fraude.

Pour rejeter cette prétention, le premier juge a soulevé l'autorité de chose jugée qui s'attache à la décision de la Cour d'appel de céans en date du 23 octobre 2012, qui avait débouté Roger MAC DONELL d'une demande à l'identique. L'intimé soutient qu'il s'agissait d'une instance différente, alors que la cour statuait sur l'ordonnance de non conciliation, qui constitue la première phase de la procédure de divorce. Par ailleurs, Roger MAC DONELL ne démontre pas que les pièces visées dans ses conclusions ne seraient pas celles soumises à l'appréciation de la cour et sur la recevabilité desquelles il a déjà été statué. Partant, il convient d'approuver la décision du premier juge de refuser d'écarter ces pièces des débats.

Dans ses écritures, Roger MAC DONELL fait allusion à d'autres pièces (352 à 367, 387, 394 à 398) qui auraient été subtilisées par Sharon HAFNER sur ses diverses boites électroniques.

Or, dans le dispositif de ses conclusions, le visa de ces pièces n'est pas repris. Si bien que par application de l'article 954 alinéa 2 du Code de Procédure Civile, la cour n'a pas à statuer sur la recevabilité de ces documents, étant par ailleurs relevé que les pièces communiquées par Sharon HAFNER devant la cour sont numérotées de 1 à 222, et que l'on voit mal à quoi se réfère Roger MAC DONELL.

Sharon HAFNER demande quant à elle d'écarter des débats les pièces 272 et 354ter de la partie adverse.

La pièce 272 de Roger MAC DONELL est un détail des communications téléphoniques du n° d'appel 06 87 45 71 11 pour la période du 9 août au 12 septembre 2009. La pièce 354 ter est constituée de photos de Sharon HAFNER la représentant nue et dans des attitudes particulièrement intimes.

Le premier juge a refusé la demande au motif que Roger MAC DONELL avait obtenu communication de ces pièces par décision de l'autorité judicaire l'autorisant à procéder à la recherche de preuves.

L'ordonnance sur requête du premier vice président du Tribunal de Grande Instance de Grasse en date du 21 juin 2012 autorisait Roger MAC DONELL à confier mission à tout huissier de justice de se rendre au domicile de Sharon HAFNER pour rechercher principalement la présence de tout logiciel permettant d'intercepter ou détourner une messagerie électronique, d'y accéder à distance, de recueillir des informations confidentielles stockées sur un autre ordinateur à distance. Roger MAC DONELL se plaignait en effet de ce que Sharon HAFNER avait produit aux débats plusieurs dizaines de courriers électroniques dont il était l'émetteur ou le destinataire sur deux adresses dont il était l'unique utilisateur, et la soupçonnait d'avoir utilisé du matériel espion pour accéder aux messages reçus ou envoyés à partir de ces deux adresses.

La pièce 272 ne peut avoir été obtenue sur autorisation judiciaire, vu sa date. Sharon HAFNER soutient que Roger MAC DONELL, avec l'aide d'un certain Jonathan QUINLAN qui aurait confectionné un projet de faux, aurait adressé le 6 septembre 2010 à la société Orange une demande aux fins d'obtenir le détail de ses communications pour les 12 derniers mois en faisant croire que la demande émanait d'elle.

Les deux pièces versées aux débats (88 et 89) n'établissent pas clairement la pertinence de cette assertion, aucun élément objectif ne permettant de relier le courrier reçu par Orange à Roger MAC DONELL même s'il est troublant de constater que le dénommé Jonathan QUINLAN envoie à ce dernier un courrier dont les termes sont identiques à celui adressé à Orange. La correspondance reçue par Orange est accompagnée en effet d'une copie du passeport de Sharon HAFNER, dont celle-ci n'explique pas comment il aurait pu être en possession du mari.

Les photographies de la pièce 354 ter sont issues de l'exploitation du matériel saisi par l'huissier et expertisé par un expert en systèmes d'information inscrit près la cour d'appel d'Aix en Provence. La mission de l'huissier était circonscrite à ce qui a été indiqué plus haut. Les photographies extraites du matériel saisi, n'ont aucun rapport avec les investigations que devait mener l'huissier sur la présence de matériel de piratage de ses adresses électroniques.
De plus, elles portent gravement atteinte à la vie privée de Sharon HAFNER.

Il convient de dire que cette pièce a été obtenue par fraude, et de l'écarter des débats.

**Au fond**

**Sur le prononcé du divorce**

Aux termes de l'article 242 du Code Civil, le divorce peut être demandé par l'un des époux lorsque des faits constitutifs d'une violation grave ou renouvelée des devoirs et obligations du mariage sont imputables à son conjoint, et rendent intolérable le maintien de la vie commune

Les fautes de l'époux qui a pris l'initiative du divorce n'empêchent pas d'examiner sa demande ; elles peuvent, cependant, enlever aux faits qu'il reproche à son conjoint le caractère de gravité qui en aurait fait une cause de divorce.

Ces fautes peuvent aussi être invoquées par l'autre époux à l'appui d'une demande reconventionnelle en divorce. Si les deux demandes sont accueillies, le divorce est prononcé aux torts partagés.

Sharon HAFNER invoque trois griefs à l'égard de son mari :
- L'adultère
- Le recel d'argent de la communauté
- Le désintérêt pour la vie familiale et pour les enfants

L'adultère n'est pas nié par Roger MAC DONELL mais ce dernier soutient que ce comportement fautif devra être excusé par le comportement fautif de l'épouse qui avait auparavant noué une relation avec un amant de 20 ans son cadet, avec lequel elle partage désormais sa vie.

Sharon HAFNER produit aux débats une attestation d'une certaine Setareh KEYKAVOUSSI laquelle affirme le 17 janvier 2012, avoir entretenu une relation intime avec Roger MAC DONELL à partir de juin 2009, et ce pendant deux années. Certes la même personne a rédigé en novembre 2012 en faveur du mari une attestation, dans laquelle elle revient sur certains propos qu'elle a tenus dans le premier témoignage, notamment sur les rapports particuliers que Roger MAC DONELL entretenait avec l'argent et le fait qu'il cherchait à déplacer des fonds discrètement, à l'insu de son épouse. En revanche, jamais le témoin ne revient sur la date de ses relations avec Roger MAC DONELL.

Cette relation débutée bien avant l'autorisation de résider séparément, constitue un adultère, qui ne peut être excusé par l'attitude de l'épouse, puisque Roger MAC DONELL ne démontre pas l'infidélité de celle-ci avant 2009.

Sur le recel d'argent de la communauté, Sharon HAFNER critique la décision du premier juge qui n'a pas retenu ce grief, alors que selon elle, à l'insu de son épouse, d'une part Roger MAC DONELL a ouvert de nombreux comptes à l'étranger sur lequel il aurait versé des sommes considérables appartenant à la communauté, et d'autre part a ouvert un trust en y plaçant la somme de 4 millions USD au prétexte de financer des études des enfants, qu'il utilise à des fins personnelles.

Il a été vu ci-avant que Setareh KEYKAVOUSSI est revenue sur ses affirmations sur ce point. La cour suprême de Berne, dans sa décision du 2 décembre 2010, n'a pas retenu que Roger MAC DONELL avait cherché à dissimuler à son épouse les comptes qu'il détenait en Suisse. En revanche, pour accéder à la demande de Sharon HAFNER de bloquer les comptes ouverts à la Saanen Bank, ainsi que le coffre fort détenu dans cet établissement bancaire, la juridiction helvétique a relevé que :
- Le 5 août 2010, Roger MAC DONELL a retiré 1M USD d'un compte ouvert à la Vanguard Bank , soit un jour seulement après qu'un tribunal californien eut édicté une restriction à pouvoir disposer de ce compte. Roger MAC DONELL a affirmé que la décision ne lui a été signifiée qu'après l'opération financière, mais il connaissait pertinemment les prétentions de son épouse.
- La correspondance échangée par courrier électronique entre l'intimé et son conseil helvétique démontre que le premier avait l'intention de transférer les comptes de la Saanenbank sur un compte client du cabinet d'avocat auprès de l'UBS AG, pour effacer les traces.

De même, des échanges de courriels entre Roger MAC DONELL et son conseil financier à la Dreyfus Bank en février 2010 montrent que le premier cherchait à s'informer sur la possibilité de retirer « TOUT » son argent de cet établissement bancaire à n'importe quel moment, « juste au cas où.... »

Partant, sans aller plus avant dans l'analyse de l'illustration de ce moyen par l'étude de la constitution du trust et de l'utilisation qui en a été faite,  il convient de considérer que le comportement du mari par rapport à ses comptes en Suisse, s'il ne peut être qualifié de « recel de communauté », constitue au moins un manquement grave au devoir de loyauté qu'imposent les relations matrimoniales. Le grief sera en conséquence retenu.

Quant au troisième grief, c'est à bon droit que le premier juge a rejeté le désintérêt de Roger MAC DONELL pour ses enfants. L'épouse verse effectivement aux débats de nombreux courriels par lesquels elle reproche à Roger MAC DONELL de ne pas s'occuper des enfants et de ne pas les prendre en vacances avec lui. Toutefois, ces reproches réitérés, dont on ne sait jamais ce qu'il y est répondu par Roger MAC DONELL (lequel indique dans ses écritures qu'il n'y répliquait pas toujours car Sharon HAFNER ne cessait de le harceler)  concernent une période post-séparation du couple, où les relations maritales sont à l'évidence difficiles,  ce qui peut avoir, à tort ou à raison,  une incidence sur les rapports avec les enfants. Roger MAC DONELL verse quant à lui aux débats de nombreux témoignages de proches qui attestent de son affection pour ses enfants et de leur prise en charge sans faille, sur le plan matériel et éducatif, le père offrant à sa petite tribu une éducation en

19

adéquation avec son niveau de vie (voyages lointains, sports coûteux etc...), ce qu'illustrent de nombreux clichés photographiques.

Roger MAC DONELL reproche à Sharon HAFNER les griefs d'adultère, de harcèlement constant à son égard, l'instrumentalisation des enfants.

Le premier grief est parfaitement établi par la production de diverses pièces dont :
- Un rapport de détective privé en date du mois de novembre 2010, qui décrit l'attitude intime de Sharon HAFNER à l'égard d'un homme identifié comme Laurent PHILIPPE, dans un lieu public
- Le témoignage d'une certaine Rébecca LAÏK qui affirme le 12 janvier 2011 que Sharon HAFNER et Laurent PHILIPPE ont une relation depuis plus de deux ans
- Le relevé des appels de Sharon HAFNER vers le sieur PHILIPPE, à une fréquence soutenue, à partir du mois d'août 2009
- Des photographies des enfants MAC DONELL, de Sharon HAFNER et de Laurent PHILIPPE, lors de vacances à Dubaï en août 2011
- Un rapport de détective privé en date du 18 octobre 2011 établissant la proximité des relations entre Sharon HAFNER et Laurent PHILIPPE

L'ensemble de ces pièces démontre qu'avant l'ordonnance de non conciliation, Sharon HAFNER s'est affranchie du devoir de fidélité avec Laurent PHILIPPE, et a intensifié ses relations avec lui peu après le prononcé de l'ordonnance, en ne cachant pas à sa famille la nature des rapports qui s'étaient noués entre eux.

En ce qui concerne le second grief, qualifié de « harcèlement » par l'intimé, il s'apparente plutôt à un manque de respect à l'égard du mari, qui constitue effectivement une violation grave ou renouvelée aux devoirs et obligations du mariage, et qui peut être sanctionné tant que perdure l'instance en divorce.

Ce manque de respect s'illustre par :
- Divers messages adressés par Sharon HAFNER dans lesquels elle qualifie son mari d'épithètes injurieux : « fou, lâche, cochon, tapette, etc.... ». Il n'est pas rare au décours d'une séparation de voir les époux s'adresser des correspondances injurieuses, mais en l'espèce, la multiplication de messages de cette teneur renforce l'intensité des insultes et dépasse de beaucoup ce qui peut-être raisonnablement admis.
- La participation de l'épouse à une émission de télévision, où elle s'étale sans retenue sur ses prétentions à savoir qu'elle veut récupérer toute la fortune de son mari, qui mérite d' « être dans la rue » et qui doit « payer l'addition » car elle a « bossé pour élever ses enfants pendant 18 ans ». A l'issue de l'audience, Sharon HAFNER traite son mari de « monstre » devant les caméras, et ajoute un peu plus tard « je le déteste ».

Ces faits sont suffisants pour démontrer le manque de respect de l'épouse.

En ce qui concerne le dernier grief, c'est à bon droit qu'il a été écarté par le premier juge, car la manipulation des enfants, ou le manquement aux règles de la co-parentalité en cours de procédure de divorce, relèvent en l'espèce de considérations subjectives et ne peuvent constituer une faute au sens de l'article 242 du Code Civil.

En définitive, chacun des époux de par son attitude fautive, a contribué au délitement du lien conjugal. C'est à juste titre que le premier juge a prononcé le divorce aux torts partagés.

## Sur les conséquences du divorce relativement aux enfants

*Sur les modalités d'exercice de l'autorité parentale*

Il convient en préliminaire de constater que depuis le prononcé du divorce, les deux enfants aînés du couple sont devenus majeurs, si bien que les mesures prises pour eux par le juge aux affaires familiales de Grasse sont devenues caduques.

20

En ce qui concerne les jumeaux Roger Jr et Taylor, il sera rappelé que la loi française s'applique au cas des enfants MAC DONELL, et non les règles de la « General California Child Custody Guidelines » auxquelles se réfère Roger MAC DONELL dans ses écritures.

Par application de l'article 372 du Code Civil, il sera constaté que les parents exercent en commun l'autorité parentale et qu'ils sont d'accord pour que la résidence des enfants mineurs soit fixée chez la mère.

Au moment du divorce, Sharon HAFNER résidait avec ses enfants en Californie. Le juge du divorce avait donc accordé à Roger MAC DONELL, resté sur le continent européen, un droit de visite et d'hébergement règlementé de manière particulière, à savoir 9 jours par mois en période scolaire, et la totalité des vacances hormis celles de Noël et d'été partagées par moitié en alternance suivant les années.

Au mois de septembre 2015, Sharon HAFNER est venue s'installer de nouveau en France, avec les enfants. Elle a sollicité du conseiller de la mise en état un réaménagement du droit de visite et d'hébergement du père, eu égard à ses nouvelles conditions de vie.

Le conseiller de la mise en état a fait droit à sa demande et a accordé à Roger MAC DONELL un droit de visite et d'hébergement élargi, dont Sharon HAFNER demande à ce qu'il soit maintenu, en l'absence d'élément nouveau afférent à la situation des enfants.

Ces mesures seront effectivement maintenues, pour assurer aux enfants MAC DONELL, qui ont connu de nombreux bouleversements dans leurs conditions de vie depuis la séparation de leurs parents, une stabilité dans leur vie quotidienne.

*Sur la contribution à l'entretien et l'éducation des enfants*

Il sera rappelé là encore que l'article 4061 du Code californien de la famille invoqué par Roger MAC DONELL ne s'applique pas en l'espèce, en vertu des principes exposés plus haut.

Le premier juge a maintenu la contribution à l'entretien et l'éducation des enfants à la somme qui avait été fixée par le juge de la mise en état dans son ordonnance du 2 décembre 2013, à savoir 1000€/mois pour Jackson, Taylor et RogerJr, considérant qu'aucun élément nouveau n'était intervenu depuis lors.

Mais l'ordonnance du 2 décembre 2013 a été réformée par la Cour d'appel de céans dans un arrêt du 26 mars 2015, qui a restauré le quantum de la contribution à l'entretien et l'éducation des enfants à la somme de 2000€/mois et par enfant, y compris pour Lauren, soit au total la somme de 8000€.

En l'absence de fait nouveau intervenu entre décembre 2013 et juin 2014, c'est à bon droit que Sharon HAFNER demande que le jugement de divorce soit réformé sur ce point et que le montant de la contribution soit fixé à la somme de 2000€/mois et par enfant, à compter du jugement et jusqu'à ce jour, malgré le fait qu'elle soit revenue en France entre temps.

Roger MAC DONELL s'acquittera également des frais de scolarité de ses enfants, comme il le fait déjà.

**Sur les conséquences du divorce relativement aux époux**

*Sur la date de report des effets du divorce*

Aux termes de l'article 262-1 du Code Civil, le jugement de divorce prend effet dans les rapports entre les époux, en ce qui concerne leurs biens lorsqu'il est prononcé pour acceptation du principe de la rupture du mariage, pour altération définitive du lien conjugal et pour faute, à la date de l'ordonnance de non conciliation
A la demande de l'un des époux, le juge peut fixer les effets du jugement à la date à laquelle ils ont cessé de cohabiter et de collaborer.

La fin de la cohabitation fait présumer la fin de la collaboration.

Les époux sont contraires sur ce point devant la cour : Roger MAC DONELL souhaite que le divorce prenne effet dans les rapports entre les époux en ce qui concerne leurs biens à la date de l'ordonnance de non conciliation, tandis que Sharon HAFNER fait valoir que la cohabitation a cessé le 4 août 2010.

L'assertion de l'épouse est établie par un procès-verbal d'audition de Roger MAC DONELL en date du 30 mars 2015, par lequel ce dernier, entendu suite à une plainte de son épouse pour abandon de famille, débute son audition par la déclaration suivante : « *je suis séparé de ma femme Sharon Louise depuis le 4 août 2010* ».

Cette déclaration est confortée par le dépôt d'une requête en divorce par l'épouse devant les juridictions américaines le 5 août 2010, le fait que Roger MAC DONELL a dénoncé le compte joint ouvert à la Société Générale le 8 août 2010 (pièce 15 de l'appelante) et divers échanges de mails au cours du mois d'août 2010, qui montrent que les époux sont effectivement séparés à cette date, et que Sharon HAFNER n'envisage pas à son retour en France en septembre 2010, de vivre sous le même toit que son mari.

Partant, il sera fait droit à cette demande.


*Sur l'usage du nom marital*

Aux termes de l'article 264 du Code Civil, à la suite du divorce, chacun des époux perd l'usage du nom de son conjoint.

L'un des époux peut néanmoins conserver l'usage du nom de l'autre, soit avec l'accord de celui-ci soit avec l'autorisation du juge, s'il justifie d'un intérêt particulier pour lui ou pour les enfants.

Roger MAC DONELL s'oppose à cette demande qui a été favorablement accueillie par le premier juge, lequel a pris en considération la durée du mariage et l'intérêt des enfants à porter le même nom que leurs parents.

Sharon HAFNER approuve l'analyse qu'a faite le premier juge, et rajoute qu'aux Etats Unis, l'épouse a toujours le choix de conserver l'usage du nom marital après le divorce, sans que l'époux puisse s'y opposer.

Ce dernier argument n'a aucun intérêt, dans la mesure où comme il a été vu plus haut, s'applique ici la loi française.

Il convient de constater que Sharon HAFNER ne travaille pas, et que le fait de perdre l'usage du nom marital ne lui portera aucun préjudice sur le plan professionnel.

En ce qui concerne les enfants, ils sont âgés actuellement de 20 ans pour l'aînée, 18 ans pour le cadet, et 16 ans pour les benjamins. Ils sont largement en âge de comprendre les conséquences d'un processus de séparation engagé depuis plus de six années.

Enfin, la durée du mariage ne saurait conférer un intérêt particulier pour une épouse appartenant à une génération de femmes dont la place dans la société ne relevait pas principalement du statut de femme mariée.

La décision sera réformée, et Sharon HAFNER déboutée de cette demande.


*Sur les dommages-intérêts*

Aux termes de l'article 1382 du Code Civil, tout fait quelconque de l'homme qui cause un dommage à autrui, oblige celui par la faute duquel il est arrivé, à le réparer.

En matière de divorce, ce texte permet de réparer un dommage distinct de celui causé par la dissolution du mariage. Il est applicable quelle que soit la répartition des torts.

Roger MAC DONELL sollicite l'octroi de la somme de 50 000€ aux motifs qu'il a exposé de nombreux frais d'avocat aux Etats-Unis, en France et en Suisse, du fait de la procédure de divorce,

et que l'attitude qualifiée de « sulfureuse » de Sharon HAFNER lui a porté préjudice auprès de ses relations amicales et professionnelles.

Le fait que Sharon HAFNER ait multiplié les procédures ne peut constituer un abus de droit fautif, vu les intérêts en jeu et le cosmopolitisme de la situation financière du mari.

En revanche, le fait pour Sharon HAFNER de se livrer dans une émission de télévision à des commentaires désobligeants sur son mari, lèse gravement l'image de celui-ci, présenté publiquement comme un Harpagon, qui refuserait bourse délier pour sa famille et en particulier ses enfants. Le préjudice sera réparé par l'allocation de la somme de 5000€.

*Sur la prestation compensatoire*

Cette mesure est régie par la loi française, et non par la loi californienne, comme le soutient longuement l'intimé dans ses écritures.

Il résulte des articles 270 et suivants du Code Civil que l'un des époux peut être tenu de verser à l'autre une prestation destinée à compenser autant qu'il est possible, la disparité que la rupture du mariage crée dans les conditions de vie respectives. La prestation compensatoire est fixée selon les besoins de l'époux à qui elle est versée et les ressources de l'autre en tenant compte de la situation au moment du divorce et de l'évolution de celle-ci dans un avenir prévisible. Pour ce faire, le juge prend en considération un certain nombre d'éléments non limitativement énumérés par l'alinéa 2 de l'article 271 du Code Civil, à savoir notamment :
   - la durée du mariage
   - l'âge et l'état de santé des époux
   - leur qualification et leur situation professionnelle
   - les conséquences des choix professionnels faits par l'un des époux pendant la vie commune pour l'éducation des enfants et du temps qu'il faudra encore y consacrer ou pour favoriser la carrière de son conjoint au détriment de la sienne
   - le patrimoine estimé ou prévisible des époux, tant en capital qu'en revenu,après la liquidation du régime matrimonial
   - leurs droits existants et prévisibles
   - leur situation respective en matière de pensions de retraite en ayant estimé autant qu'il est possible, la diminution des droits à retraite qui aura pu être causée, pour l'époux créancier de la prestation compensatoire, par les circonstances visées au sixième alinéa.

La situation financière des parties se présente comme suit.

Roger MAC DONELL est âgé de 54 ans et Sharon HAFNER de 52 ans.

Le mariage a été célébré le 3 octobre 1992 et la séparation est intervenue le 4 août 2010. La vie commune dans les liens du mariage a duré un peu moins de 18 ans.

Le couple a eu quatre enfants. Sharon HAFNER a cessé de travailler en 1999 après la naissance du second enfant du couple. Roger MAC DONELL s'acquitte d'une contribution de 2000€/mois et par enfant, et des frais de scolarité des enfants, qui sont particulièrement onéreux :
   - Lauren est inscrite à l'Irving Valley College depuis la rentrée 2016, et le coût trimestriel de la scolarité s'élève à 5 503 USD. Il prend également en charge son loyer.
   - Les trois autres enfants sont scolarisés pour l'année 2016/2017 à l'ISN, établissement privé qu'ils fréquentaient avant leur départ aux US.
Vu l'âge des enfants (de 20 à 16 ans), cette charge financière pèsera encore longtemps sur Roger MAC DONELL et risque même de s'amplifier si les plus jeunes entreprennent de longues études.

Sharon HAFNER n'exerce aucune activité professionnelle et ne subsiste que grâce à la pension alimentaire mise à la charge du mari, soit la somme de 30 000€/mois, qu'il a cessé de payer sitôt que le divorce a été prononcé. Elle a introduit devant les juridictions américaines une procédure en paiement direct de cette pension, ce qui lui permet de percevoir mensuellement la somme de 7400€.

Elle ne justifie pas avoir recherché du travail pendant toute la période où elle résidait aux Etats Unis (2012/2015) alors qu'elle détient des diplômes en marketing et que la situation de l'emploi en Californie n'est pas comparable avec celle de la France. Son mari le lui reproche vertement,

l'accusant d'entretenir son jeune amant avec lequel elle mènerait un train de vie qualifié de fastueux, grâce à l'argent qu'il lui verse.

Lors de son retour en France, elle n'a pas pu intégrer le domicile conjugal dont la jouissance avait été attribuée au mari, et a sollicité du conseiller de la mise en état qu'elle puisse à nouveau l'occuper. Elle a été déboutée de cette demande mais a déféré la décision du conseiller de la mise en état sur ce point. Elle a d'abord loué à Antibes à compter du 9 septembre 2015, une villa de 6 pièces et 280m2, pour la somme de 4000€. Puis à compter du 1er février 2016, elle a loué une autre villa au Cap d'Antibes pour la somme de 3500€ jusqu'au mois d'avril, puis 4000€ en mai.

Roger MAC DONELL a fondé en 1991 une société intitulée CONSORTIUM GROUP INC. qu'il a dirigée avec un certain David KIGER. En 2007, il a vendu une partie des actions de cette société, pour un montant de 28 246 170 USD. Il s'est arrêté de travailler pour s'installer en France dont des ancêtres sont originaires. Il explique qu'en 2012, il a dû reprendre une activité professionnelle dans la société Shipping Solutions, ce qui a permis à Sharon HAFNER de faire effectuer une saisie sur partie des salaires qu'il reçoit de cette société.

Pour l'année 2015, Roger MAC DONELL a déclaré 345 694USD à l'administration américaine, dont 307 500 USD au titre de Shipping Solution, 36 000 USD de CSC/Roger MAC DONELL et 2072 USD de CGI Franchise System INC. En 2014, Roger MAC DONELL a reçu de cette société la somme de 2 000 000 USD, dont il a prétendu qu'elle résultait d'une vente d'actions de cette société, ce qui était fortement contesté par la partie adverse, qui faisait remarquer que l'argent avait été viré de cette société, ce qui était incohérent s'il s'agissait d'une vente d'actions.

Dans ce document (pièce 215 de la partie adverse), Roger MAC DONELL déclare pour 496 800 USD de pensions alimentaires (soit plus que ses revenus).

Il convient de relever que pour cette même année 2015, Roger MAC DONELL produit une déclaration de revenus différente (pièce 609), qui fait apparaître un total de revenus de 348 221USD mais ainsi répartis: 307 500 USD +2527au titre de Shipping Solution, 2072 USD de CGI Franchise Systems et 36 000USD de CSC /Roger MAC DONELL (?). Il déclare également 114 409 USD au titre de « rental real estate, royalties, partnerships ; S coroporation and Trusts », tandis que dans le document versé par l'épouse, cette somme est inférieure : 89 789 USD. Le quantum des pensions alimentaires versées est en revanche identique.

La situation financière du mari n'est donc pas du tout claire, comme l'ont déjà constaté les différentes juridictions qui se sont penchées sur cette affaire.

La domiciliation de Roger MAC DONELL est l'objet de controverses, l'intimé soutenant occuper le domicile conjugal et ne le louer que de manière épisodique, Sharon HAFNER prétendant qu'il vit en fait à Monaco, où il occupe un deux pièces.

Sharon HAFNER a ouvert dans l'établissement Charles Schwab un compte-épargne retraite qui totalisait 85 887USD au 31 janvier 2011, et 3931.94USD au 30 septembre 2014.

Le couple possède les biens suivants :

- En France et à Monaco:
- Un bien immobilier sis à Juan les Pins : estimé par le mari à 1 800 000USD soit 1 584 000€, et par l'épouse à 1 020 000USD ou 884 000€. Cette seconde estimation apparait faible car en 2010, ce bien apparaissait dans la déclaration d'ISF pour 945 000€ ; il a été acquis en 2008 pour 1 350 000€. Ce bien est grevé d'un emprunt immobilier
- Une assurance vie (chez HSBC) : 426 000USD soit 374 880€
- Un compte au Crédit du Nord : 10 000USD ou 8800€
- Plusieurs véhicules et scooters
- Un bateau : 130 000 USD soit 114 100€
- Un anneau d'amarrage : 50 000€ (dans la déclaration d'ISF 2010)

- Aux USA :
- Un bien immobilier à Auburn : déclarée pour 2 000 000USD ou 1 760 000€ par le mari et 1 500 000USD ou 1 360 000€ par l'épouse.

- ▸ Un bien immobilier au Texas, déclaré 600 000USD ou 528 000€ par le mari. Ce bien serait grevé d'un emprunt à hauteur de 36 288USD ou 31 036€. Il est loué et rapporte des revenus à Roger MAC DONELL.
- ▸ Des comptes ouverts chez AMEGY Bank of Texas, VANGUARD BANK, WELLS FARGO, GRAND RAPIDS Bank détenant aux dires du mari pour 1 739 000USD ou 1 530 320€
- ▸ Les parts de Shipping Solutions : 1 600 000USD d'après Roger MAC DONELL
- ▸ Les parts de CGI Franchises Systems Inc : 600 000USD ou 528 000€ (toujours d'après Roger MAC DONELL)

- En Suisse
- ▸ Des comptes et un coffre fort à la Saanenbank : gelés depuis 2010
- ▸ Un compte à la Dreyfus Bank, ainsi qu'un coffre fort dans lequel il y avait en de l'or en février 2010 (pièce 17 de Sharon HAFNER) : 25 000USD ou 22 000€
- ▸ Un compte à la banque Maerki Baumann : 2 175 280USD ou 1 914 246€
- ▸ Un trust pour les enfants : 3 760 000USD ou 3 308 800€

Sharon HAFNER fait également valoir que Roger MAC DONELL possèderait des œuvres d'art, puisqu'il figure parmi les collectionneurs de l'œuvre picturale d'un certain Chris Judy, peintre abstrait texan ayant une certaine notoriété. Elle soutient également que le couple a vendu en 2007, leur maison en Californie pour la somme de 1 978 715 USD, dont elle ne sait ce qu'il en est advenu.

Sharon HAFNER ne possède pas de bien propre. Le caractère commun du patrimoine du couple ci-dessus exposé, est pour partie contesté par Roger MAC DONELL. Il produit à cet effet un courrier que son conseil américain Maître Paul VORSATZ adresse le 4 janvier 2011 à un magistrat, dans lequel ce dernier explique que les lois californiennes protègent les biens propres de chacun. Or les biens acquis par le couple pendant le mariage ont été le résultat de la vente d'une entité commerciale créée par le mari en 1991, soit avant le mariage. Même si la société a pris une autre forme en 1994, elle a continué de conserver son caractère de bien propre. La société a été vendue en 2007 et la totalité de la somme versée à Roger MAC DONELL

Partant de cet avis, Roger MAC DONELL estime que seuls les biens immobiliers acquis par les époux sont communs. En ce qui concerne les biens en France, une incertitude plane sur leur caractère commun : l'acte de Maître NAOUR du 19 novembre 2007 n'est pas produit si bien qu'il est impossible de savoir si l'ensemble des biens situés en France sont placés sous le régime de communauté universelle, comme semble l'indiquer l'acte d'acquisition de la maison du 9 octobre 2008, ou s'il s'agit seulement des biens immobiliers comme l'indique l'acte du 29 décembre 2008 passé entre les époux et la société HSBC. La première interprétation semble celle qu'agrée Roger MAC DONELL, lequel dans sa déclaration sur l'honneur porte la mention « commun avec Mme HAFNER » pour l'assurance vie contractée chez HSBC et le compte CMB/Crédit du Nord, ainsi que pour le bateau, l'anneau et le scooter.

L'ensemble de ces éléments met en évidence la disparité que la rupture du mariage va créer dans les conditions de vie des époux au détriment de Sharon HAFNER, en termes de revenus et de patrimoine.

Vu le patrimoine propre du mari tel qu'il se dessine à la lecture de ses prétentions, la durée significative de la vie commune dans les liens du mariage, et le fait que Sharon HAFNER a interrompue sa carrière pour s'occuper des quatre enfants du couple, mais compte tenu aussi du fait qu'elle n'a pas cherché à retrouver du travail depuis plus de 6 ans, alors que ses enfants sont en voie d'autonomie, et que la présence de la mère n'est plus aussi indispensable qu'auparavant, il sera octroyé à Sharon HAFNER une prestation compensatoire en capital de 4 millions d'euros.

*Sur l'avance sur les droits de l'épouse dans la liquidation du régime matrimonial*

Sharon HAFNER sollicite à ce titre la somme de 1 047 720€ au motif que le mari chiffrerait désormais les biens communs à la somme de 2 095 440€.

Roger MAC DONELL s'oppose à cette prétention, en faisant valoir que l'épouse préjuge des sommes figurant dans la communauté.

Comme il a été vu ci-avant, la consistance de la communauté et sa valeur sont pour l'heure largement inconnues, les époux étant contraires sur l'estimation des biens reconnus communs par l'un et par l'autre, et des comptes devant être faits entre les époux pour tous les crédits réglés pendant la durée de la procédure par Roger MAC DONELL à charge de récompense lors de la liquidation du régime matrimonial, et pour son occupation du domicile conjugal à titre onéreux.

En l'absence de certitudes, il n'apparaît pas utile d'allouer à Sharon HAFNER une avance sur communauté.

*Sur la saisie du compte de la Saanenbank*

Roger MAC DONELL fait valoir que la somme bloquée depuis 2010 ne serait pas une somme entrant dans la communauté.

Quand bien même cette analyse serait admise, il convient de constater qu'il n'appartient pas à une juridiction française d'ordonner la main-levée de sommes bloquées dans un pays étranger. Cette réponse avait déjà été donnée par la cour à Roger MAC DONELL dans son arrêt du 23 octobre 2012, au motif qu'il n'expliquait pas sur quel fondement le juge français serait compétent pour faire échec à une mesure conservatoire ordonnée par une juridiction étrangère définitive pour des biens situés à l'étranger.

**Sur les dépens**

Le divorce étant prononcé aux torts partagés des époux, chacun d'eux supportera la charge des dépens par lui exposé.

L'équité commande d'allouer la somme de 5000€ à Sharon HAFNER au titre des frais irrépétibles, et de débouter Roger MAC DONELL de la demande formée au même titre.

# Par ces motifs

La cour, statuant en audience publique, contradictoirement, après débats hors la présence du public

Reçoit l'appel

Dit que les juridictions françaises sont compétentes pour connaître du litige, et la loi française applicable, excepté pour partie de la liquidation des intérêts patrimoniaux soumis au régime primaire californien

Infirme la décision entreprise, et écarte des débats la pièce 354 ter de Roger MAC DONELL

Confirme pour le surplus des demandes de rejet des pièces

Confirme la décision entreprise sur le prononcé du divorce, la publicité des débats, la liquidation du régime matrimonial, le rejet de la désignation d'un notaire, et le débouté de l'octroi d'une avance sur communauté,

Infirme sur le report des effets du divorce, l'usage du nom marital, les dommages-intérêts et le quantum de la prestation compensatoire

Et statuant à nouveau de ces chefs

Reporte les effets du divorce au 4 août 2010

Rejette la demande de Sharon HAFNER d'être autorisée à conserver l'usage du nom marital

Condamne Sharon HAFNER à payer à Roger MAC DONELL la somme de 5000€ à titre de dommages-intérêts sur le fondement de l'article 1382 du Code Civil

Condamne Roger MAC DONELL à payer à Sharon HAFNER une prestation compensatoire en capital de 4 millions d'euros

Constate que Lauren et Jackson sont devenus majeurs et que les mesures relatives à l'autorité parentale prises à leur endroit sont devenues caduques

Dit que Roger MAC DONELL et Sharon HAFNER exerceront en commun l'autorité parentale à l'égard de leurs enfants mineurs Roger Jr et Taylor

Fixe la résidence des enfants au domicile de Sharon HAFNER

Dit que Roger MAC DONELL exercera son droit de visite et d'hébergement tel que le conseiller de la mise en état l'a règlementé dans son ordonnance du 11 janvier 2016

Fixe à la somme de 2000€/mois et par enfant, la contribution que Roger MAC DONELL devra verser à Sharon HAFNER pour l'entretien et l'éducation de ses quatre enfants, et au besoin l'y condamne

Dit que le paiement et l'indexation de la contribution s'appliqueront dans les conditions fixées par arrêt de la cour du 26 mars 2015.

Dit que Roger MAC DONELL s'acquittera de l'intégralité des frais scolaires de ses enfants.

Y ajoutant

Déboute Roger MAC DONELL de sa demande de main-levée de la saisie opérée sur les comptes de la Saanenbank

Déboute Roger MAC DONELL de sa demande formée sur le fondement de l'article 700 du Code de Procédure Civile

Condamne Roger MAC DONELL à payer à Sharon HAFNER la somme de 5000€ au titre des frais irrépétibles

Laisse à Roger MAC DONELL et Sharon HAFNER la charge des dépens par eux exposés, ceux de première instance restant répartis comme il est dit dans le jugement.

**Le Greffier,**                                        **Le Président,**

**EXHIBIT D**

1

**COURT OF APPEAL OF AIX-EN-PROVENCE**
**6th Chamber B**

**JUDGMENT ON THE MERITS**
**OF NOVEMBER 29, 2016.**
**No. 2016/489**
Decision brought before the Court:
The judgment of June 16, 2014 issued by the Regional Court of GRASSE recorded in the general list under number 10/05257.

Role # 14/21683

**APPELLANT**
**Mrs. Sharon Louise MAC DONELL née HAFNER**

Born on October 27, 1964 in PALO ALTO CALIFORNIA (USA)

Sharon Louise MAC
DONNELL née
HAFNER

of American nationality

**Residing at** Villa Rustica - 5 Avenue de l'Antiquité - 06160 CAP D'ANTIBES

Versus

Roger James MAC
DONNELL

**Represented by** *Maître* Alexandra BOISRAME, Barrister of AIX-EN-PROVENCE

**Assisted by** *Maître* Jerome BOURSICAN, Barrister of PARIS,

**RESPONDENT**
**Mr. Roger James MAC DONELL**
Born on January 10, 1962 at MOUNTAIN VIEW (CALIFORNIA) USA,

of American nationality,

**Residing at** Le Continental - Bloc C n° 75 Place des Moulin's - 98000 MONACO

**Represented by** *Maître* Pierre-Yves IMPERATORE of SELARL BOULAN CHERFILS IMPERATORE, Barrister of AIX-EN-PROVENCE

**Assisted by** *Maître* Alain LUCIANI, Barrister of GRASSE

Execution copy
issued on:
To: *Maître* BOISRAME
SELARL BOULAN
CHERFILS
IMPERATORE

* * * * *

2

## COMPOSITION OF THE COURT:

The matter was debated on **September 22, 2016,** in judge's chambers. In accordance with Article 785 of the Code of Civil Procedure, Chantal MUSSO, the Presiding Judge gave an oral report of the case at the hearing before pleas. The Court was composed by:

Mrs. Chantal MUSSO, Presiding Judge
Mr. Joël MOCAER, Presiding Judge
Mr. Benoît PERSYN, Counselor

who deliberated on the matter.
**Clerk of the Court during the debates:** Mrs. Marie-Sol ROBINET.
The parties were advised that the decision will be issued by being made available at the Court Registry on November 29, 2016.

## **DECREE**

In the presence of all parties,
Delivered by being made available at the Court Registry on November 29, 2016.
Signed by **Mrs. Chantal MUSSO, Presiding Judge** and **Mrs. Marie-Sol ROBINET, the Clerk of the Court,** to whom record of the decision was handed by the undersigned Judge.

3

Mr. Roger James MAC DONELL and Mrs. Sharon HAFNER, both of American nationality, were married on October 3, 1992 before a priest of San Mateo County in the State of California, United States of America. They did not sign a pre-nuptial contract.

Four children were born of this union, all in the United States:
- Lauren Michelle born on August 4, 1996 (of age)
- Jackson Delaney born on April 6,1998 (of age)
- Roger James and Taylor Diane, both born on June 30, 2000

A procedure brought in Switzerland by Mrs. HAFNER resulted in a decision from the Court of Appeal of the Canton of Berne dated December 2, 2010, prohibiting Mr. MAC DONELL from having access to four bank accounts held with the SAANEN BANK AG, the funds blocked at this establishment representing about eight million US dollars.

Initially petitioned, the US court declared itself incompetent to hear the divorce proceedings, since the family had been living in France as of the month of September 2006.

The family matters judge of Grasse was presented with a divorce petition and on February 21, 2011 issued a separation, under the terms of which he:
- awarded the wife enjoyment of the housing and household furniture within the marital home, free of charge until her return to the United States
- declared that the husband must leave the premises within a fortnight
- declared that Mr. MAC DONELL shall pay the expenses relating to the family home
- ordered the husband be returned his personal effects and clothes
- declared that there is no reason to rule on the allocation of the enjoyment of real estate belonging to the couple in the United States, the husband, however, having the obligation to assume sole responsibility for payment of costs relating to the ownership and occupation of this property, in as far as he is the only one with an income
- ordered Mr. MAC DONELL to pay his wife alimony of EUR 20,000 per month under duty of assistance
- declared that Mr. MAC DONELL must also provide, under the duty of assistance, the provisional settlement of the following joint debts: costs relating to the ownership and occupation of the marital home and property located in the United States, private health insurance for the entire family, the family's sports and leisure activities, as well as the costs for domestic staff (housekeeper, driver)
- declared that Mr. MAC DONELL must ensure the provisional settlement of the following joint loans: loan from HSBC to buy the marital home (monthly payment of EUR 11,060) and loans for the purchase of the house in Auburn and in Dallas in the United States (monthly charge of EUR 2,800)
- ordered Mr. MAC DONELL to pay his wife the sum of EUR 10,000 as a provision for court costs
- ordered Mr. MAC DONELL to pay his wife an advance on part of the joint property in the amount of EUR 1,000,000
- declared that there were no grounds to appoint a notary or a qualified professional
- nonsuited Mrs. HAFNER in her application for the sequestration of amounts held in bank accounts opened in the spouse's names or in the name of Mr. MAC DONELL and located in Switzerland, the United States and France
- declared that there was no reason for the wife to administer these accounts
- declared that parental authority over the four minor children will be exercised jointly by both the parents
- determined the habitual residence of the children as being at the mother's home and gave the father extended visiting and custody rights as long as the children are in France and, after their move to the United States, during the entire school holidays of Halloween, February and Easter and half of other school holidays
- declared that the transport costs incurred in the exercise these visiting and custody rights will be borne exclusively by the father
- Henceforth authorized the mother to return to live in the United States with the four

4

children at the end of the current school year

&ndash; declared that there was no reason to prohibit the children from leaving the Schengen area

&ndash; determined the monthly indexed amount of EUR 2,000 per child, i.e. a total sum of EUR 8,000, as the amount of paternal contribution to the maintenance and education of their shared children

&ndash; declared that the father must continue to solely assume all the expenses relating to the children with regard to schooling, tutoring, sports and leisure activities, trips abroad during Christmas and summer and their Health Insurance.

This order was brought before this Court of Appeal, which, by decree dated October 23, 2012, partially reformed the provisions of the Decision, and:

&ndash; fixed the alimony to be paid by Mr. MAC DONELL to his wife under the duty of assistance at the indexed monthly sum of EUR 30,000, making Mrs. HAFNER responsible for paying the expenses related to the marital home and health costs, including insurance, as well as to leisure and sports activities, the domestic staff and driver and all other personal expenses

&ndash; declared that Mr. MAC DONELL shall bear the costs of ownership and occupancy of property located in the United States, the loans taken out to purchase the said property and the loan from HSBC to purchase the family home, subject to settling the accounts between the parties during the dissolution of the matrimonial regime

&ndash; awarded the wife free use of the marital home

&ndash; nonsuited Mrs. HAFNER in her application for the allocation of a provision on account of her rights in the dissolution of the matrimonial regime

&ndash; determined the paternal contribution towards the maintenance and education for children in the sum of EUR 2,000 per child per month and declared that this sum will cover all the children's expenses

&ndash; nonsuited Mr. MAC DONELL in his request to limit the period of free enjoyment of the marital home

&ndash; nonsuited Mr. MAC DONELL in his request for the bank accounts opened at Saanen Bank AG to be unfrozen

&ndash; ordered Mr. MAC DONELL to pay the invoices issued by ISN for the children's schooling as of the date of the decree

&ndash; declared that the provisions of the separation order are intended to apply as long as the children are domiciled in France

&ndash; rejected the request to stop the children's overnight visitation with the father on Wednesdays.

On November 8, 2012, Mrs. HAFNER sued her husband for divorce on the basis of the provisions of Article 242 of the Civil Code.

Presented with this plea, the pre-trial judge issued an order on December 2, 2013 under which he notably:

&ndash; declared and ruled that Mrs. HAFNER would no longer enjoy the free use of the marital home located in Juan les Pins

&ndash; awarded enjoyment of the property for a consideration to Mr. MAC DONELL, the latter having responsibility for paying all the related expenses, to be accounted between the parties at the time of dissolution of the marriage

&ndash; recorded Mr. MAC DONELL's agreement for enjoyment of the property located in Auburn in the United States to be awarded to Mrs. HAFNER and grant this request on condition that the wife is to pay all the expenses related thereto, subject to the rights of each party during the dissolution of the marriage

&ndash; maintained the habitual residence of the shared minor children as being at the mother's home in the United States

&ndash; declared that the father's visitation and custody rights will be exercised outside of school holidays for nine days per month, the first of weekend of each month from Friday after school until the following weekend on return to classes on Monday, and during all school holidays with the exception of Christmas and summer, which are shared jointly

5

      – declared that the transport costs incurred in the exercise of this right will be borne exclusively by the father

      – declared and ruled that Mr. MAC DONELL must pay the enrolment fees for their child Lauren, for the year 2013/2014Stopped with effect from September 1, 2013 the paternal contribution to Lauren's maintenance and education

      · fixed the amount of the father's contributory share of the maintenance and education for the other three shared children at the monthly indexed amount of EUR 1,000 per child, i.e. a total sum of EUR 3,000, specifying that this amount was to cover all the children's expenses.

The 6th Chamber C of the Court of Appeal of Aix en Provence, by decree dated March 26, 2015, reversed the decision of the pre-trial judge solely in the financial measures relating to the children.

The amount of the paternal contribution towards the maintenance and education of the shared children was once again set at the indexed monthly sum of EUR 2,000 per child. In addition, the Court ruled that Mr. MAC DONELL would be responsible for the tuition costs for the year 2013/2014 for the children Lauren and Jackson.

By Judgment *inter partes* rendered on June 16, 2014, the family matters judge of Grasse in particular:

      – pronounced the divorce of the spouses with joint responsibility for the faults

      – declared and ruled that the law applicable to the marriage between the MAC DONELL/HAFNER couple was that of the primary regime in California and that therefore, the parties must settle their property interests under Californian rules

      – ordered the liquidation and distribution of the economic interests existing between the parties

      – declared there were no grounds at this stage of the proceedings to appoint a notary to carry out the liquidation of the respective rights of the parties

      – nonsuited Mrs. Hafner in her application for an advance on the share of communal propertyconfirmed the latest provisional measures with regard to the children

      – ordered Mr. Mac Donell to pay Mrs. Hafner a pecuniary provision in the amount of EUR 2,000,000

      – rejected the request for provisional enforcementnonsuited Mr. Mac Donell in his request for damagesauthorized Mrs. Hafner to retain the use of the husband's surname.

Mrs. Hafner appealed against this decision by declaration to the court registry received on November 17, 2014.

On July 1, 2015, the parties were summonsed to the Court hearing fixed on October 15, 2015 at 8:20 a.m., as the conclusion of the proceedings was to be on October 8, 2015.

On September 24, 2015, Mrs. HAFNER made her incidental submissions to the pretrial counselor.

The closing order was revoked on October 15, 2015 and the case was listed for hearing by the pretrial counselor on November 9, 2015.

In her incidental submissions notified on November 6, 2015, the appellant sought the rejection of debates on submissions and documents filed by the opposing party on November 6, 2015 as being in breach of the *inter partes* principle. Failing this, Mrs. HAFNER requested that:

      – Mr. MAC DONELL be nonsuited in all his demands, purposes and submissions

      – she be awarded the enjoyment of the common property located at 1 Avenue Commandant Garbes, 06160 Cap d'Antibes, the former marital home, free of charge, under the duty of assistance

6

it be declared and ruled that the father may, as of the forthcoming decision, benefit from visitation and custody rights on the first, third and fifth weekends of each month from Friday evening after school until Sunday evening 6:00 p.m. during school periods and half of all school holidays of more than five days in length

– Mr. MAC DONELL be ordered to pay the mother a contribution to the maintenance and education of the children in the amount of EUR 2,000 per month per child, i.e. a total amount of EUR 8,000 per month, as of July 2014, the date on which Mr. MAC DONELL ceased to pay the duty of assistance to his wife.

In his submissions in response to the incidental plea notified on November 6, 2015, the respondent's main requests were that:

– it be declared and ruled that the opposing party has not demonstrated a new element within the meaning of Articles 1118 and 1119 of the Code of Civil Procedure

– the plea of Mrs. HAFNER be declared inadmissible and it be dismissed on meritMrs. HAFNER's proceedings be declared a delay tactic

– she be ordered to pay the sum of EUR 10,000 pursuant to Article 700 of the Code of Civil Procedure.

In the alternative, it was requested that:

– Mrs. HAFNER be nonsuited in all her applications

– it be declared and ruled that Mr. MAC DONELL may continue to enjoy the apartment in Antibes Juan les Pins for considerationalternating custody be arranged for the four children, two weeks per month at the home of each parentit be confirmed that Mr. MAC DONELL will make a contribution to the children in the amount of EUR 4,000, i.e. EUR 1,000 per child

– it be declared and ruled that the school fees will be shared between both parents

– the opposing party be ordered to pay the costs of the incidental plea and to the payment of a sum of EUR 5,000 pursuant to Article 700 of the Code of Civil Procedure.

By order dated January 11, 2016, the pretrial counselor:

– declared that the French courts were competent to hear the case and that they shall apply French law

– dismissed the deliberation notes which did not meet the demand of the pretrial counselordeclared admissible the submissions and evidence from the respondent notified and filed on November 6, 2015.

– nonsuited Mrs. Sharon HAFNER in her application for enjoyment to be awarded for the common property located at 1 Avenue Commandant Garbes in Cap d'Antibes

– maintained the usual residence of the minor children as being the mother's home

– declared that, as of this order, Mr. Roger MAC DONELL would exercise visitation and custody rights over the minor children, in principle amicably and failing agreement between the parties, on the first, third and fifth weekends from Friday end of classes to Sunday 6:00 p.m., the visitation and custody rights being extended to public holidays before or after the weekend, the second and fourth mid-week from Tuesday after classes to Wednesday 6:00 p.m. and the first half of the school holidays of more than five days in length in even years and the second half in odd years

– fixed, as of this order, the contribution by Mr. Roger MAC DONELL for the maintenance and education of the four shared children in the sum of EUR 1,000 (one thousand euro) per month per child, i.e. a total monthly sum of EUR 4,000 (four thousand euro), payable amount, indexed under the conditions set out in the judgment of June 16, 2014 by the family matters judge at the Regional Court of Grasse

– declared that Mr. Roger MAC DONELL shall pay the entire tuition costs for the four children

– ordered Mrs. Sharon HAFNER to pay Mr. Roger MAC DONELL the sum of EUR 1,500 (one thousand five hundred euro) pursuant to Article 700 of the Code of Civil Procedure

– ordered Mrs. Sharon HAFNER to bear the entire costs of the incidental proceedings, which will be recovered in accordance with Article 699 of the Code of Civil Procedure.

7

Sharon HAFNER has brought this order before the court, by application filed on January 26, 2016.

By last summary conclusions #4 notified on September 21, 2016, Sharon HAFNER asked the court to:*In limine litis*:

− reject from the debates exhibits 272 and 354 provided in the interest of Roger MAC DONELL

− nonsuit Roger MAC DONELL in his requests to see certain evidence produced by the wife excluded from the proceedings

On the merits,

− DISMISS Mr. MAC DONELL in all his demands, purposes and submissions

− ORDER Mr. MAC DONELL to pay his wife the capital sum of EUR 6,000,000 by way of pecuniary provision,ORDER Mr. MAC DONELL to pay his wife an advance on the communal property in the amount of EUR 1,047,720 FIX the effects of divorce on August 4, 2010, the date on which the spouses ceased to cohabit and collaborate

− FIX the habitual residence of the minor children as being the mother's home

− FIX in favor of the father the visitation and custody rights, which will be exercised in the following manner, failing better agreement between the parties:

- On the first, third and fifth weekends of each month, from Friday after school until Sunday 6:00 p.m.
- On the second and fourth mid-week, from Tuesday after school to Wednesday 6:00 p.m.
- Half of the school holidays (first half in even years and second half in odd years for the father).

− ORDER Mr. Roger MAC DONELL to pay Mrs. Sharon MAC DONELL the sum of EUR 2,000 per month per child, i.e. total amount of EUR 8.000 as his contribution to the maintenance and education of the children, retroactively from the date of the divorce judgment, if necessary, sentence him to do so.

− DECLARE AND RULE that these payments be made in advance at the residence of Mrs. MAC DONELL on the 1st of each month,DECLARE AND RULE that these payments will be revised annually on the consumer price index for all urban households (Parisian series excluding tobacco) and will vary each year on January 1;

− ORDER Mr. Roger MAC DONELL to pay the entire tuition fees for the four children

− ORDER Mr. MAC DONELL to pay Mrs. MAC DONELL the sum of EUR 10,000 under the provisions of Article 700 of Code of Civil Procedure and the entire costs of the proceedings.

In the preliminary proceedings, Sharon HAFNER emphasized the lack of transparency on the part of Roger MAC DONELL throughout the divorce process and gave various examples of this behavior. Furthermore, in the course of his statements, Mr. MAC DONELL voluntarily adopted a fuzzy position, especially on what should be qualified as own and joint property, given that his statements contradict each another, this procedure has not allowed Mrs. MAC DONELL to submit effective responses and the Court to understand what is Mr. MAC DONELL's true position. For example, he creates confusion between his own and joint properties. Or he claims now, after 6 years of proceedings, that California law would apply to the financial consequences of the divorce.

On the petitions *in limine litis*:

The petition made by the wife to set aside exhibits 354ter and 272 from the debate: Roger MAC DONELL produced documents obtained through a forgery made by him, especially the particularly intimate pictures of his wife, fraudulently obtained and fully intruding on her privacy. It is wrong that the trial judge has nonsuited the petition to set aside these documents from the debates

− On the request of Roger MAC DONELL to set aside from the debates a number of documents produced by the wife; he was nonsuited on this point in the first instance and the decision must be confirmed. The trial judge had rightly noted that Roger MAC DONELL had sought the rejection of these documents and that this Court of Appeal had already ruled in the context of its judgment of October 23, 2012.

8

**On the divorce decree:**

The divorce was granted by the trial judge on joint fault, the trial judge upheld:
- The adultery facts proven against the husband
- The adultery facts proven against the wife
- The "harassment and aggressiveness" that Sharon HAFNER demonstrated with regard to her husband

Accordingly:

- The judge did not consider the facts of concealment of communal funds (through the establishment of a trust on behalf of children) committed by Mr. MAC DONELL, even though clearly established

- The judge did not accept the material and emotional disinterest of Mr. MAC DONELL even though this was established by the wife and constituting a fault: he is irregular in the exercise of visitation rights, takes absolutely no care of Lauren who, at the initiative of her mother, was diagnosed as suffering from autism spectrum disorders and attention deficit disorders; these disorders requiring that "she is closely monitored, including during psychotherapy sessions, the cost is about USD 160 (EUR 120) per session, with two sessions per week.

Mr. MAC DONELL has no longer paid alimony under the duty of assistance for two years, leaving his wife and four children in a catastrophic situation (arrears of EUR 390,000), while he indicates in his statements that he holds assets in his sole name of more than EUR 16 million and he gave Jackson a new car worth USD 36,000

The judge accepted the complaint of adultery against Mrs. MAC DONELL on the basis of documents obtained by fraud (the photos referred to above)

The complaint of "harassment and aggressiveness" on the part of the wife against her husband has no reality. The divorce judge felt able to uphold a grievance against him resulting from the "harassment and aggressiveness which Sharon HAFNER demonstrates against her husband "established according to him by:
- "Countless" messages sent by Mrs. MAC DONELL to her husband
- Messages sent to the husband's entourage,
- The television program entitled "Divorce: when no holds are barred"

She claims that:
- Both spouses have sent each other many messages, which show reciprocity
- Mrs. MAC DONELL was forced to send numerous messages to her husband, the latter having a habit of not answering his wife, even though she asked about important and non- conflicting issues, particularly regarding the children.

- Finally, as regards the issue of the television program to which reference is made, Mrs. MAC DONELL, who obviously did not choose the title, was recorded as part of a general program on divorce, years after the separation, which should not constitute a grievance.

The adultery complaint was clearly established against Mr. MAC DONELL, given the evidence produced in the debates by his wife and the fact that, in any event, he does not deny having had extra-marital relations.

Two other grievances should be added:
- The concealment of communal money
- Disinterest in family life and the children

The divorce will be pronounced on the sole fault of the husband, and following the trial judge's example, his application for damages should be rejected. On the consequences of divorce:

9

**On the consequences of divorce:**

On the use of marital name:

Mrs. MAC DONELL has been using her husband's name for 24 years: all her identity documents, bank accounts, email addresses, etc. are in this name only and Mrs. MAC DONELL is known only by her married name.

The MAC DONELL couple have four children with this name, all four are attending school.

Finally, it is pointed out that in the US, the wife always has the choice to retain the use of her husband's name after a divorce, without the possibility of this being challenged.

On the date of effects of the divorce:

The divorce decree ruled that the divorce took effect on the date of the separation order, i.e. on February 21, 2011. However, the spouses had actually separated for several months at that time and had ceased to cohabit and collaborate. In fact, the spouses separated on August 4, 2010, when Mr. MAC DONELL made the decision to leave the marital home and on which Mrs. MAC DONELL petitioned the US courts for a divorce (petition of August 5, 2010).

On the pecuniary provision:

In the preliminary proceedings, as part of a confusion deliberately created by Mr. MAC DONELL between the law applicable to the spouses' marriage and the law applicable to the financial consequences of the divorce, particularly for the pecuniary provision, Mr. MAC DONELL claimed, for the first time, in the latest statements he submitted to the Court, that Californian law would be applicable to the pecuniary provision.

This is clearly not the case, and as pointed out in the Order from the pretrial counselor dated January 11, 2016, it is the French law applicable to the MAC DONELL divorce and its financial consequences.

Mr. MAC DONELL's developments on Californian law are therefore excluded from the debate and cannot support the Court's decision on the pecuniary provision payable to the wife.

The decision of the trial judge who awarded her a pecuniary provision of EUR 2,000,000 is questionable, insofar as it:

> Did not draw the necessary conclusions from Mr. MAC DONELL's refusal to be transparent and therefore the impossibility for the court to know the reality of his situation

> Did not draw the necessary conclusions from the implementation difficulties that are sure to arise, which prevented consideration, as per the actions of the trial judge, for acknowledging that Mrs. MAC DONELL "aims to collect a share several million euro" in the dissolution of the marriage

It is specified that this is now challenged by Mr. MAC DONELL, who now claims that the bulk of the couple's assets would consist of property belonging to him alone. This point must be taken into consideration by the Court.

> Has committed an error in assessing the elements to be considered, resulting in this regard in a value judgment on the behavior of Mrs. MAC DONELL that is both inaccurate and inappropriate.

It has in fact upheld that Roger MAC DONELL has, in implementing various decisions rendered within the framework of these proceedings, already paid his wife the sum of EUR 1,370,000.

However, the sums received have been under the duty of assistance or for the contribution to the maintenance and education of the children.

Mrs. MAC DONELL has not worked since 1999, having ceased professional activity by mutual agreement with her husband, after the birth of their second child, i.e. 17 years ago. Clearly , it is not easy in the current context and after a long period of inactivity, to find a job and contrary to what the divorce decree suggests, the mere fact of being healthy is not sufficient to find a job. Furthermore, Mrs. MAC

10

DONELL alone was caring for the couple's four children on a daily basis, given that the father had little interest in the children's daily lives.

Roger MAC DONELL has resumed professional activity since 2012, without specifying its exact nature or the income it generates. He has acknowledged that he was receiving income from the company SHIPPING SOLUTIONS representing an amount of USD 25,000 per month without offering any proof of this.

In reality, SHIPPING SOLUTIONS is not the only source of income for Mr. MAC DONELL.

Mr. MAC DONELL has retained shares in the company CGI Franchise Systems Inc. (which he does not dispute) but refuses to report the income he receives from these, despite the demands for disclosure that were issued to him for this purpose.Above all and as already indicated, Mr. MAC DONELL received USD 2 million from this company in February 2014 and thus everything suggests that it is income from this company.Indeed, Mr. MAC DONELL claims that this relates to the sale of company shares, but refuses to disclose the elements that would attest to that (certificate from the company accountant, deed of transfer, valuation by the company accountant for the number of shares held and their value, etc.)Personal expenses of Mr. MAC DONELL paid directly by the company SHIPPING SOLUTIONS represent an additional revenue of USD 200,000 per yearMr. MAC DONELL's annual income from SHIPPING SOLUTIONS is thus: (25,000 X 12) + 200,000 = 300,000 + 200,000 = USD 500,000Mr. MAC DONELL receives income from two trusts: up to USD 2,000 per month (EUR 1,500) from a trust created by his parents and an amount unknown to Mrs. MAC DONELL from the trust that he created without his wife's consent.

The other income to which he refers in his affidavit is for a total of USD 68,462, i.e. approximately EUR 50,000, or a monthly income of EUR 4,166.

I.e. a total income of a minimum EUR 150,000 per month, excluding income from CGI and the trust created by Mr. MAC DONELL.

She points out that her lifestyle during the marriage was EUR 85,000/month. The family was traveled abroad every year, staying each time in the finest hotels, 4 to 5 star hotels as a minimum, such as the Ritz or the Four Seasons.The family is accustomed to luxury clothing, and jewelry. The family is also accustomed to eating at restaurants, since they dined out almost every week.

She says the Mr. MAC DONELL's standard of living is actually, for him alone, around EUR 50,000 per month since the separation order. He has acquired a new Range Rover car worth USD 100,000

The spouse's estimated or foreseeable assets, both capital and income, after the dissolution of the marriage: according to Mr. MAC DONELL, are shared only with regard to the couple's real-estate properties, an HSBC life insurance covering the loan on former marital home and the boat, the berth in Gallice port and a scooter, i.e. common assets, according to the husband, of a total net value of EUR 2,095,440, i.e. a sum of EUR 1,047,720 for each spouse, according to the affidavit of Mr. MAC DONELL, his own global assets representing EUR 17,679,606.The wife has no assets of her own.

The respective situations of parties with regard to pensions: she had to close her retirement savings account and has nothing more. Mr. MAC DONELL has not provided proof of his pension situation.

On advance on the wife's rights in the dissolution of the marriage: the trial judge rejected this request because it had already been rejected by this Court of Appeal, thus confusing the provisions of Article 255(7) and Article 267(3) of the Civil Code. She is seeking the sum of EUR 1,047,720 which represents the uncontested part of her rights.

This advance is justified by Mr. MAC DONELL's behavior, who will necessarily make every effort to prolong the dissolution proceedings for years (10 to 15 years according to his own threats), after which time the wife will face great difficulty in enforcing the decision obtained.

On the consequences of divorce for the children: She calls for the restoration of the father's contribution in the sum of EUR 2,000/month per child, and for the father to be ordered to pay the education fees.

In his latest submissions filed on September 14, 2016, Roger MAC DONELL asked the court to:Ruling *in limine litis*:

11

DECLARE and RULE that Mr. Roger MAC DONELL is admissible and well founded in his petition and REJECT from the debates the exhibits disclosed in the interest of Mrs. Sharon HAFNER, numbered in the first instance as #14, 19 to 21, 26 to 33, 36 to 39, 42, 43, 45, 93, 94, 96 to 98, 148 to 150,157,165,183,207 to 216, 223 to 225, 235, 237, 254 to 258, 264, 288 to 293, 370, 382 to 385, 407 to 408, because they were fraudulently obtained, in violation of Article 259 -1 of the Civil Code;

Ruling on the merits:

Reverse the judgment in the first instance and DECREE the divorce of the MAC DONELL spouses at the sole fault of the wife, in accordance with the provisions of Articles 242 ff of the Civil Code;

Reverse the judgment in the first instance and DECLARE and RULE that Mrs. Sharon HAFNER will not be allowed to use her husband's name after the divorce DECLARE AND RULE that the relationship of the parties, divorce and dissolution of the community between spouses are subject to Californian law

DECLARE AND RULE that the effects of the divorce shall be fixed at the date of the separation order.ORDER the liquidation and division of property interests of the MAC DONELL couple under the rules of law applicable in the California primary regime;

DECLARE and RULE that the wrongful conduct of Sharon HAFNER has caused harm to her husband,

Reverse the judgment in the first instance and ORDER Mrs. Sharon HAFNER to pay her husband damages in the amount of EUR 50,000 pursuant to Article 1382 of the Civil Code;

DECLARE that the parental authority over:

Lauren MAC DONELL, born on August 4, 1996 in Redwood City (California, USA)Jackson MAC DONELL, born on April 6, 1998 in Redwood City (California, USA)Roger MAC DONELL, born on June 30, 2000 in Redwood City (California, USA)

Taylor MAC DONELL, born on June 30, 2000 in Redwood City (California, USA),

is to be exercised jointly by both parents;

FIX the residence of the minor children with the mother in France

FIX the father's visitation and custody rights for Jackson, Lauren, Roger Jr. and Taylor as follows:

Outside of school holidays: 9 days per month, from the first weekend of each month, Friday after school, the following weekend, Monday return to class.During the holidays: the entire school holidays except Christmas and summer, which will be shared by alternating half, with children with their father in the first half in even years and the second half in odd years

Confirm the judgment in the first instance that fixed the father's contribution to the maintenance and education of Jackson, Roger Jr. and Taylor as the sum of EUR 1,000 per child per month, i.e. a total of EUR 4,000;DECLARE AND RULE that Mr. Mac DONELL will have the enjoyment of the apartment in ANTIBES JUAN LES PINS, against consideration and that he is to pay the associated charges

DECLARE AND RULE that school fees will be shared between both parents

NONSUIT Mrs. Sharon HAFNER in all her petitions, aims and conclusions; alternatively, if the Court were to consider that Mrs. HAFNER is entitled to a pecuniary provision, fix this in the sum of EUR 523,000 and reverse the judgment in the first instance that fixed this sum at EUR 2,000,000.

ORDER Mrs. HAFNER, against payment of a penalty of EUR 1,000 per day of delay from the service of the pending judgment, to give immediate release of funds frozen in the SAANEN BANK account: If the Court finds that Mrs. HAFNER is entitled to a pecuniary provision, she will then have to have this paid from this bank account so that the balance will be immediately released for the benefit of Mr. MAC DONELL;

ORDER Mrs. Sharon HAFNER to pay Mr. Roger MAC DONELL a sum of EUR 10,000 under Article 700 of the Code of Civil Procedure;ORDER Mrs. Sharon HAFNER to pay the entire

costs of the appeal, these will be deducted in favor of SELARL LEXAVOUE AIX EN PROVENCE represented by *Maître* Pierre-Yves IMPERATORE, Barrister of this jurisdiction, on proof of having made the advance.

**On the rejection of adverse exhibits:** Mrs. Sharon HAFNER submitted to the debates exhibits obtained fraudulently. The adverse exhibits from the first instance #14, 19 to 21, 26 to 33, 36 to 39, 42, 43, 45, 93, 94, 96 to 98, 148 to 150, 157, 165, 183, 207 to 216, 223 to 225, 235, 237, 254 to 258, 264, 288 to 293, 370, 382 to 385, 407 to 408 were obtained in violation of the provisions of Article 259-1 of the Civil Code.

In this case, it concerns the emails that Mrs. Sharon HAFNER had stolen from her husband's email account, protected by a personal code. It is undisputed that these documents have been obtained by fraud and must therefore be rejected from the debates. In fact, the finding of *Maître* Fabien MATTEIS, court officer, dated September 16, 2010 shows that Mrs. Sharon HAFNER violated her husband's secret codes to access the information in his computer and therefore his email.Moreover, since April 10, 2012, Mrs. Sharon HAFNER has submitted to the debates emails dating after the separation of the spouses, stolen from various electronic mailboxes used by Mr. Roger MAC DONELL.Considering all these elements, Mr. Roger MAC DONELL obtained on the basis of Article 145 of the Code of Civil Procedure, an order aimed at seizing the computer equipment belonging to Mrs. Sharon HAFNER. On June 27, 2012, upon the arrival of the court bailiff at her home, Mrs. Sharon HAFNER "phoned her lawyer" and entrusted her computer to her lover, Mr. Laurent PHILIPPE who "suddenly went away with the computer in his arms". Mrs. Sharon HAFNER also has a "double lock" on her mobile phone

She has thus made impossible any investigation measures authorized by the petitions judge that would have demonstrated the fraudulent capture of electronic correspondence of Mr. Roger MAC DONELL. The obstruction of Mrs. Sharon HAFNER demonstrates the alleged fraud even more strongly.

**On the divorce decree:**

The grievances filed by Mrs. HAFNER:

> Adultery: It is not disputed that **Mr. Roger** MAC DONELL has maintained a relationship with Mrs. Saterah KEYKAVOUSSI while his wife had long lacked the duty of fidelity by taking a lover aged 20 with whom she now shares her life. The wrongful behavior of Mr. Roger MAC DONELL may be excused by the wrongful conduct of his wifeThe so-called "possession of joint money": the allegations of possession, concealment of funds, organization of insolvency were examined in turn by the courts of Monaco and the French criminal authorities: NO ACTION was taken against Mr. MAC DONELLThe alleged "lack of interest in family life and the children": since he ceased his professional activities, Mr. Roger MAC DONELL has devoted himself to his family and especially his children. The hearing of the MAC DONELL children in no way corroborated the accusations of Mrs. Sharon HAFNER. They declared that they wanted to see their father as part of visitation and extended custody rights, i.e. every Wednesdays and on alternate weekends.

This desire demonstrates their willingness to spend time with their father, with whom they share a deep bond

Mr. MAC DONELL currently exercises his visitation and custody rights as set out by the divorce decree, i.e. 9 days per month; things are also going so well that alternating custody today seems perfectly suitable. Regarding the alleged lack of interest in Lauren, she lives in the UNITED STATES where she plays tennis intensively as a boarder; Mr. MAC DONELL took an apartment on campus and naturally pays the rent (USD 1,800/month).

The behavior of Sharon HAFNER: Mrs. Sharon HAFNER maintains an adulterous relationship with Mr. Laurent Philippe, 23 years her junior, with whom she leads a luxurious lifestyle (exhibits 235, 256, 272) in a luxury villa with swimming pool that "she rented when she resided in France (exhibit 232) leaving her

13

"staff" to care for her children and occupying herself solely with deriving maximum benefit from the divorce proceedings that she has initiated. This relationship began in 2009, a year before the couple's separation.

Mr. Roger MAC DONELL was forced to submit to the debates unequivocal photographs on the relationship between Mrs. Sharon HAFNER and Mr. Laurent PHILIPPE.
Mr. Roger MAC DONELL intends to highlight that these photographs were obtained via a court officer's report pursuant to an order of the Regional Court of Grasse dated June 25, 2012.

Mrs. Sharon HAFNER has cornered her husband not only by the numerous proceedings that she has filed but also by the flood of daily messages that she sends him (exhibits 2, 3, 15, 16, 260-262, 310, 437, 493). These messages, by their number and the insulting content they convey constitute real harassment.
In addition, Mrs. Sharon HAFNER does not just insult her husband, she also involves all her husband's contacts: accountants, lawyers, old and new business partners, friends, etc.

Not content with the effects of individual petitions, Mrs. Sharon HAFNER openly participated in a documentary called "Divorce: when no holds are barred" (exhibit 386). This documentary, aired again in the August 2013 on Canal+, relays falsehoods and makes a characterized attack on the privacy of Mr. Roger MAC DONELL. He had in fact learnt of the existence of this documentary during its television broadcast, because many acquaintances contacted him to tell him that his wife was exhibiting her divorce proceedings on television

Mrs. HAFNER exploits the children and violates shared parental authority. He illustrates this assertion with various examples.

**On payment of damages:** he criticizes his wife of the multiple proceedings.
Moreover, the "scandalous" behavior of Mrs. Sharon HAFNER over the last three years has led many of Mr. Roger MAC DONELL's business relations to stay away from him, afraid to arouse his wife's ire, even though he is trying to resume his professional activity.

**On the law applicable to the marriage:** Approval should be given to the trial judge who considered that it was that of the Californian primary regime. Californian law gives each spouse half the communal property created since their marriage (Exhibit 478).
Through his affidavit of 2016, Mr. MAC DONELL clearly identified the communal property and his own property (Exhibit 613).

**On the name:** Sharon HAFNER does not work and has no commercial and/or industrial activity under her married name.
The simple fact of wanting to use the same name as the children is not nowadays a sufficient reason to justify the continued use of the name.

**On the pecuniary provision:** the principle of the pecuniary provision does not exist under California law. He will proceed with the calculation of a permanent alimony, based on legal advice given by *Maître* VORSATZ, a California lawyer specializing in family law, and confirmed by Professor Ben DEPOORTER.Consequently, in view of the behavior of Mrs. Sharon HAFNER and pursuant to Articles 4323 and 4320 of the California Family Code, equity demands that Mrs. HAFNER is purely and simply deprived of the pecuniary provision.
IN THE ALTERNATIVE, if the Court fixes a pecuniary provision, it should be fixed at an amount of EUR 523,000, in application of the Californian law applicable in this case.

He then explains his situation. He co-founded a company for the transport of goods named the Consortium Group, Inc (Exhibits 67, 68). He managed the company until August 2006 and then sold his shares in 2007 (Exhibit 165). He received a sum of USD 28,246,170, i.e. EUR 19,490,643 and not EUR 23,000,000 as claimed by his spouse.
As he has said before, this company belonged solely to Mr. MAC DONELL; the sale price of this company is therefore a sole asset for Mr. MAC DONELL in accordance with the California law applicable in the matter.

14

He considers that this money cannot be taken into account in calculating the pecuniary provision payable to Mrs. HAFNER.

Mr. MAC DONELL remains a shareholder in Shipping Solutions, a franchise of the company Worldwide Express (Exhibit 31).
Because of the numerous proceedings brought by his wife and considerable costs arising as a result, Mr. Roger MAC DONELL resumed partial professional activity in 2012. To date, Mr. MAC DONELL's income is USD 25,000, i.e. about EUR 22,000/month, drawn from the company SHIPPING SOLUTIONS (Exhibit 614).

He makes much of the fact that Sharon HAFNER has not paid her income tax returns, and he even doubts that she filed tax returns on the large amounts of money she has collected since the introduction of the petition.

**On the measures related to the children:** He refers here to California law regarding the exercise of parental authority and for the contribution to the maintenance and education of the children.

He states that he decided to abandon his request for the transfer of Jackson's residence to his home, given the pressure exerted by his mother.

Today, he has the children for 10 days per month and their relations are excellent. He has abandoned his request for alternate residence and asks that the same schedule for visitation and custody rights be maintained.

For the contribution to the maintenance and education of the children, pursuant to Article 4061 of the California Family Code, and taking into account the monthly income of Mr. MAC DONELL (USD 28,000/month), it is Mrs. HAFNER who should actually pay the children's' school fees, having a monthly income of EUR 20,000 and then EUR 30,000/month. Furthermore, pursuant to the applicable rules of California law, the maximum amount of alimony due from Roger MAC DONELL would be USD 6,229 for the four children, i.e. approximately EUR 5500 (see Exhibit 582 above).

**On the advance on community property:** He opposes this. The liquidation operations will be carried out in light of the applicable California law; however, it has been shown that this provides for an equal division between the spouses for property acquired during the marriage, but specifies that property acquired before the marriage remains separate property, including also the proceeds from the sale of the said property. Thus, the sum of EUR 19 million from the sale of the company belonging solely to Mr. MAC DONELL cannot be the subject of any sharing since this is separate property.
To grant the request of Mrs. HAFNER, who claims an advance of EUR 1 million, would prejudge that these sums are included in the communal property; however, this is not the case; moreover, Mrs. HAFNER has received almost EUR 4 million over the last three years and has at no time proved her lifestyle by providing her American or her French tax returns.

**On freezing the account in SAANEN BANK:** It is now several years that a very significant amount has been frozen in the SAANEN BANK accounts on the initiative of Mrs. HAFNER. Mrs. HAFNER has at no time demonstrated that the amounts in this account are part of the joint property.
And even if they were, which has not been shown, Mrs. HAFNER would only be entitled to half, to date the sum of EUR 3.7 M.In addition, Mrs. HAFNER, while she has based her petition for the seizure of this bank account to assure the payment of alimony, HAS REFUSED to use part of this money to receive the payment of arrears, preferring multiple seizures and harass her husband.The closing order was issued on September 22, 2016.

**REASONS FOR THE DECISION**

**On the admissibility of appeal**

The admissibility of the appeal is not contested. No evidence is provided to the Court to allow it to raise the absolute inadmissibility based on the non-observation of the appeal period. The appeal will be declared admissible.

**On jurisdiction and applicable law**

In the presence of an international element, both spouses being of American nationality, it follows from Article 3 of the Civil Code, 13 of the Code of Civil Procedure and the principles of private international law, that the French judge must *ex-officio* and subject to compliance with the principle of contradiction, apply the rule of conflict of laws for inalienable rights.

The jurisdiction and the applicable law will be considered for the principle of the divorce and all ancillary measures in debate.

<u>Regarding the divorce</u>

In application of Article 3a) of EC Council Regulation 2201/2003 of November 27, 2003, called Brussels II bis, this court is competent to hear the action for divorce purposes, given the residence of each spouse on the French territory.

It will be pointed out here that Sharon HAFNER had filed a divorce petition on August 5, 2010 before the California Superior Court for the County of San Mateo, California and this court declared itself incompetent because the applicant did not reside here for at least six months before the filing of the petition on American soil.

The divorce petition filed by Roger MAC DONELL on September 24, 2010 applies, with regard to determining the applicable law, Article 309 of the Civil Code which provides that the divorce is governed by French law when both spouses are domiciled on French territory.

<u>Regarding the liquidation of property interests</u>

The MAC DONELLs who married on October 3, 1992 are subject to the rule of conflict laid down by the Hague Convention of March 14, 1978.

Under the terms of Article 4 of the Convention, if the spouses have not designated prior to the marriage the law applicable to their marriage regime, this is subject to the internal law of the State in whose territory they establish their first habitual residence after the marriage.

In this case, the MAC DONELLs are subject to the California primary regime.

However, with regard to the property they own in France, the MAC DONELLs have chosen their marriage regime by opting for the universal community of property, according to a deed received on November 19, 2007 by *Maître* NAOUR, notary in Antibes.

<u>Regarding parental authority</u>

Competence is set by Article 8 of EC Council Regulation #2201/2003 of November 27, 2003 called Brussels II bis concerning the competence, recognition and enforcement of judgments in matrimonial matters and matters of parental responsibility. Under this Article, the courts of a Member State are competent in matters of parental responsibility for a child who is habitually resident in that Member State at the time the court is petitioned.

When Roger MAC DONELL filed his divorce petition, the couple's four children resided with their mother in France, as decided by the California court cited above.

16

In application of Article 15 of The Hague Convention of October 19, 1996, which came into force on February 1, 2011, the French judge resolves the dispute according to the rules laid down by French law.

Regarding the contribution to the maintenance and education of the children and the pecuniary provision

These are subject to EC Regulation #4/2009 of December 18, 2008 on jurisdiction, applicable law, recognition and enforcement of decisions and cooperation in matters relating to maintenance obligations, which came into force on June 18, 2011.

In Article 3 the said regulation stipulates that competence to rule on maintenance obligations in Member States is incumbent on the Court covering the location of the respondent's habitual place of residence or that of the creditor's habitual place of residence.

As Sharon HAFNER is domiciled in the jurisdiction of the Regional Court of Grasse, the French judge is competent to hear these actions.

Article 15 of the regulation further specifies, in respect of maintenance obligations, that the applicable law is determined by the Hague Protocol of November 23, 2007, which designates in its Article 3, the law of the creditor's habitual place of residence. The applicable law is therefore the French law in this case, even though Roger MAC DONELL submits that California law should be applied.

**On the proceedings**

Roger MAC DONELL and Sharon HAFNER request that certain exhibits should be excluded from the proceedings.

It will be pointed out that under Article 259 of the Civil Code, the facts relied on as grounds for divorce or as a defense to a petition may be established by any type of evidence, including confession. However, Article 259-2 of the same Code imposes a limit on freedom in the administration of proof by enacting that a spouse may not submit to the proceedings evidence that has been obtained by fraud or violence.

Roger MAC DONELL argues that Sharon HAFNER submitted a large number of exhibits obtained by fraud.

In rejecting this argument, the trial judge raised the *res judicata* authority relating to the decision of this Court of Appeal dated October 23, 2012, which had nonsuited Roger MAC DONELL in an identical petition. The respondent submits that this was a different procedure, whereas the court was ruling on the separation order, which constitutes the first phase of the divorce proceedings. Moreover, Roger MAC DONELL has not demonstrated that the documents referred to in his submissions are not those subject to the discretion of the Court and the admissibility of which has already been decided. The decision of the trial judge to refuse to disregard those exhibits from the proceedings should therefore be approved.

In his pleadings, Roger MAC DONELL alluded to other exhibits (352 to 367,387,394 to 398) allegedly stolen by Sharon HAFNER from his various electronic mailboxes.

However, in the disposition of his submissions, the signature of such exhibits is not repeated. So, even in application of Article 954(2) of the Code of Civil Procedure, the court did not rule on the admissibility of these exhibits, it also being noted that the exhibits submitted by Sharon HAFNER to the court are numbered 1 to 222 and that it is unclear to what Roger MAC DONELL refers.

Sharon HAFNER asked for the exclusion from the proceedings of exhibits 272 and 354ter from the opposing party.

The exhibit 272 from Roger MAC DONELL is details of telephone communications from line # 06 87 45 71 11 for the period August 9 to September 12, 2009. Exhibit 354ter consists of pictures of Sharon HAFNER, showing her in the nude and in particularly intimate acts.

17

The trial judge denied the request because Roger MAC DONELL had obtained these exhibits by decision of the judicial authority authorizing him to proceed with the search for evidence.

The orders of the First Deputy Presiding Judge of the Regional Court of Grasse dated June 21, 2012 authorized Roger MAC DONELL, to entrust this mission to any court officer, to visit the home of Sharon HAFNER for the main purpose of searching for the presence of any software to intercept or divert e-mail, to access messages remotely, collect confidential information stored on another remote computer. Roger MAC DONELL complained in fact that Sharon HAFNER had produced in proceedings dozens of e-mails that he had sent or received on two addresses for which he was the sole user and suspected her of having used spyware to access the messages received or sent from these addresses.

Exhibit 272 may have been obtained on judicial authorization, given its date. Sharon HAFNER argues that Roger MAC DONELL, with the help of a certain Jonathan QUINLAN, who created a fake project, allegedly sent a request on September 6, 2010 to Orange, in order to obtain the details of her communications for 12 months making it appear that the request came from her.

The two documents submitted in evidence (88 and 89) do not clearly establish the relevance of this assertion, there being no objective element to connect the mail received by Orange to Roger MAC DONELL even if it is disturbing to record that the said Jonathan QUINLAN sent to him a letter for which terms are identical to that sent to Orange. The correspondence received by Orange is indeed accompanied by a copy of Sharon HAFNER's passport; she cannot explain how this could have been in the possession of the husband.

The photographs of exhibit 354ter come from the use of hardware seized by the court officer and appraised by an IT expert registered with the Aix en Provence Court of Appeal. The mission of the court officer was limited to what has been stated above. The photographs from the hardware seized have no connection with the investigations to be undertaken by the court officer on the presence of hardware used for hacking his email addresses.Moreover, they seriously attack the privacy of Sharon HAFNER.

It is necessary to declare that this exhibit was obtained by fraud  and dismiss it from the proceedings.

**On the merits**

**On the divorce decree:**

Under Article 242 of the Civil Code, divorce can be requested by either spouse when the facts of a serious or repeated breach of marriage duties and obligations attributable to his/her spouse and render the continuation of common life intolerable

The faults of the husband who initiated the divorce do not prevent his petition from being examined; however, they may negate the faults for which he blames his spouse from having the serious nature that would have made them a cause for divorce.

These faults can also be invoked by the other spouse to support a counterclaim for divorce. If both applications are accepted, the divorce is granted on shared fault.

Sharon HAFNER puts forward three grievances against her husband:
  Adultery:Concealment of shared monies
  Disinterest in family life and the children

Adultery is not denied by Roger MAC DONELL but he maintains that this misconduct must be excused by the wrongful conduct of the wife, who had previously started a relationship with a lover 20 years her junior, with whom she now shares her life.

Sharon HAFNER produced in the proceedings an attestation from one Setareh KEYKAVOUSSI who confirmed on January 17, 2012 that she had been in an intimate relationship with Roger MAC DONELL since June 2009, lasting for two years. Of course, the same person drew up an attestation in November 2012 in favor of the husband, in which she retracted some remarks she made in the first testimony, including the special relationship that Roger MAC DONELL maintained with money and the fact he was trying to move money quietly, without the knowledge of his wife. However, the witness never retracted the date of her relationship with Roger MAC DONELL.

This relationship, started well before the authorization to reside separately, constitutes adultery, which cannot be excused by the attitude of the wife, as Roger MAC DONELL has not proved her infidelity before 2009.

On the concealment of joint monies, Sharon HAFNER criticizes the trial judge's decision not to uphold this grievance as, according to her, without the knowledge of his wife, Roger MAC DONELL had on the one hand opened several foreign accounts into which he would have paid considerable sums belonging to both of them, and on the other hand opened a trust by investing the sum of USD 4 million with the pretext of funding the children's education, that he uses for personal purposes.

It was seen above that Setareh KEYKAVOUSSI retracted her statements on this point. The Supreme Court of Bern, in its decision of December 2, 2010, did not uphold that Roger MAC DONELL had sought to conceal from his wife the accounts he held in Switzerland. However, to grant the petition of Sharon HAFNER to freeze the accounts in Saanen Bank and the safe deposit box held in this bank, the Swiss court stated that:

On August 5, 2010, Roger MAC DONELL withdrew USD 1M from an account at Vanguard Bank, only one day after a California court had issued a restriction on access to this account. Roger MAC DONELL stated that the decision was notified to him only after the financial transaction, but he was well aware of his wife's claims.The correspondence by email between the respondent and his Swiss counsel shows that the former had the intention to transfer the accounts from Saanenbank to a client account of the law firm at UBS AG, to erase the trace.

Similarly, exchanges of emails between Roger MAC DONELL and his financial counselor at the Dreyfus Bank in February 2010 show that the former sought to learn about the possibility of withdrawing "ALL" his money from this bank at any moment, "just in case...."

Consequently, without going further into the analysis of the illustration of this method by studying the trust formation and the use that was made of this trust, it should be considered that the husband's behavior in relation to his bank accounts in Switzerland, if not a "concealment of community assets," is at least a serious breach of duty of loyalty imposed on a marriage. The grievance will be upheld accordingly.

The third grievance concerns the legal grounds under which the trial judge dismissed the disinterest of Roger MAC DONELL for his children. The wife effectively submitted to the proceedings several emails in which she accuses Roger MAC DONELL of not caring for the children and not taking them on holiday with him. However, these repeated reproaches, where the response of Roger MAC DONELL is unknown (the letter indicates in his pleadings that he did not always respond, as Sharon HAFNER kept harassing him) relate to a period after the couple's separation, when marital relations were obviously difficult, and which may have, rightly or wrongly, affected relationships with the children. Roger MAC DONELL submits to the proceedings several testimonials from relatives of that attest to his love for his children and their faultless care, with regard to material and educational, needs, the father offers his little tribe an education matching his living standards (long-distance travel, expensive sports, etc..), as is illustrated in numerous photographs.

Roger MAC DONELL criticizes Sharon HAFNER with grievances of adultery, constant harassment against him, and exploitation of the children.

19

The first complaint is well established by the production of various exhibits including:

- A private detective's report dated November 2010, which describes the intimate attitude of Sharon HAFNER with respect to a man identified as Laurent PHILIPPE, in a public place- The testimony of a one Rebecca LAÏK who states that on January 12, 2011 Sharon HAFNER and Laurent PHILIPPE had been in a relationship for over two years- The statement of calls made by Sharon HAFNER to Mr. PHILIPPE, with a sustained frequency, from the month of August 2009-
   Photographs of the MAC DONELL children, Sharon HAFNER and Laurent PHILIPPE while vacationing in Dubai in August 2011-        A private detective's report dated October 18, 2011 establishing the close relations between Sharon HAFNER and Laurent PHILIPPE

All these exhibits shows that before the separation order, Sharon HAFNER had broken her duty of fidelity with Laurent PHILIPPE and deepened the relationship with him shortly after the order was issued, by no longer hiding from her family the nature of the relationship that had developed between them.

Regarding the second grievance, described as "harassment" by the respondent, it is more like a lack of respect towards the husband that effectively constitutes a serious or repeated violation of duties and obligations of marriage, and can be punished as long as the divorce proceedings continue.

This lack of respect is illustrated by:

- Various messages sent by Sharon HAFNER in which she describes her husband with insulting epithets: 'crazy, cowardly, pig, fagot, etc.". It is not uncommon with the degradation of a separation to see the couple send insulting letters, but in this case, the multiplication of messages with such content enhances the intensity of insults and far exceeds what might be reasonable to accept.-The participation of the wife in a TV show, where she speaks out without restraint on her claims that she wants to recover her husband's entire fortune, who deserves to be "on the street" and must "pay the bill" because she has "worked to raise the children for 18 years." At the end of the interview, Sharon HAFNER calls her husband a "monster" in front of the cameras, adding later, "I hate him."

These facts are sufficient to show the wife's disrespect.

As regards the last grievance, it is right that it was dismissed by the trial judge because the manipulation of children, or breach of the co-parenting rules during divorce proceedings, comes under subjective considerations and cannot constitute a fault within the meaning of Article 242 of the Civil Code.

Ultimately, each spouse, by his/her bad attitude, contributed to the disintegration of the marriage bond. It is right that the trial judge granted the divorce on shared fault.

### The consequences of divorce with relation to children

*On the methods of exercising parental authority*

It should firstly be noted that since the divorce, the two eldest children of the couple came of age, so that the measures taken for them by the Family Court of Grasse have become null and void.

Regarding the twins Roger Jr. and Taylor, it will be pointed out that French law applies to cases of the MAC DONELL children, not the rules of the "General California Child Custody Guidelines" referred to by Roger MAC DONELL in his submissions.

In application of Article 372 of the Civil Code, it will be found that parents have joint parental authority and they agree that the residence of the minor children is fixed with the mother.

At the time of divorce, Sharon HAFNER was living with her children in California. The divorce court had therefore granted Roger MAC DONELL, who remained on the European continent, visitation and custody

20

rights in a specific way, namely nine days per month during term time, and all holiday periods except those of Christmas and summer, shared equally by alternating according to odd or even years.

In September 2015, Sharon HAFNER returned to live again in France, with children. She asked the pretrial counselor to alter the father's visitation and custody rights, given her new living conditions.

The pretrial counselor accepted her application and granted Roger MAC DONELL visitation and extended custody rights, which Sharon HAFNER asked be maintained, in the absence of new evidence relating to the children's situation.

These measures will indeed be maintained, to ensure that the MAC DONELL children, who have experienced many changes in their lives since the separation of their parents, have stability in their daily lives.

*On the paternal contribution to the maintenance and education of the children*

It will again be pointed out that Article 4061 of the California Family Code cited by Roger MAC DONELL does not apply in this case, under the principles set out above.

The trial judge upheld the contribution to the maintenance and education of the children in the sum that had been fixed by the pretrial judge in his order of December 2, 2013, namely EUR 1,000/month for Jackson, Taylor and Roger Jr, considering that nothing new had occurred since then.

However, the order of December 2, 2013 was reformed by this Court of Appeal in a judgment dated March 26, 2015, which restored the quantum of contribution to the maintenance and education of the children to the sum of EUR 2,000/month per child, including Lauren, i.e. a total of EUR 8,000.

In the absence of new facts occurring between December 2013 and June 2014, Sharon HAFNER is fully entitled to demand that divorce decree be reformed on this point and the amount of the contribution be set at EUR 2,000/month per child, from the date of the decree and to this day, despite the fact that she has returned to France in the meantime.

Roger MAC DONELL will also pay the children's school fees, as he already does.

### On the consequences of divorce with relation to the spouses

*On the date of the divorce takes effect:*

Under Article 262-1 of the Civil Code, the divorce decree takes effect in the relationship between the spouses regarding property when rendered for accepting the principle of the marriage breakdown, for final alteration of the marriage bond and for fault, on the date of the separation order

At the request of one of the spouses, the judge may fix the effects of the decree on the date on which they ceased to cohabit and collaborate.

The end of cohabitation is assumed as being the end of the collaboration.

The spouses are opposed before the Court on this point: Roger MAC DONELL wants the divorce to take effect in the relationship between the spouses with regard to their property on the date of the separation order, while Sharon HAFNER argues that cohabitation ceased on August 4, 2010.

The wife's assertion is established by a record of Roger MAC DONELL's hearing on March 30, 2015, in which the latter, heard following a complaint from his wife for the abandonment of his family, begins his interview with the following statement: *"I have been separated from my wife Sharon Louise since August 4, 2010"*.

21

This statement is supported by the filing of a divorce petition by the wife before the US courts on August 5, 2010, the fact that Roger MAC DONELL denounced the joint account opened with Société Générale on August 8, 2010 (appellant's Exhibit 15) and various e-mail exchanges during the month of August 2010, which show that the spouses are effectively separated by that date and that Sharon HAFNER has no plans on her return to France in September 2010, to live under the same roof as her husband.

Accordingly, she will be granted this request.

*On the use of marital name:*

Under Article 264 of the Civil Code, following the divorce, each spouse loses the use of the name of his wedded partner.

One spouse may nevertheless retain the use of the other's name, either with the consent of the latter or with the authorization of the judge, if it is of special interest for him/her or for the children.

Roger MAC DONELL opposes this request, which was favorably received by the trial judge, who took into account the duration of the marriage and the children's interest in having the same name as their parents.

Sharon HAFNER approves the analysis by the trial judge and adds that in the USA, the wife always has the choice to retain the use of the marital name after the divorce without the husband being able to oppose this.

This argument is of no interest, insofar as the French law applies here (as seen above).

It should be noted that Sharon HAFNER is not working and that to lose the use of her married name will do her no harm professionally.

With regard to the children, the eldest is now 20 years old, the younger son 18 years old and the youngest 16 years old. They are largely old enough to understand the consequences of a separation process begun more than six years ago,

Finally, the duration of marriage does not confer a particular interest for a wife belonging to a generation of women whose place in society did not derive mainly from a married woman's status.

The decision will be reformed and Sharon HAFNER will be nonsuited in this request.

*On damages*

Under Article 1382 of the Civil Code, any act whatsoever by man that causes harm to another obliges the person by whose fault it happened to repair it.

n divorce, this text can repair distinct harm caused by the dissolution of marriage. It is applicable irrespective of the distribution of wrongs.

Roger MAC DONELL seeks the award of the sum of EUR 50,000 on the grounds that he incurred numerous legal costs in the United States, France and Switzerland, because of the divorce proceedings and that by her attitude, deemed "scandalous," Sharon HAFNER has caused damage to his friendly and professional relations.

The fact that Sharon HAFNER has multiplied procedures may constitute an abuse of law, given the interests involved and cosmopolitanism of the husband's financial position.
However, the fact that Sharon HAFNER has indulged in a TV show to make derogatory comments about her husband, injures his image by being presented publicly as a miser, who to pay a penny for his family and in particular for his children. The damage will be repaired by the allocation of the sum of EUR 5,000.
*On the pecuniary provision*

22

This measure is governed by French law, not by California law, as claimed by the respondent in his lengthy submissions.

It follows from Articles 270 ff of the Civil Code that one spouse may be required to pay the other a provision to compensate in as far as possible, the disparity that the breakdown of the marriage creates in their respective living conditions. The pecuniary provision is fixed according to the needs of the spouse to whom it is paid and the resources of the other, taking into account the situation at the time of the divorce and its evolution in the foreseeable future. To do this, the judge takes into consideration a number of elements listed in, but not limited to, Article 271(2) of the Civil Code, namely:- The duration of the marriage-    The age and health of spouses- Their qualifications and occupational status

- The consequences of the career choices made by one spouse during the common life for the education of children and the time that must still be devoted to this or to promote the career of his/her husband at the expense of his/her own- The estimated or anticipated assets of the spouses, both capital and income, after the dissolution of the marriage
- Their existing and foreseeable rights
- Their respective situations regarding pension matters, having estimated as much as possible, decreased pension rights that may have been caused to the creditor spouse of the pecuniary provision, by the circumstances described in the sixth paragraph.

The financial situation of the parties is as follows.

Roger MAC DONELL is 54 years old and Sharon HAFNER 52 years.

The marriage took place on October 3, 1992 and the separation occurred on August 4, 2010. Common life in wedlock lasted a little less than 18 years.

The couple had four children. Sharon HAFNER stopped working in 1999 after the birth of the couple's second child. Roger MAC DONELL pays a contribution of EUR 2,000/month per child and children's school fees, which are particularly expensive:-    Lauren has been enrolled in Irving Valley College since the 2016 school year, and the quarterly schooling cost amounts to USD 5,503. He also pays her rent.-

The other three children are attending school for the year 2016/2017 at ISN, a private institutionthey attended before their departure to the US.Having regard to the age of the children (16-20), the financial burden will last much longer for Roger MAC DONELL and may even increase if the younger children undertake long studies.

Sharon HAFNER has no professional activity, and exists only on the alimony from her husband, representing the sum of EUR 30,000/month, that he stopped paying as soon as the divorce was granted. She has filed before the US courts a direct payment procedure for such alimony, allowing her to collect monthly the sum of EUR 7,400.

She has not proved having searched for employment during the period when she lived in the USA (2012/2015) while she holds degrees in marketing and the employment situation in California is not comparable with that in France. Her husband criticized her harshly, accusing her of maintaining her young lover with whom she would lead a sumptuous lifestyle, thanks to the money he pays.On her return to France, she was unable to integrate the family home, enjoyment of which has been awarded to the husband, and sought the intervention of the pretrial counselor so that she can occupy it again. She was nonsuited in this request but appealed the decision of the pretrial counselor on this point. She first rented in Antibes as of September 9, 2015, a villa with 6 rooms and 280m2 for the sum of EUR 4,000. Then, from February 1, 2016, she rented another villa in Cap d'Antibes for the sum of EUR 3,500 until April and then EUR 4,000 in May.

In 1991, Roger MAC DONELL founded a company called CONSORTIUM GROUP INC. that he managed with one David KIGER. In 2007, he sold part of the shares in this company, for the amount of USD 28,246,170. He stopped working and moved to France, the country of his ancestors. He explained that in 2012 he had to return to work in the company Shipping Solutions, which allowed Sharon HAFNER to make a seizure of part of the salaries received from this company.

For 2015, Roger MAC DONELL has declared USD 345,694 to the US administration, including USD 307,500 USD from Shipping Solution, USD 36,000 from CSC/Roger MAC DONELL and USD 2,072 from CGI Franchise System INC. In 2014, Roger MAC DONELL received from this company the sum of USD 2,000,000, which he claimed was the result of a sale of shares in this company, which was strongly contested by the other party, who noted that the money had been transferred from that company, which

23

was inconsistent if it were a sale of shares.In this document (Exhibit 215 of the opposing party), Roger MAC DONELL declares USD 496,800 for alimony (i.e., more than his income).
It should be noted that in the same year, 2015, Roger MAC DONELL filed a different income declaration (exhibit 609), which shows a total income of USD 348,221, but distributed as follows: USD 307,500 + USD 2,527 from Shipping Solution, USD 2,072 from CGI Franchise Systems and USD 36,000 from CSC/Roger MAC DONELL (?). He also declares USD 114,409 under "rental real estate, royalties, partnerships; S Corporation and Trusts ", while in the document submitted by the wife, this amount is less: USD 89,789. The quantum of alimony paid, on the other hand, is the same.
The husband's financial situation is not at all clear, as already noted by the various courts that have considered the matter.
The domiciliation of Roger MAC DONELL is controversial, the respondent claiming to occupy the matrimonial home and renting it out only periodically; Sharon HAFNER claiming that he actually lives in Monaco, where he occupies a two-room flat.
Sharon HAFNER opened in the Charles Schwab establishment a retirement savings an account which totaled USD 85,887 on January 31, 2011 and USD 3,931.94 on September 30, 2014.

The couple owns the following properties:
-    In France and Monaco:
     Real estate located in Juan les Pins: estimated by the husband at USD 1,800,000 or EUR 1,584,000, and by the wife at USD 1,020,000 or EUR 884,000. This second estimate appears low because in 2010, this property appeared in the ISF declaration for EUR 945,000; it was acquired in 2008 for EUR 1,350,000. This property is subject to a mortgageLife insurance (HSBC): USD 426,000 or EUR 374,880
     An account with Crédit du Nord: USD 10,000 or EUR 8,800 Several vehicles and scootersA boat: USD 130,000 or EUR 114,100 A docking ring: EUR 50,000 (in the ISF 2010 declaration)
     In the USA:Real estate in Auburn: declared for USD 2,000,000 or EUR 1,760,000 by the husband and USD 1,500,000 or EUR 1,360,000 by the wife.
Real-estate in Texas, declared for USD 600,000 or EUR 528,000 by the husband. This property is encumbered by a loan of USD 36,288 or EUR 31,036. It is leased and brings an income to Roger MAC DONELL.Accounts opened with AMEGY Bank of Texas, VANGUARD BANK, WELLS FARGO, GRAND RAPIDS Bank holding, according to the husband, USD 1,739,000 or EUR 1,530,320Shares in Shipping Solutions: USD 1,600,000 according to Roger MAC DONELL
Shares in CGI Franchise Systems Inc: USD 600,000 or EUR 528,000 (again according to Roger MAC DONELL)

     In Switzerland
Accounts and a safe deposit box in Saanenbank: frozen since 2010An account at the Dreyfus Bank and a safe deposit locker in which there was gold in February 2010 (Exhibit 17 from Sharon HAFNER): USD 25,000 or EUR 22,000An account in the Maerki Baumann bank: USD 2,175,280 or EUR 1,914,246
A trust for the children: USD 3,760,000 or EUR 3,308,800

Sharon HAFNER also claims that Roger MAC DONELL possesses works of art, since he is one of the collectors of the pictorial work of one Chris Judy, an abstract painter from Texas of some reputation. She also claims that, in 2007, the couple sold their home in California for the sum of USD 1,978,715 and she does not know what happened to this amount.

Sharon HAFNER does not have her own property. The common nature of the couple's assets presented above is partly disputed by Roger MAC DONELL. He produced a letter to that effect from his US counsel *Maître* Paul Vorsatz sent on January 4, 2011 to a magistrate, in which it is explained that the California laws protect the private property of each person. However, properties acquired by the couple during the marriage were the result of the sale of a business entity created by the husband in 1991, i.e. before the

24

marriage. Although the company took another form in 1994, it continued to maintain its character of separate property. The company was sold in 2007 and the full amount paid to Roger MAC DONELL.

Based on this opinion, Roger MAC DONELL considers that only real-estate properties acquired by spouses to be common. Regarding the property in France, uncertainty hangs over their common character: the deed of *Maître* NAOUR dated November 19, 2007 is not well prepared so that it is impossible to know whether all the assets located in France are placed under the universal community, as suggested by the purchase deed for the house dated October 9, 2008, or if it concerns only real estate as shown in the deed of December 29, 2008 signed between the spouses and HSBC. The first interpretation seems to be the one agreed by Roger MAC DONELL, which in his sworn statement is labeled "common property with Mrs. HAFNER" for life insurance contracted with HSBC and Crédit du Nord account and the boat, mooring ring and the scooter.

All these elements highlight the disparity that the breakdown of the marriage will create in the lives of the spouses at the expense of Sharon HAFNER, in terms of income and wealth.

Given the sole assets of the husband as it emerges from reading his claims, the significant period of cohabitation in marriage, and the fact that Sharon HAFNER interrupted her career to care for the couple's four children, and also taking into account the fact that she did not try to find work for more than six years while his children are on the way to being autonomous, and that the presence of the mother is no longer as necessary as before, Sharon HAFNER will be awarded a capital pecuniary provision in the amount of EUR 4 million.

### On the advance on the wife's rights in the dissolution of the marriage

In this respect, Sharon HAFNER requests the sum of EUR 1,047,720 on the grounds that the husband now estimates the common assets in the sum of EUR 2,095,440.

Roger MAC DONELL opposes this claim, arguing that the wife prejudges the sums listed in the community.

As seen above, the consistency of the communal assets and their value are largely unknown at present, the spouses disagreeing on the estimation of common property recognized by both and accounts are to be made between the spouses for all loans paid during the proceedings by Roger MAC DONELL to be compensated in the dissolution of the marriage and for his occupation of the matrimonial home for consideration.I
n the absence of certainty, it does not appear useful to allocate Sharon HAFNER an advance on community assets.

*On freezing the account in SAANEN BANK:*
Roger MAC DONELL argues that the sum frozen since 2010 would not be a sum entering the communal assets.

Even if this analysis is accepted, it must be noted that a French court cannot order the release of sums frozen in a foreign country. This answer had already been given by the court to Roger MAC DONELL in its judgment of October 23, 2012 on the grounds that he did not explain on what basis the French judge would be competent to defeat a precautionary measure ordered by a definitive foreign court for property situated abroad.

### On costs
The divorce being granted on shared faults, each of the spouses shall bear the costs they have each incurred.
Fairness demands the award of EUR 5,000 to Sharon HAFNER for unrecoverable costs, and Roger MAC DONELL being nonsuited in his demand formed for the same reason.
**For these reasons**
The court, ruling in public, *inter partes*, after discussion without the public present

Accepts the appeal

25

Declares that the French courts have jurisdiction to hear the case and the applicable law is French law, except for the part concerning the liquidation of property interests subject to the California primary regime Reverses the decision taken and removes from the proceedings Exhibit 354ter from Roger MAC DONELL

Confirms in addition the rejection of exhibits
Confirms the decision taken on pronunciation of the divorce, the open debates, the dissolution of the marriage, the rejection of the appointment of a notary and the nonsuiting of awarding an advance on community assets
Reverses the postponement of the effects of divorce, the use of the married name, damages and amount of the pecuniary provision

And ruling again on these grounds
Postpones the effects of divorce to August 4, 2010
Rejects the request of Sharon HAFNER to continue using her married name

Orders Sharon HAFNER to pay Roger MAC DONELL the sum of EUR 5,000 in damages on the basis of Article 1382 of the Civil Code

26

Orders Roger Mac Donell to pay Sharon HAFNER a capital pecuniary provision of EUR 4 million
Records that Lauren and Jackson have come of age and that the measures relating to parental authority
with regard to them have become null and void

Declares that Roger MAC DONELL and Sharon HAFNER will jointly exercise parental authority over
their minor children Roger Jr and Taylor

Fixes the habitual residence of the minor children in the home of the mother

Declares that Roger MAC DONELL will exercise his visitation and custody rights as ruled by the pretrial
counselor in his order of January 11, 2016

Fixes the contribution that Roger MAC DONELL must pay to Sharon HAFNER for the maintenance and
education of his four children in the sum of EUR 2000/month per child and if necessary, sentences him to
do so

Declares that the payment and indexation of the contribution will be applied under the conditions
established by the court decree of March 26, 2015.

Declares that Roger MAC DONELL shall pay all the school fees for his children.

Adding,

Roger MAC DONELL is nonsuited in his request to cancel the seizure made on the Saanenbank accounts
Roger MAC DONELL is nonsuited in his application formed on the basis of Article 700 of the Code of
Civil Procedure

Orders Roger MAC DONELL to pay to Sharon HAFNER the sum of EUR 5,000 in respect of
irrecoverable costs

Leaves Roger MAC DONELL and Sharon HAFNER to bear the costs incurred by each of them, those of
First Instance remaining divided as stated in the judgment.

**The Clerk of the Court**                              **The Presiding Judge**

**EXHIBIT E**

FL-340

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| COURT PREPARED | |

**Superior Court of California**
**County of San Mateo**
TELEPHONE NO.:   JC County Center
E-MAIL ADDRESS (Optional): Red. ood City, CA 84063-1656
ATTORNEY FOR (Name):

**ENDORSED FILED**
**SAN MATEO COUNTY**

JUL 2 8 2016

Clerk of the Superior Court
By _____ G. Thompson
DEPUTY CLERK

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN MATEO
STREET ADDRESS: 400 COUNTY CENTER
MAILING ADDRESS:
CITY AND ZIP CODE: REDWOOD-CITY, CA 94404
BRANCH NAME:

PETITIONER/PLAINTIFF: SHARON MACDONELL

RESPONDENT/DEFENDANT: ROGER MACDONELL

OTHER PARTY:

| FINDINGS AND ORDER AFTER HEARING | CASE NUMBER: F 0128164 |
|---|---|

1. This proceeding was heard
on (date): JULY 20, 2016   at (time): 9:00 AM   in Dept.: 15   Room:
by Judge (name): DON FRANCHI   ☐ Temporary Judge
On the order to show cause, notice of motion or request for order filed (date): 4/20/2016 by (name): RESPONDENT, ROGER MACDONELL
a. ☒ Petitioner/plaintiff present   ☒ Attorney present (name): CHRISTINE TOUR-SARKISSIAN
b. ☐ Respondent/defendant present   ☒ Attorney present (name): PAUL VORSATZ
c. ☐ Other party present   ☒ Attorney present (name): ABIGAIL MORRIS, FOR PETITIONER

**THE COURT ORDERS**

2. Custody and visitation/parenting time:   As attached ☐   on form FL-341 ☐   Other ☐   Not applicable ☒
3. Child support:   As attached ☐   on form FL-342 ☐   Other ☐   Not applicable ☒
4. Spousal or family support:   As attached ☐   on form FL-343 ☐   Other ☐   Not applicable ☒
5. Property orders:   As attached ☐   on form FL-344 ☐   Other ☐   Not applicable ☒
6. Attorney's fees:   As attached ☐   on form FL-346 ☐   Other ☒   Not applicable ☐
7. Other orders:   As attached ☒   Not applicable ☐
8. All other issues are reserved until further order of court.
9. ☐ This matter is continued for further hearing on (date):   at (time):   in Dept.:
on the following issues:

Date: 7/27/16

JUDICIAL OFFICER

Approved as conforming to court order.

► _____
SIGNATURE OF ATTORNEY FOR ☐ PETITIONER / PLAINTIFF ☐ RESPONDENT/DEFENDANT ☐ OTHER PARTY

Form Adopted for Mandatory Use
Judicial Council of California
FL-340 [Rev. January 1, 2012]

**FINDINGS AND ORDER AFTER HEARING**
(Family Law—Custody and Support—Uniform Parentage

S.APP_117

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| IRMO MACDONELL, SHARON AND ROGER | F 012 B164 |

1 This matter came before the Court on July
2 28, 2016 for a long cause hearing. After
3 review of the pleadings and consideration
4 of the arguments of counsel, the Court makes
5 the following orders:
6
7 ① Respondent's Request for Order to quash
8 service of the Deposition Subpoena for Production
9 of Business Records on Shipping Solutions, LP
10 IS DENIED. Shipping Solutions, LP shall produce
11 all requested records within 15 days of being
12 served with this order.
13
14 ② Respondent's Request for Order to vacate the
15 Court's prior orders of June 30, 2015 and
16 February 26, 2016 is DENIED with prejudice.
17
18 ③ Respondent's Request for Order to ~~dismiss~~
19 dismiss the present action is DENIED
20 with prejudice.
21
22 ④ Respondent shall produce a complete
23 Income and Expense Declaration to Petitioner's
24 counsel within 30 days of this order.
25
26 (Required for verified pleading) The items on this page stated on information and belief are (specify item numbers):
27 This page may be used with any Judicial Council form or any other paper filed with the court.

Form Approved by the
Judicial Council of California
MC-020 [New January 1, 1987]

ADDITIONAL PAGE
Attach to Judicial Council Form or Other Court Paper

SHORT TITLE:

IRMO MACDONELL, SHARON AND ROGER

CASE NUMBER: F 0281164

(5) Respondent shall produce complete copies
of his 2014 and 2015 tax returns as
filed with the IRS. Such production
shall include "all" documents filed with the
IRS, and shall sign a declaration verifying such.
A scanned signature is OK
. Such production shall occur within 15
days of this order. If petitioner claims any
documents are missing from this production,
petitioner shall provide a list of the missing
documents to Respondent's counsel and Respondent
shall produce such documents forthwith, or
a declaration stating they were not precluded.

(6) Respondent is ordered to pay sanctions in
the amount of $10,000 to petitioner's attorney
under Family Code s. 271 for his misconduct
as related to the bringing of his Request for
Order referenced herein.

(7) Respondent's request for attorney fees associated
with the Requests for Order referenced herein
is denied.

(8) All other orders not in conflict remain in full force
and effect.

(Required for verified pleading) The items on this page stated on information and belief are (specify item numbers):

This page may be used with any Judicial Council form or any other paper filed with the court.

Form Approved by the
Judicial Council of California's
MC-020 [Rev. January 1, 1987]

ADDITIONAL PAGE
Attach to Judicial Council Form or Other Court Paper

**EXHIBIT F**

# ORDONNANCE

Nous, Marie Laure GUEMAS, première vice-présidente au tribunal de grande instance de GRASSE,

Vu la requête présentée par Sharon HAFNER, au visa des articles L 511-1 et suivants, L521-1, R 521-1, R 522-1 et R 525-1 et suivants du Code des procédures civiles d'exécution, tendant à être autorisée à pratiquer une saisie conservatoire sur l'ensemble des sommes dues ou appartenant à Monsieur MACDONELL et conservées directement ou indirectement par les sociétés CGI FRANCHISE SYSTEMS Inc. et WWEX UNI TopCo Holdings LLC, quelle que soit la forme sous laquelle elles sont détenues, ainsi que toutes les actions, parts sociales, distributions détenues pour le compte et/ou appartenant à Monsieur Roger MACDONELL, directement ou indirectement, à hauteur de la somme de 10.050.000 dollars US, soit 8.600.000 euros ;

Aux termes de l'article L 511-1 du code des procédures civiles d'exécution « toute personne dont la créance paraît fondée en son principe peut solliciter du juge l'autorisation de pratiquer une mesure conservatoire sur les biens de son débiteur, sans commandement préalable, si elle justifie de circonstances susceptibles d'en menacer le recouvrement.
La mesure prend la forme d'une saisie conservatoire ou d'une sûreté judiciaire ».

Alors même que Sharon HAFNER justifierait d'une créance fondée en son principe s'agissant de ses droits dans la liquidation, selon le droit californien, de la communauté ayant existé entre elle et Roger MACDONELL, en l'occurrence au titre des participations et sommes détenues directement et indirectement dans la société CGI FRANCHISE SYSTEMS Inc., société de droit américain créée après le mariage des époux MACDONELL/ HAFNER et de circonstances susceptibles d'en menacer le recouvrement, le juge de l'exécution du tribunal de grande instance de Grasse n'est pas compétent pour ordonner une mesure d'exécution, même conservatoire, sur des biens situés à l'étranger.

Les biens sur lesquels elle entend faire pratiquer une saisie conservatoire sont situés à l'étranger (Etat du Texas).

Aux termes d'une jurisprudence constante de la Cour de cassation *« les procédures conservatoires ou d'exécution relèvent des lois de l'état où ces procédures sont diligentées, même si d'autres juridictions sont internationalement compétentes sur statuer sur le fond. »*

Elle considère qu'« *en vertu du principe de l'indépendance et de la souveraineté respective des Etats, le juge français ne peut, sauf convention internationale ou législation communautaire l'y autorisant, ordonner ou autoriser une mesures d'exécution, forcée ou conservatoire, devant être accomplie dans un Etat étranger.* » (Cass. 2ème chambre civile 21 janvier 2016 – n°15-10.193).

Or, il n'existe aucune convention internationale entre la France et les USA autorisant le juge français à autoriser une mesure conservatoire qui devrait être accomplie sur le territoire américain.

En conséquence, le juge français est territorialement incompétent pour autoriser Madame HAFNER à faire pratiquer une mesure conservatoire permettant de saisir l'ensemble des sommes due ou appartenant à Monsieur MACDONELL et conservées directement ou indirectement par les sociétés CGI FRANCHISE SYSTEMS Inc. et WWEX UNI TopCo Holdings LLC, directement ou indirectement, et ce, même si les juridictions françaises sont compétentes pour connaître de la procédure au fond, en l'espèce, la procédure de liquidation de la communauté ayant existé entre Monsieur MACDONELL et Madame HAFNER.

Il convient par conséquent de se déclarer incompétent territorialement et de rejeter la requête.

REJETONS la requête présentée.

A GRASSE le 30 juillet 2018

LA PREMIÈRE VICE-PRÉSIDENTE

M.L GUEMAS

# EXHIBIT G

# ORDER

We, Marie Laure GUEMAS, First Vice President of the Superior Court of *Grasse,*

In view of the petition submitted by Sharon HAFNER, in accordance with Articles L 511-1 and following, L 521-1, R 521-1, R 522-1 and R 525-1 and following of the Code of Civil Enforcement Procedures, whereby she would be authorized to carry out a protective seizure on all of the amounts due or belonging to Mr. MACDONELL and kept directly or indirectly by the companies CGI Franchise Systems, Inc. and WWEX UNI Topco Holdings LLC, regardless of the way in which they are held, as well as all securities, shares and distributions held on behalf of Mr. Roger MACDONELL and/or belonging to him, directly or indirectly, up to an amount of US $10,050,000, i.e., 8,600,000 Euros;

In accordance with Article L 511-1 of the Code of Civil Enforcement Procedures, "any individual whose monetary claim seems theoretically legitimate may request from the Judge an authorization to carry out a protective measure on the property of his/her debtor, without any prior order, if he/she can prove the existence of circumstances likely to threaten its collection. The measure takes the shape of a protective seizure or a legal guarantee."

Even if Sharon MACDONELL were to prove the existence of a theoretically legitimate monetary claim with regard to her right, in accordance with California law, to liquidate the joint estate that existed between her and Roger MACDONELL, in the present case involving participations and amounts held, directly and indirectly, in CGI Franchise Systems, Inc., which is a company subject to American law created after the marriage of the spouses MACDONELL/HAFNER, and also if she were to prove circumstances likely to threaten their collection, the enforcement Judge for the Superior Court of *Grasse* would not be authorized to order an enforcement measure, or even a protective measure, on property located abroad.

The property on which she intends to carry out a protective seizure is located abroad (State of Texas).

In accordance with an unbroken line of precedents from the Supreme Court of Appeals, *"the protective or enforcement procedures are subject to the laws of the country in which these procedures are initiated, even if other jurisdictions are internationally entitled to rule on the merits."*

It considers that ***"by virtue of the respective independence principle and the sovereignty of nations, a French Judge cannot,*** except if an international agreement or community legislation authorizes him/her to do so, ***order or authorize an enforcement measure, either compulsory or protective, to be fulfilled in a foreign country."*** (Supreme Court of Appeals, 2nd Civil Chamber, January 21, 2016 - no. 15-10.193).

In fact, no international agreement exists between France and the U.S.A. that would entitle the French Judge to authorize a protective measure to be carried out in the American territory.

Therefore, the French Judge does not have territorial jurisdiction to authorize Mrs. HAFNER to carry out a protective measure that would allow all amounts due or belonging to Mr. MACDONELL, and kept directly or indirectly by the companies CGI Franchise Systems, Inc. and WWEX UNI Topco Holdings LLC, to be seized, and this even if the French jurisdictions have the capacity to act regarding the procedure on the merits, in this case, the liquidation procedure of the joint estate that existed between Mr. MACDONELL and Mrs. HAFNER.

It is proper to declare that we do not have territorial jurisdiction and to dismiss the petition.

WE DISMISS the petition that was submitted.


IN *GRASSE*, on **July 30, 2018**

THE FIRST VICE PRESIDENT

[Signed (illegibly) by M. L. GUEMAS
next to the official stamp of the
Superior Court of *Grasse*]

**EXHIBIT H**

Me BROSSON Julien
Me LOANOF Nicolas,
Me DJIAN Rémy
M. MACDONELL par LRAR

**TRIBUNAL JUDICIAIRE DE GRASSE**
37 Avenue Pierre Semard
06133 GRASSE CEDEX

GRASSE, le **11 février 2021**

**JUGE AUX AFFAIRES FAMILIALES**
4 ème chambre Cabinet C

**AFFAIRE** : **Sharon HAFNER divorcée MACDONELL C/ Roger MACDONELL**

**N° ROLE** : N° RG 18/00324 - N° Portalis DBWQ-W-B7C-MVNM

ORDONNANCE D'INJONCTION

Nous, Sophie Bazureault, juge commis ,

Vu le jugement N° 2020/05 en date du 27 janvier 2020 (RG 18/00324) ayant
notamment ordonné l'ouverture des opérations de comptes, liquidation et partage
des intérêts patrimoniaux de Sharon HAFNER divorcée MACDONELL et Roger
MACDONELL et ayant renvoyé les parties devant Maître Rémy DJIAN pour y
procéder,

Vu le procès-verbal de difficultés en date du 8 juillet 2020 mentionnant que le
notaire a requis les parties d'avoir à lui communiquer tous les éléments visés ci-
dessus dans leurs dires ainsi que tous les éléments d'actif et de passif nécessaires
à la liquidation du régime matrimonial avec leur valorisation au plus tard le 27
aout ,
Vu le courrier de Maitre DJIAN en date du 3 novembre 2020 nous informant ne
pas être en possession des différents documents sollicités auprès de monsieur
Roger MACDONELL,
Vu le courrier de Maitre BROCQUET en date du 10 décembre 2020,
Vu l'absence de réponse à notre courrier en date du 14 décembre 2020 ,

Attendu qu'il ressort de l'article 1365 du code de procédure civile que le notaire
rend compte au juge commis des difficultés rencontrées et peut solliciter de lui
toute mesure de nature à faciliter le déroulement de sa mission, que l'article 1371
du code de procédure civile dispose que le juge commis veille au bon déroulement
des opérations de partage et peut adresser des injonctions aux parties ,et prononcer
des astreintes ,

Qu'il y a donc lieu de faire injonction à Roger MACDONELL de produire les
pièces suivantes:

Titres de propriété
-statuts des sociétés
-relevés des comptes bancaires à une date récente
-évaluations des biens à partager, en ce compris ceux situés à l'étranger
-tableaux d'amortissement des emprunts éventuels
-baux qui auraient pu être consentis sur les biens immobiliers
-Toutes les déclarations fiscales fédérales et d'Etats entre 2010 et aujourd'hui, y
compris les rapports de comptes bancaires et financiers étrangers (FBAR).
-Les relevés de comptes bancaires au 4 août 2010 de : SAANEN, de DREYFUS, de
MAERKI, de VANGUARD, de GRAND RAPIDS Bank, de AMEGY et les
justificatifs du contenu de tous les coffres forts afférents à ces banques.
-Pour SHIPPING SOLUTION, copie du compte bancaire où se trouve le produit de la
vente de SHIPPING SOLUTION

aujourd'hui.
-relevés des sociétés de SHIPPING SOLUTION et de CGI
et ce sous astreinte de 100 euros par jour de retard, qui courra passé le délai de
30 jours après la notification de la présente ordonnance.

## PAR CES MOTIFS

Ordonnons à Roger MACDONELL de produire les pièces suivantes:

Titres de propriété
-statuts des sociétés
-relevés des comptes bancaires à une date récente
-évaluations des biens à partager, en ce compris ceux situés à l'étranger
-tableaux d'amortissement des emprunts éventuels
-baux qui auraient pu être consentis sur les biens immobiliers
-Toutes les déclarations fiscales fédérales et d'Etats entre 2010 et aujourd'hui, y
compris les rapports de comptes bancaires et financiers étrangers (FBAR).
-Les relevés de comptes bancaires au 4 août 2010 de : SAANEN, de DREYFUS, de
MAERKI, de VANGUARD, de GRAND RAPIDS Bank, de AMEGY et les
justificatifs du contenu de tous les coffres forts afférents à ces banques.
-Pour SHIPPING SOLUTION, copie du compte bancaire où se trouve le produit de la
vente de SHIPPING SOLUTION
-tout relevé bancaire des comptes de WELLS FARGO entre le 1ᵉʳ octobre 2018 et
aujourd'hui.
-relevés des sociétés de SHIPPING SOLUTION et de CGI
et ce sous astreinte de 100 euros par jour de retard, qui courra passé le délai de
30 jours après la notification de la présente ordonnance.

Fait en notre Cabinet à Grasse le 11 février 2021

LE JUGE COMMIS



# EXHIBIT I

# BAY AREA INTERNATIONAL TRANSLATION SERVICES

*Bay Area International Translation Services*
*46921 Warm Springs Blvd, Suite #101*
*Fremont, CA 94539*
*Tel: (510) 673-8912*
*Fax (510) 225-0136*
*Email: info@docstranslate.com*
*www.docstranslate.com*



Translation from the original in French

TRANSLATION CERTIFICATION FOR THE ATTACHED DOCUMENT

I, Meghan O'Shea, hereby declare and certify that I am fluent in French and English languages and competent to translate from French into English language. I have completely and accurately translated the attached document. This translation was prepared in accordance with the U.S Regulation 8 *CFR 103.2 (b) (3)*

Title or description of document: ORDER OF INJUCTION

Signature of translator: *Meghan O'Shea*

Name of translator: Meghan O'Shea

Address: 46921 Warm Springs Blvd, Suite #101
Fremont, CA 94539

BAY AREA INTERNATIONAL TRANSLATION SERVICES
46921 Warm Springs Blvd, Suite #101
Fremont, Ca 94539
(510) 673-0136 * FAX (510) 225-0136

Telephone: (510) 673-8912

Date:    04/12/2021

*Attorney BROSSON Julien*
*Attorney LUCIANI Alain*         COURT OF APPEAL FOR AIX-EN-PROVENCE
*Attorney DJIAN Rémy*
*Mr. MACDONELL via LRAR*
                                    COURT OF GRASSE
                        37 Avenue Pierre Semard 06133 GRASSE CEDEX

                                              GRASSE, February 18, 2021

FAMILY AFFAIRS Judge, 4th Courtroom, Chambers C

                                              Attorney BROCQUET
                                              Attorney BOSC

CASE: Sharon MACDONELL nee HAFNER v. Roger MACDONELL
REFERENCE: Case No. 18/00324 - Portalis No. DBWO-W-B7C-MVNM

                          ORDER OF INJUNCTION

We, Sophie Bazureault, the Presiding Judge,

Pursuant to Order No. 2020/05 dated January 27, 2020 (RG 18/00324), which, in particular,
ordered the liquidation and division of the jointly held financial interests of Sharon HAFNER f/k/a
MACDONELL and Roger MACDONELL to be commenced, and the parties referred to Attorney
Rémy DJIAN for said purposes,

Pursuant to the report, dated July 8, 2020, regarding the difficulties which have been encountered
by the notary in response to his request that the parties, prior to August 27, disclose information
pertaining to the items included in their declarations as well as information regarding all assets
and liabilities necessary for the valuation and liquidation of the matrimonial property;

Pursuant to the correspondence from Attorney DJIAN dated November 3, 2020 informing us that
he is not in possession of the various documents requested from Mr. Roger MACDONELL;

Pursuant to the correspondence from Attorney BROCQUET, dated December 10, 2020;

Pursuant to the absence of a response to our correspondence dated December 14, 2020,

Pursuant to Article 1365 of the Code of Civil Procedure which states that the notary shall report
to the presiding Judge any difficulties encountered and may request from the Court any remedy
likely to facilitate the progress of the said mission;

Pursuant to Article 1371 of the Code of Civil Procedure which states that the presiding Judge shall
ensure the smooth running of the dissolution of the joint assets and may enter orders and/or
penalties against the parties to this end;

It is therefore necessary to order Roger MACDONELL to produce the following documents:



Property deeds;

- Corporate articles of association/incorporation;

- Recent bank statements;

- Valuations of jointly held property to be divided, including property located abroad;

- Amortization schedules for any loans;

- Leases that may have been taken out on any of the said property;

- All federal and state tax returns from 2010 to present, including foreign bank and financial account reports (FBARs);

- Bank statements as of 4 August 2010 from: SAANEN, DREYFUS, MAERKI, VANGUARD, GRAND RAPIDS Bank, AMEGY and proof of the contents of all safe deposit boxes maintained by these banks;

- For SHIPPING SOLUTION, a copy of the bank account(s) in which the proceeds of the sale of SHIPPING SOLUTION are held;

- Any bank statement for any WELLS FARGO account dated October 1, 2018 to the current date. -SHIPPING SOLUTION and CGI company records;

These documents shall be produced within 30 days of the notification of this order pursuant to a penalty of 100 euros per day of delay after said deadline.

## FOR THESE REASONS

Roger MACDONELL is hereby ordered to produce the following documents:

Property deeds;

- Corporate articles of association/incorporation;

- Recent bank statements;

- Valuations of jointly held property to be divided, including property located abroad;

- Amortization schedules for any loans;

- Leases that may have been taken out on any of the said property;

- All federal and state tax returns from 2010 to present, including foreign bank and financial account reports (FBARs);

-Bank statements as of 4 August 2010 from: SAANEN, DREYFUS, MAERKI, VANGUARD, GRAND RAPIDS Bank, AMEGY and proof of the contents of all safe deposit boxes maintained by these banks;

- For SHIPPING SOLUTION, copies of the banking records for the account win which the proceeds from the sale of SHIPPING SOLUTION are maintained;

- Any bank statement for any WELLS FARGO accounts October 1, 2018 to the current date;

- SHIPPING SOLUTION and CGI company records;

These documents shall be produced within 30 days of the notification of this order pursuant to a



penalty of 100 euros per day of delay after said deadline.

Entered in our Chambers in Grasse on February 11, 2021

PRESIDING JUDGE

[Signature]
[Round Seal/Stamp: COURT OF GRASSE
[Image]
ALPES-MARITIMES ]

